No. 2026-1817

# United States Court of Appeals
# For the Federal Circuit

**GEM PRODUCTS, LLC**,
*Plaintiff-Appellant,*

v.

**RUPP MARINE, INC.**,
*Defendant-Appellee.*

Appeal from
The United States District Court for the Southern District of Florida,
Case No. 2:25-cv-14047-DMM,
Hon. Donald M. Middlebrooks

## OPENING BRIEF FOR
## PLAINTIFF-APPELLANT GEM PRODUCTS, LLC

Joseph R. Lanser
  *Principal Counsel*
Jaimin H. Shah
TAFT STETTINIUS & HOLLISTER, LLP
111 East Wacker Dr., Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
jlanser@taftlaw.com

Charles D. Pfister
TAFT STETTINIUS & HOLLISTER, LLP
40 N. Main St., Suite 1700
Dayton, OH 45423
Telephone: (937) 641-2071

Alex M. Mathews
TAFT STETTINIUS & HOLLISTER, LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Telephone: (317) 713-3500

*Counsel for Plaintiff-Appellant GEM Products, LLC*

<u>**EXEMPLARY PATENT CLAIMS**</u>

<u>**U.S. Patent No. 8,656,632, Claim 1**</u> (reexamined; reexamination additions in underlined italics, deletions crossed-out):

A line management system for a surface vessel, comprising:

[a]     an outrigger structure;

[b]     a plurality of outrigger cords;

[c]     a plurality of cord management units coupled to the outrigger structure, said cord management units being longitudinally spaced one from the other along the outrigger structure, *<u>each of said cord management units including a housing secured by at least one fastener against displacement relative to the outrigger structure</u>,* each of said cord management units defining *<u>and maintaining</u>* a plurality of cord passages transversely offset one from the other, said cord passages respectively guiding predetermined ones of said outrigger cords to extend substantially in parallel to the outrigger structure ~~so as to extend~~*,* *<u>said outrigger cords thereby extending</u>* through respective ones of said cord passages of at least two of said plurality of cord management units and ~~remain~~ *remaining* independently displaceable longitudinally relative to the outrigger structure; and

[d]     a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords, each of said retention devices defining a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

<u>**U.S. Patent No. 9,392,778, Claim 1:**</u>

A method of managing outrigger cords for a surface vessel having an outrigger structure, comprising:

[a]     establishing a plurality of outrigger cords;

[b]     establishing a plurality of cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure;

[c]     defining at each of said cord management positions within the portion of the outrigger structure a plurality of cord passages transversely offset one from the other, said cord passages respectively guiding predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, and retaining said cord management positions such that the cord passages extend at fixed angular orientations relative to the outrigger structure;

[d]     arranging said cord management positions along the portion of the outrigger structure with consecutive cord management positions within the portion of the outrigger structure respectively guiding a progressively decreasing number of outrigger cords; and,

[e]     establishing a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

## U.S. Patent No. 9,717,226, Claim 1:

An outrigger cord management system for a surface vessel having an outrigger structure, comprising:

[a]     a plurality of outrigger cords;

[b]     a plurality of cord management units disposed at respective cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure, each of said cord management units defining at least one cord passage;

[c]     at least one of said cord management units within the outrigger structure portion defining a plurality of cord passages transversely offset one from the other, wherein said cord passages respectively guide predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, said at least one cord management unit retaining the cord passages thereof to extend at fixed angular orientations relative to the outrigger structure;

[d]     said cord management units disposed along the outrigger structure portion cooperatively defining consecutive cord management positions

respectively guiding a progressively decreasing number of outrigger cords; and,

[e]     a plurality of retention devices each coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

## U.S. Patent No. 11,589,566, Claim 1:

An outrigger cord management apparatus for guiding a plurality of outrigger cords along a longitudinally extended outrigger structure of a surface vessel, the outrigger cords each having coupled thereto at least one retention device, each of said at least one retention device defining a retention point for a line advanced along the outrigger structure responsive to displacement of each of the outrigger cords thereof, the outrigger cord management apparatus comprising:

[a]     at least one outrigger structure extending beyond a surface vessel,

[b]     a plurality of outrigger cords,

[c]     a plurality of cord management units coupled to said at least one outrigger structure in a spaced apart relationship with one another,

[d]     a pivot unit attached to said surface vessel in a spaced relationship with said at least one outrigger structure, each of said outrigger cords being operatively coupled between said pivot unit and at least one respective cord management unit of said plurality of cord management units and forming a cord endless loop configuration, and a plurality of lines, wherein each of said plurality of lines is removably attached, at one end thereof, to the retention point of a respective said at least one retention device coupled to a respective outrigger cord of said plurality of outrigger cords, wherein a position of said each of said plurality of lines is controlled by displacing the retention point of the respective said at least one retention device longitudinally along said at least one outrigger structure responsive to a controlled displacement of said respective outrigger cord, and wherein said at least one respective cord management unit includes:

[e]     a housing portion;

[f]     a releasable fastening portion coupled to said housing portion, said releasable fastening portion being configured to fixedly mount said housing portion intermediately along said at least one outrigger structure extending beyond a surface vessel to thereby extend said housing portion laterally from said at least one outrigger structure; and

[g]     a rotatable portion rotatably coupled to said housing portion, said rotatable portion defining a plurality of cord passages transversely offset one from the other and configured for respectively independently guiding said each of said plurality of outrigger cords longitudinally along said at least one outrigger structure when said housing portion is mounted thereto;

[h]     wherein said housing and rotatable portions are configured to maintain the cord passages about a common axis fixed in angle relative to said at least one outrigger structure when said housing portion is mounted thereto by said releasable fastening portion, and

[i]     wherein said rotatable portion is configured to enable said plurality of outrigger cords to be independently and simultaneously controlled for displacement without undue interference of any one of said plurality of outrigger cords with other of said plurality of outrigger cords.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1817

**Short Case Caption** GEM Products, LLC v. Rupp Marine, Inc.

**Filing Party/Entity** GEM Products, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/13/2026          Signature: /s/ Joseph R. Lanser

                          Name: Joseph R. Lanser

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| GEM Products, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable        ☑   Additional pages attached

| | | |
|---|---|---|
| Taft, Stettinius & Hollister, LLP | Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A. | Raines Legal |
| Gregory Scott Weiss | Joseph R. Lanser | Alex M. Matthews |
| Jaimin Hemendra Shah | Wasch Raines LLP | Elizabeth Jimenez |

**5. Related Cases.**   Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable        ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives (Cont'd)**

Alan L. Raines

Thomas E. Bejin

William K. Broman

Charles D. Pfister

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................................1

JURISDICTIONAL STATEMENT ....................................................................2

STATEMENT OF THE ISSUES.........................................................................3

I.    STATEMENT OF THE CASE ...................................................................4

   A.  The Patented Invention ...................................................................4

   B.  The District Court Litigation .........................................................11

II.   SUMMARY OF THE ARGUMENT ........................................................16

III.  STANDARD OF REVIEW.......................................................................19

IV.   ARGUMENT............................................................................................22

   A.  The District Court's Noninfringement Findings were Wrong ......22

   B.  The District Court Failed to Address Entire Categories
       of Rupp's Pulley Clusters at Issue in this Case ...........................31

      i.   Rupp's Pulley Clusters without Stems...................................32

      ii.  Rupp's Pulley Clusters with Tight Stem.................................36

   C.  The District Court Ignored Disputed Issues of Material Facts
       Relating to Infringement..............................................................41

   D.  The District Court's "Substantial Noninfringing Use"
       Findings were Legally Wrong and Unsupported by the Evidence ........52

      i.   The District Court Failed to Apply the Correct Law ...............54

      ii.  The District Court Ignored the Evidence ................................58

      iii. District Court's "Substantial Noninfringing Use" does not Exist ............64

E.   The District Court's Finding of no Induced Infringement under 35 U.S.C. § 271(b) was Legally Wrong..........................................69

V.     CONCLUSION.................................................................................72

# TABLE OF AUTHORITIES

**Cases**

*Air Turbine Tech., Inc. v. Atlas Copco AB*,
410 F.3d 701 (Fed. Cir. 2005) ...................................................................45

*Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336 (Fed. Cir. 2002) ....................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................21

*Baron Servs., Inc. v. Media Weather Innovs. LLC*,
717 F.3d 907 (Fed. Cir. 2013) ...................................................................22

*Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*,
998 F.3d 1320 (Fed. Cir. 2021) ..................................................... 53, 66, 69

*C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*,
911 F.2d 670 (Fed. Cir. 1990) ...................................................................53

*Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370 (11th Cir. 1982) ......................20

*Ellis v. England*, 432 F.3d 1321 (11th Cir. 2005).......................................... 46, 49

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
909 F.3d 398 (Fed. Cir. 2018) ...................................................................70

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312 (Fed. Cir. 2015)......20

*FCOA LLC v. Foremost Title & Escrow Servs. LLC*,
57 F.4th 939 (11th Cir. 2023) ...................................................................21

*Feliciano v. City of Miami Beach*, 707 F.3d 1244 (11th Cir. 2013).......................21

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010)................................68

*Gemtron Corp. v. Saint-Gobain Corp.*,
572 F.3d 1371 (Fed. Cir. 2009) .......................................................... 34, 39

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
 438 F.3d 1354 (Fed. Cir. 2006) ......................................................65

*Grayson v. Warden, Comm'r, Ala. Doc*,
 869 F.3d 1204 (11th Cir. 2017) .....................................................21

*Grunenthal GmbH v. Alkem Labs. Ltd.*,
 919 F.3d 1333 (Fed. Cir. 2019) ......................................................68

*Hodosh v. Block Drug Co.*, 833 F.2d 1575 (Fed. Cir. 1987)........................... 55, 57

*HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685 (Fed. Cir. 2020) ....................44

*i4i Limited P'ship v. Microsoft Corp.*,
 598 F.3d 831 (Fed. Cir. 2010) ........................................................67

*ISCO Int'l, Inc. v. Conductus, Inc.*,
 279 F. Supp. 2d 489 (D. Del. 2003) ................................................41

*L&W, Inc. v. Shertech, Inc.*, 471 F.3d 1311 (Fed. Cir. 2006)........................... 32, 41

*Laitram Corp. v. Cambridge Wire Cloth Co.*,
 919 F.2d 1579 (Fed. Cir. 1990) ......................................................49

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002)................................................20

*Lucent Technologies, Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009) ......................................................56

*Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369 (Fed. Cir. 2004) ...........................22

*Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014) ......................69

*Mid-Continent Cas. Co. v. Basdeo*,
 742 F. Supp. 2d 1293 (S.D. Fla. 2010)....................................... 20, 21

*NeuroGrafix v. Brainlab, Inc.*, 787 F. App'x 710 (Fed. Cir. 2019) .....................50

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*,
467 F.3d 1355 (Fed. Cir. 2006) ...................................................... 19, 22

*OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*,
701 F.3d 698 (Fed. Cir. 2012) ...................................................... 24, 31

*Pandrol U.S.A., LP v. Airboss Ry. Prods., Inc.*,
424 F.3d 1161 (Fed. Cir. 2005) ...........................................................45

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016) .................................................... 70, 71

*Ricoh Co. v. Quanta Computer Inc.,* 550 F.3d 1325 (Fed. Cir. 2008),
*cert. denied*, 557 U.S. 936, (2009) ......................................... 55, 58

*Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246 (Fed. Cir. 2000) .................49

*Sandstrom v. Int'l Trade Comm'n*, No. 2025-1269,
2026 WL 71399 (Fed. Cir. Jan. 9, 2026)........................................39

*Skop v. City of Atlanta,* 485 F.3d 1130 (11th Cir. 2007) .........................................21

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
550 F.3d 1356 (Fed. Cir. 2008) .................................................... 44, 48

*Sunrise of Coral Gables Propco, LLC v. Current Builders, Inc.*,
No. 1:22-CV-21456, 2023 WL 6638050 (S.D. Fla. Oct. 12, 2023)..............46

*TechSearch, L.L.C. v. Intel. Corp.,* 286 F.3d 1360 (Fed. Cir. 2002).......................46

*Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015) ...........................20

*Toshiba Corp. v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012) .................................................... 47, 59, 67

*United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*,
894 F.2d 1555 (Fed. Cir. 1990) .................................................................40

*United States v. Stein*, 881 F.3d 853 (11th Cir. 2018) (*en banc*)......................43, 47

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
782 F.3d 671 (Fed. Cir. 2015) ....................................................................19

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)....................30

*Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008) ............................................24

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006) ..................................................................27

*Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114 (11th Cir. 2022)......................19, 20

**Statutes**

28 U.S.C. § 1295(a)(1)................................................................................................2

28 U.S.C. § 1331 ........................................................................................................2

28 U.S.C. § 1338(a) ...................................................................................................2

35 U.S.C. § 102 ........................................................................................................12

35 U.S.C. § 103 ........................................................................................................12

35 U.S.C. § 112 ........................................................................................................12

35 U.S.C. § 271(b) ........................................................................................11, 19, 75

35 U.S.C. § 271(c) .............................................................................................*passim*

**Federal Rules**

Fed. Cir. R. 47.5 ..................................................................................................1

Fed. R. App. P. 4(a)(1)(A) ....................................................................................2

Fed. R. Civ. P. 26(a)(2) ......................................................................................45

Fed. R. Civ. P. 56 .......................................................................................... 12, 20

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, Appellant, GEM Products, LLC, states there are no cases from the same civil action or the same proceedings in the lower court that are before this or any other appellate court.

# <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). The district court entered a Final Judgment on May 4, 2026, pursuant to Federal Rule of Civil Procedure 58, disposing of all claims pursuant to the February 5, 2026 Summary Judgment Order finding noninfringement in favor of Appellee, Rupp Marine, Inc., and the district court dismissed Rupp Marine, Inc.'s invalidity counterclaims, without prejudice, pursuant to the Parties' joint motion. Appx1. GEM Products, LLC timely filed a Notice of Appeal within 30 days, pursuant to Fed. R. App. P. 4(a)(1)(A), on May 5, 2026. Appx7534. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in granting summary judgment of noninfringement in favor of Appellee, without construing any disputed claim term, while finding prosecution disclaimer without proper analysis and resting its decision on limitations not included in any claim of the '632 Patent;

2. Whether there are genuine issues of material fact that Appellee's accused products, including distinct categories of Appellee's accused products not considered by the district court, cause Appellee to contributorily infringe and induce others to infringe, precluding summary judgment in Appellee's favor; and

3. Whether there are genuine issues of material fact that Appellee's accused products are not a staple article or commodity of commerce suitable for substantial noninfringing use under 35 U.S.C. § 271(c), precluding summary judgment in Appellee's favor.

# I. STATEMENT OF THE CASE

## A. The Patented Invention

Mr. Craig Mercier was a recreational fisherman who occasionally fished off-shore of the Northeast Coast. As with many recreational fisherman, Mr. Mercier used outrigger systems on his boat to maximize the fishing experience. "Outrigger structures are used on surface vessels to extend the lateral reach of the vessel for various purposes." Appx60 (1:12-13). FIGs. 1 and 2 of the Asserted Patents exemplify a boat with an outrigger fishing system:



FIG.1

FIG.2

FIG.2A

Appx54-55.

With reference to FIGs. 1 and 2, outrigger systems include:

(i) an outrigger structure (10) that extends laterally from a boat (5);

(ii) multiple outrigger cords (aka halyard lines) (20);

(iii) cord management units (30) spaced longitudinally along the outrigger pole (10);

(iv) retention devices (40); and

(v) lines (60), such as fishing lines, trolled in the water. Appx62 (5:3-31).

Each halyard line (20) includes a retention device (40) to couple the opposing ends of the halyard line (20) together, thus creating a continuous loop. Appx62 (6:9-12). The halyard lines (20) are guided through successive cord management units (30) along the outrigger pole (10) and looped around a common pivot unit (50) typically attached to the hull of the boat. Appx62 (5:32-35, 6:4-12); *see also* Appx54 (FIG. 1A, depicting example pivot unit). The retention devices (40) are also used to respectively secure lines (60) to the halyard lines (20), which are trolled in the water to attract and/or catch fish. Appx62 (5:3-5, 6:19-22).

By longitudinally moving the halyard lines relative to the outrigger pole, a fisherman controls placement of the trolled lines relative to the boat, permitting placement of multiple trolled lines at different locations along the length of the outrigger pole. Appx60 (1:43-63), Appx61 (3:18-21), Appx62 (5:23-24, 5:35-42). And by trolling multiple fishing lines at different locations with an outrigger system, the trolled lines are maintained outside the boat's "wash" (behind the boat), increasing the chances of attracting and/or catching fish with the trolled lines. Appx63 (6:27-32); *see also* Appx54 (FIG. 1).

Conventional outrigger systems used eyehooks or eyebolts as the cord management units to guide the halyard lines along the outrigger pole. Appx60 (2:1-17). But these eyehooks/eyebolts caused friction and wear between the eyehook and halyard lines, resulting in the halyard lines failing or snagging, as well as entangling and/or bunching. Appx60 (2:1-17). FIG. 7 of the Asserted Patents shows a prior art eyehook/eyebolt (30') attached to an outrigger pole (10') with the halyard lines (20') prone to chafing, bunching, and entanglement. Appx60 (2:1-17).



FIG.7

Appx59

Mr. Mercier invented a new type of cord management unit to solve this problem. Examples of Mr. Mercier's cord management units (30) are depicted in FIGs. 3 and 3A of the Asserted Patents:



FIG.3          FIG.3A

Appx56-57.

Mr. Mercier's inventive cord management units include a housing (306) that includes multiple, separated cord passages (304) transversely offset from each other to respectively guide the halyard lines (20). Appx61 (3:12-17), Appx63 (7:22-24). Mr. Mercier's cord management units orient the housing with cord passages relative to the outrigger pole in such a way to minimize halyard line chafing and entanglement while allowing easy longitudinal movement of the halyard lines relative to the outrigger pole. Appx60 (2:11-17), Appx61 (3:3-6). In some embodiments, Mr. Mercier's cord management units (10) include independently rotatable pulleys (300) defining the cord passages that guide the halyard lines (20). Appx63 (7:22-24). Mr. Mercier's cord management units can be secured to the outrigger pole by a clamp or fastener, as depicted in FIG. 3 (Appx56), or by other means, such as with a bolt as shown in FIG. 3A (Appx57). Appx63 (8:42-45), Appx64 (10:17-31).



FIG.2A

FIG.2

An example configuration of Mr. Mercier's invention used with an outrigger system is shown in FIG. 2 (Appx55)—the first two cord management units (30a)(30b) nearest the boat on the outrigger pole define three cord passages for three halyard lines; the next (30c) has two cord passages for two halyard lines; and the last cord management unit (30d) has one cord passage for one halyard line—since at each successive cord management unit after the first (30a), one of the halyard lines (20a, b, c) loops around the pivot unit (50). Appx63 (7:57-67).

Mr. Mercier filed a patent application for his invention on March 10, 2010, which issued as U.S. Patent No. 8,656,632 on February 25, 2014. Appx52-68. Mr. Mercier was ultimately granted three more patents for his invention—9,392,778, a divisional of the '632 Patent (Appx70-85); 9,717,226, a continuation of the '778 Patent (Appx87-102); and 11,589,566, a continuation of the '226 Patent (Appx104-

121) (collectively "Asserted Patents").

Sometime around 2012, Appellee, Rupp Marine, Inc. ("Rupp"), a manufacturer that sells recreational and sport fishing equipment, started selling cord management units (aka "Pulley Clusters") that are attached to Rupp's fishing outriggers, as depicted below:



**Rupp's Pulley Clusters,
from Rupp's catalog**
Appx5201

As Mr. Mercier was only a recreational fisherman, and not a fishing equipment manufacturer or supplier, he never commercialized his invention. Instead, he approached Rupp in 2013 to determine whether Rupp would be interested in licensing his patented inventions. *See* Appx3609-3610. Mr. Mercier and Rupp had discussions about licensing for over 2 years, but never reached an agreement. Instead, Rupp filed an *Ex Parte* Reexamination Request for the '632 Patent with the

USPTO on September 23, 2015. Appx67-68, Appx1334-1403. The USPTO issued a Reexamination Certificate on August 23, 2016 confirming patentability of every claim of the '632 Patent: claims 1, 6, 9, 12, and 16, as amended, and all dependent claims. Appx67-68.

While the reexamination was proceeding, Rupp started selling a second type of Pulley Cluster with a "stem," as depicted below.



**Appx5204**

After the Reexamination Certificate issued for the '632 Patent, Mr. Mercier approached Rupp again about his patents, but those discussions ended without agreement sometime in 2017.

On May 12, 2023, shortly after Appellant, GEM Products, LLC. ("GEM Products"), a leading manufacturer and designer of high-quality fishing equipment, learned of Mr. Mercier's patents, GEM Products acquired from Mr. Mercier the entire rights, titles, and interests in and to each of the Asserted Patents. Appx7814-7816 .

Then, in 2024, GEM Products determined Rupp's Pulley Clusters are covered

by the claims of the Asserted Patents. For months, GEM Products unsuccessfully attempted to amicably resolve Rupp's infringement to no avail. As a result, GEM Products filed this lawsuit against Rupp on February 6, 2025 in the US District Court for the Southern District of Florida. GEM Products' complaint asserted, *inter alia*, that Rupp's sale and offer for sale of Rupp's Pulley Clusters caused Rupp to contributorily infringe under 35 U.S.C. § 271(c) and induce others to infringe under 35 U.S.C. § 271(b). Appx39-50.

## B.    The District Court Litigation

This Appeal arises from a Final Judgment from the US District Court for the Southern District of Florida, entered May 4, 2026, pursuant to the district court's Summary Judgment Order of noninfringement in favor of Rupp. Appx1. As set forth in its *First Amended Complaint*, filed May 19, 2025 (Appx356-431), GEM Products accuses Rupp of contributory infringement, under 35 U.S.C. § 271(c), and inducing others to infringe, under 35 U.S.C. § 271(b): (a) claims 1-2, 4-11, and 14-17 of the '632 Patent; (b) claims 1-20 of the '778 Patent; (c) claims 1-18 and 20 of the '226 Patent; and (d) Claims 1-17 of the '566 Patent (collectively "Asserted Claims"), by Rupp's manufacture, offer for sale, and sale of pulley clusters and pulley upgrades (collectively "Pulley Clusters") specifically designed and intended by Rupp to be attached to Rupp's outriggers, and which, when used, necessarily cause users to directly infringe the Asserted Claims. Appx133-162, Appx356-431, Appx6525-

6539.

Pursuant to the district court's *Pre-Trial Scheduling Order* (Appx283-289), the Parties submitted a *Joint Claim Construction Statement* on June 2, 2025, which was amended on June 5, 2025. Appx349-365. In the amended *Joint Claim Construction Statement*, Rupp contended 22 terms/phrases of the Asserted Claims require construction, and GEM Products contended 4 terms/phrases require construction. Appx349-365. By June 20, 2025, claim construction of the disputed terms/phrases was fully briefed. Appx2349-2415, Appx2442-2488. However, the district court never held a Markman hearing, nor did it issue any claim construction order/opinion for any of the terms/phrases the Parties disputed.

Also, pursuant to the district court's *Pre-Trial Scheduling Order*, cross-motions for summary judgment under Federal Rule of Civil Procedure 56 were filed November 5, 2025, and were fully briefed by November 25, 2025. Appx3371-3396, Appx5213-5240, Appx5997-6025, Appx6596-6619, Appx7285-7301, Appx7311-7324. GEM Products moved for summary judgment that Rupp contributorily infringed, under 35 U.S.C. § 271(c), independent claim 1 of the '632 Patent. Appx3371-3396. Rupp moved for summary judgment of noninfringement (contributory and inducement) of all Asserted Claims, and that each Asserted Claim was invalid under §§ 102, 103 and/or 112. Appx5213-5240. The district court scheduled a *Final Pretrial Conference* for January 7, 2026, with a one-week jury

trial tentatively scheduled for the week of January 12, 2026. Appx283, Appx285.

Instead of the *Final Pretrial Conference* on January 7, 2026, the district court held a hearing on Rupp's motion for summary judgment of noninfringement on January 7, 2026 ("Summary Judgment Hearing"). Appx7462. Before the Summary Judgment Hearing, the district court did not rule on any of the motions then pending before the district court, including motions *in limine* and Daubert motions. After the Summary Judgment Hearing, the district court stayed the scheduled trial.

On February 5, 2026, the district court issued its *Order on Cross Motions for Summary Judgment* (the "SJ Order"): (1) denying GEM Products' motion for summary judgment of contributory infringement of independent claim 1 of the '632 Patent; (2) granting Rupp's motion for summary judgment of noninfringement (contributory and induced infringement) of all Asserted Claims; and (3) not deciding invalidity of the Asserted Claims. Appx2-14. The SJ Order did not include any construction of any disputed terms/phrases of the Asserted Claims.

There are four distinct categories of Rupp's products at issue: (1) Pulley Clusters *with Loose Stems*; (2) Pulley Clusters *with Tight Stems*; (3) Pulley Clusters *without Stem*; and (4) Clamp-on Pulley Clusters, in addition to outriggers that Rupp sells with such Pulley Clusters. However, in the SJ Order, the district court addressed only *one* of these accused product categories—Pulley Clusters *with Loose Stems*—and ignored the other product categories. GEM Products is not appealing whether

Rupp's Pulley Clusters *with Loose Stems* infringe the Asserted Claims, as this is not a category of products Rupp commercializes. Rather, Rupp's other categories of accused products are subject to this appeal, as those products—which Rupp actually sells—were never considered, let alone addressed, by the district court.

On February 17, 2026, GEM Products filed a *Motion for Clarification* of the SJ Order, contending it was unclear as to: (1) which of Rupp's products were subject to the SJ Order, since the SJ Order addressed only a single category of Rupp's products; (2) whether summary judgment of noninfringement applied to only claim 1 of the '632 Patent, since the SJ Order addressed only claim 1 of the '632 Patent; and (3) what claim construction(s) the district court considered and applied for its noninfringement findings in the SJ Order. Appx7400-7405. On February 20, 2026, the district court denied GEM Products' *Motion for Clarification* with a one-page order without addressing any of the questions raised by GEM Products in the motion. Appx15.

On March 4, 2026, GEM Products filed a *Motion for Reconsideration* of the SJ Order, on the basis the district court: (1) applied incorrect law; (2) failed to perform requisite claim construction; (3) addressed only claim 1 of the '632 Patent; (4) did not consider any evidence submitted by GEM Products; and (5) addressed only a single category of Rupp's products at issue. Appx7414-7432. On March 5, 2026, the day after filing, the district court denied GEM Products' *Motion for*

*Reconsideration* with a one-page order without addressing any of the issues raised by GEM Products in the motion. Appx16.

On April 13, 2026, the district court denied, as moot, all remaining motions pending before the district court, including pending motions in *limine*. Appx7532-7533. On May 4, 2026, the district court dismissed, without prejudice, Rupp's counterclaims of invalidity (the sole remaining claims in the case), pursuant to the Parties' joint motion requesting the same. *See* Appx1, Appx8336-8337 .

On May 4, 2026, the district court entered its Final Judgment of noninfringement in favor of Rupp and against GEM Products, pursuant to the district court's February 5, 2026 SJ Order. Appx1. On May 5, 2026, GEM Products filed a Notice of Appeal, appealing the Final Judgment and initiating this appeal. Appx7534.

## II. SUMMARY OF THE ARGUMENT

When granting summary judgment of noninfringement in Rupp's favor, the district court incorrectly concluded "Plaintiff utilizes a patent with a fixed attachment mechanism which is unlike the pulleys sold by Defendant. The Defendant pulleys cannot contributorily infringe"[1] and "[w]hen used with an outrigger, [Rupp's Pulley Clusters] attach and move differently than contemplated by the Plaintiff's Patents." Appx11. Yet the Summary Judgment Order includes several misapplications of basic patent law and unresolved factual disputes irreconcilable with Rule 56 summary judgment, this Court's law, and Eleventh Circuit law.

First, the district court failed to construe any of the terms in the Asserted Claims disputed by the Parties, let alone identify what construction(s) it considered and applied for its noninfringement analysis, including the disputed "fixed angular orientation" term central to the district court's noninfringement findings. The district court further improperly found claim scope disclaimer without performing the requisite analysis. The district court exacerbated its errors by introducing

---

[1] The district court also found Rupp's products do not cause infringement since "[Rupp's] pulleys are standard and ordinary, not 'uniquely suited' as a component *of Plaintiff's rigging system*." Appx11 (emphasis added). However, whether "Plaintiff utilizes a patent" and "Plaintiff's rigging system" are irrelevant, as "[i]nfringement is determined by comparing the accused devices not with products made by the patentee but with the claims of the patent as properly construed." *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1351 (Fed. Cir. 2002).

requirements into the claims that do not exist, and addressed only claim 1 of the '632 Patent, but no other Asserted Claims of the other Asserted Patents. Indeed, the "fixed angular orientation" language on which the district court based its noninfringement findings is not in any claim of the '632 Patent; instead, those claims require a housing "secured by at least one fastener against displacement relative to the outrigger structure." Appx67-68. And, with its broad noninfringement findings, the district court improperly excluded expressly disclosed embodiments from the scope of the Asserted Claims. By themselves, the district court's errors regarding claim construction and disclaimer constitute reversible error.

Second, the district court ignored multiple distinct categories of Rupp's accused products—namely, (1) Pulley Clusters *without stems*; and (2) Pulley Clusters *with tight stems*—despite GEM Products' evidence. The district court's noninfringement findings were based solely on a version of Rupp's product that Rupp does not actually sell and end users do not use. The district court never addressed the products Rupp actually sells and that are used by end users. At minimum, GEM Products' evidence created genuine issues of material facts concerning the products Rupp sells, and whether those products cause infringement, precluding summary judgment.

Third, the district court's central factual finding for noninfringement - "the way [Rupp's Pulley Clusters] move is significant" (Appx11) - not only misapplied

basic patent law, but ignored all evidence GEM Products presented, including substantial evidence that contradicted Rupp's noninfringement arguments and the district court's findings. Instead, the district court improperly relied solely on: (1) an unsupported, unqualified declaration submitted by Rupp's vice president and co-owner; and (2) the district court's examination of a demonstrative exhibit during the Summary Judgment Hearing that was not representative of Rupp's products at issue in this case. The district court never addressed, let alone acknowledged, any of GEM Products' substantial, contradictory evidence. The district court was required to view all factual disputes in a light most favorable to GEM Products, but failed to do so. At minimum, GEM Products substantial evidence created genuine issue of material fact concerning infringement, precluding summary judgment.

Fourth, the district court never analyzed whether Rupp's accused products have any substantial noninfringing use under 35 U.S.C. § 271(c). Instead, the district court provided a series of generalized, historical observations about generic pulleys as a class of simple machines to conclude that, because Rupp's accused products include pulleys, Rupp's accused products must have substantial noninfringing uses, despite GEM Products' substantial evidence to the contrary. Indeed, the district court's purported noninfringing use finding was based on a hypothetical, contradicting evidence GEM Products presented that Rupp's accused products are not used in such a manner. This violates fundamental principles of basic patent law.

At minimum, GEM Products evidence created genuine issues of material facts concerning noninfringing uses, precluding summary judgment.

Lastly, the district court misapplied basic patent law relating to induced infringement under 35 U.S.C. § 271(b). The district court improperly required that, to be liable for inducement, Rupp must have provided express instructions through direct communications with end users. Not only did this ignore that induced infringement can be established with circumstantial evidence, but it failed to consider GEM Products' evidence showing Rupp's instructions and direct communications. Here again, at minimum, GEM Products presented substantial evidence that created genuine issue of material fact precluding summary judgment.

Any one of these errors requires vacating the district court's Summary Judgment Order and Final Judgment.

## III.   <u>STANDARD OF REVIEW</u>

The Federal Circuit "review[s] summary judgment decisions according to the law of the regional circuit." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 676 (Fed. Cir. 2015). However, issues unique to patent law are reviewed according to Federal Circuit law. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006). In the Eleventh Circuit, the circuit from where this case originates, a grant of summary judgment is reviewed *de novo*. *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 126 (11th Cir. 2022). Therefore, this Court reviews

the district court's Summary Judgment Order without deference to the district court's conclusions, applying the same legal standards the district court was required to apply. *Id.* To the extent that the Summary Judgment Order relied on any implicit claim construction, such construction is also reviewed *de novo* because it drew only on the intrinsic record. *Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).

Summary judgment requires the moving party to "show[] that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "Summary judgment should be entered ***only if*** 'there is no genuine issue as to any material fact and… the moving party is entitled to a judgment as a matter of law.'" *Clark v. Union Mut. Life Ins. Co.,* 692 F.2d 1370, 1372 (11th Cir. 1982) (internal citations omitted) (emphasis added); *see also Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1326–27 (Fed. Cir. 2015) (vacating summary judgment because of disputed issues of material fact).

"On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant." *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1320–21 (S.D. Fla. 2010) (*citing Lee v. Ferraro,* 284 F.3d 1188 (11th Cir. 2002)). "When parties jointly move for summary judgment, the court has three options: granting summary judgment for the plaintiff

under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023). "[C]ourts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *Id*.

Being the non-movant to Rupp's summary judgment motion for noninfringement, the district court was required to resolve any genuine factual disputes in GEM Products' favor. *Id.; Grayson v. Warden, Comm'r, Ala. Doc*, 869 F.3d 1204, 1212 (11th Cir. 2017). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The Court does not weigh conflicting evidence." *Mid-Continent*, 742 F. Supp. 2d at 1321 (*citing Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007)). "Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices. This is because credibility determinations and the weighing of evidence are jury functions, not those of a judge." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013).

## IV. <u>ARGUMENT</u>

### A. **The District Court's Noninfringement Findings were Wrong**

The district court summarized its noninfringement findings as:

> Plaintiff has not, and cannot, in view of the manner of operation of Defendant's products as explained below, point to any end user, or third party, who has directly infringed the Plaintiff's Patents by using Defendant's products.

Appx8. But this was based on incorrect applications of basic patent law and ignored the substantial evidentiary record. The district court found noninfringement without construing a single disputed claim term, including the disputed "fixed angular orientation" limitation central to the district court's noninfringement findings. *See* Appx2-14. In fact, the "fixed angular orientation" limitation does not appear in the claims of the '632 Patent—it appears only in the claims of the '778, '226, and '566 Patents—yet the district court improperly imported it into the claims of the '632 Patent.

A patent infringement analysis requires two steps: the court must first construe the asserted claims, then it must compare the accused products to the properly construed claims. *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004). Even at summary judgment, this two-step process is required. *Baron Servs., Inc. v. Media Weather Innovs. LLC*, 717 F.3d 907, 914 n.13 (Fed. Cir. 2013). While not every claim term must be construed, "it is the court's duty to resolve" fundamental disputes of claim scope when raised by the parties. *O2 Micro*, 521 F.3d at 1362.

The Parties disputed many claim terms, including the "fixed angular orientation" term. Appx2351, Appx2456-2457. Even though "fixed angular orientation" was central to the district court's noninfringement findings (*see* Appx12-13), the district court performed no claim construction analysis for this disputed term, yet it made pivotal noninfringement findings underpinned by this term, leaving significant claim interpretation questions unanswered. For example, the district court found:

- All Pulley Clusters do not infringe because "the way [Rupp's Pulley Clusters] move is significant." Appx11. ***But***, the district court never explained how or why the way Rupp's Pulley Clusters move is "significant."

- "Plaintiff's change to a fixed angular orientation relative to the outrigger structure *disclaimed movement of the kind the [Pulley Clusters] allow*;" Appx12 (emphasis added). ***But***, the district court never explained: (a) where there was clear and unambiguous disclaimer; (b) what type of "movement" was purportedly disclaimed; or (c) what kind of "movement" Rupp's Pulley Clusters allow.

- "When used with an outrigger, [Rupp's Pulley Clusters] *attach and move differently than contemplated by the Plaintiff's Patents*." Appx11 (emphasis added). ***But***, the district court never explained: (a) how the Asserted Claims require any specific type of "attach[ment]" or "move[ment]," (b) what that

"attach[ment]" and "move[ment]" are, or (c) how Rupp's Pulley Clusters "attach" and "move" differently.

As this Court held:

> It is not [the appellate court's] role to scour the record and search for something to justify a lower court's conclusions, particularly at the summary judgment stage. Whether dealing with an issue of law like claim construction or an issue of fact such as infringement, this court must be furnished sufficient findings and reasoning to permit meaningful appellate scrutiny.

*OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 707 (Fed. Cir. *2012)* (cleaned up).

The district court based its entire noninfringement findings on only claim 1 of the '632 Patent, where it improperly created a requirement that the claims do not allow some type of "movement," and summarily concluded the patentee "disclaimed movement of the kind the Defendant pulleys allow" (Appx12) and "the way Defendant's pulleys *move is significant.*" Appx11 (emphasis added). This was legally wrong. None of the Asserted Claims—nor the entire intrinsic record— mention the words "move" or "movement" relating to the cord management units.

First, the district court found disclaimer without the required analysis. As this Court mandates, "[i]n order to disavow claim scope during prosecution, a patent applicant ***must clearly and unambiguously express surrender of subject matter.***" *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (cleaned up) (emphasis added). The district court never identified any "clear" and "unambiguous" subject

matter surrender. Instead, the district court referenced a single excerpt from the '632 Patent reexamination proceeding relating to "fixed angular orientation." Appx12. This excerpt was a statement by the patentee in response to an office action during the reexamination proceeding of the '632 Patent about how using "fixed angular orientation" in the claims could differentiate how the claimed cord management units are oriented relative to the outrigger pole compared to the prior art, which allowed pulleys to freely take on whatever orientation relative to the outrigger pole a tensioning force may dictate. Appx1272 (reexam file history). The district court then improperly used purported attributes of Rupp's Pulley Clusters relating to "movement," and incorrectly interpreted this excerpt as establishing a broad surrender of some unknown "movement." Appx12.

Second, even assuming those remarks disclaim any subject matter—they do not—such disclaimer would, at most, extend only to what the patentee actually addressed—"the [prior art] eye-linked coupling [that] leaves the 'snapped' pulley essentially free to take on whatever orientation relative to the outrigger that a tensioning force on the [halyard line] may dictate." Appx1269-1274. Rupp's Pulley Clusters do not use any eyehook or snap coupling; Rupp's Pulley Clusters are specifically designed and intended to physically *replace* eye-hooks on Rupp's outriggers, and Rupp's Pulley Clusters' housings are secured to the outrigger with a bolt or clamp. Appx3890, Appx3898-3899, Appx3919-3923. Any alleged

disclaimer directed to the prior art's dangling, snap-hooked pulleys discussed during Reexamination cannot be construed as surrendering something the remarks never mentioned.

Third, the "fixed angular orientation" phrase was not included in any of the issued reexamined claims of the '632 Patent. Appx67-68. What the Reexamination actually added to the claims of the '632 Patent is a different limitation—a housing "secured by at least one fastener against displacement relative to the outrigger structure." Appx67-68. The district court thus rested its disclaimer finding on language the claims of the '632 Patent do not even contain, and it never addressed the limitations the claims of the '632 Patent actually contain.

Lastly, the district court obviously improperly used purported "movement" in Rupp's Pulley Clusters as guidance, since neither the Asserted Claims nor intrinsic record ever mention "movement" relating to the claimed cord management units. The district court admitted it "examined Defendant's pulleys," (Appx12 (n.4)), and concluded "the way [Rupp's Pulley Clusters] move is significant" (Appx11), and then found "[patentee]'s change to a fixed angular orientation relative to the outrigger structure disclaimed movement of the kind the Defendant pulleys allow." (Appx12). This was legally wrong. This Court's long-standing rule is that "claims may not be construed with reference to the accused device" and "a court may not use the accused product or process as a form of extrinsic evidence to supply limitations

-26-

for patent claim language." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006)) (internal quotes omitted). Indeed, this rule "forbids biasing the claim construction process to exclude or include specific features of the accused product or process," which is precisely what the district court did. *Id.;* (Appx12) ("[patentee]'s change to a fixed angular orientation relative to the outrigger structure ***disclaimed movement of the kind the Defendant pulleys allow***.") (emphasis added).

Even ignoring these issues, the district court never reconciled the fact that "fixed angular orientation" does not appear in the claims of the '632 Patent. Appx68. "Fixed angular orientation" appears only in the claims of the '778, '226, and '566 Patents. Appx84-85, Appx101-102, Appx119-121. Making matters worse, the district court never addressed any Asserted Claims from any of the '778, '226 or '566 Patents. The Asserted Claims differ materially from one another—(a) the'632 Patent claims require a housing "secured by at least one fastener against displacement," not any "fixed angular orientation"; (b) the '778 Patent claims methods; and (c) the '226 and '566 Patents claim systems and apparatus with their own distinct limitations. Appx65-68, Appx84-85, Appx101-102, Appx119-121. Instead, the district court improperly assumed all Asserted Claims have an identical scope without any analysis, and summarily concluded *none* of the Asserted Claims in *any* of the Asserted Patents is infringed.

The district court further erred by finding "[w]hen used with an outrigger, [Rupp's Pulley Clusters] *attach… differently than contemplated by the Plaintiff's Patents*." Appx11 (emphasis added). For this, the district court improperly read into the claims a requirement that the housings of the Pulley Clusters must "attach[] directly to an outrigger with at least one fastener." Appx7. Yet nowhere do any of the Asserted Claims or intrinsic record ever mention any "attaches directly" requirement, nor did the district court explain how the claims require a specific attachment.

But even assuming the district court's improper "attaches directly" requirement was correct - it is not - Rupp's Pulley Clusters *without Stems* (defined *infra*, Section IV.B.i, p. 32) directly negate the district court's finding that "[n]one of Defendant's accused pulley products have a housing that *attaches directly to an outrigger with at least one fastener*." Appx7. There is no dispute the housings in Rupp's Pulley Clusters *without Stems* "attaches *directly*" to an outrigger with a bolt. Appx3898-3899, Appx3919-3923.





**Pulley Clusters *without Stems*, from Rupp's catalog**
(Appx5201 (Appx3402 (¶ 22)))

**Photo of Rupp's Pulley Clusters *without Stems* attached to Rupp outrigger**
(Appx3904 (¶ 99))



**Photo of Rupp's Pulley Clusters *without Stems* attached to Rupp outrigger**
(Appx3902 (¶ 98))

Also, by finding none of Rupp's Pulley Clusters are covered by the Asserted Claims based on how they must "attach[] directly" to the outrigger pole, the district court improperly excluded embodiments expressly disclosed in the Specifications from the scope of the claims. For example, Rupp's Pulley Clusters *with Tight Stem*

(defined *Infra*, Section IV.B.ii, p. 36) are *substantially identical* to embodiments depicted in FIG. 3A of the Asserted Patents, as they "attach[] directly" and extend in the same manner:



Asserted Patents' FIG. 3A
(Appx57)



**Photo of Rupp's Pulley Cluster** *with Tight Stem* (Appx3403 (¶ 28))

**Photo of Rupp's Pulley Clusters** *with Stem* **attached to Rupp outrigger** (Appx3905 (¶ 99))

Reading claims to exclude expressly disclosed embodiments "is rarely, if ever, correct…." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583–84 (Fed. Cir. 1996). The district court never explained why the claims do not cover these disclosed embodiments.

The district court obviously created claim limitations through some unknown construction, especially considering the district court found Rupp's Pulley Clusters "attach and move differently than contemplated by the Plaintiff's Patents." Appx11. Yet the district court never performed any claim construction analysis, let alone disclosed what constructions it considered or applied. *See OSRAM Sylvania,* 701 F.3d at 707 ("this court must be furnished sufficient findings and reasoning to permit meaningful appellate scrutiny.").

These errors, by themselves, require vacating the Final Judgment and Summary Judgment Order.

**B.      The District Court Failed to Address Entire Categories of Rupp's Pulley Clusters at Issue in this Case**

The district court's noninfringement findings hinged on Rupp's argument that Rupp's Pulley Clusters include "an adjustable polyaxial ball-joint stem that allows the pulley housing to pivot relative to the outrigger." Appx12 ("Pulley Clusters *with Loose Stems*"). GEM does not challenge that these Pulley Clusters *with Loose Stems* would not cause infringement.[2] The evidence shows that Pulley Clusters *with Loose Stems* are neither Rupp's commercialized product, nor are they used by end users.

---

[2] The arguments in this section are premised on the district court's misunderstanding the claims require no "movement." While GEM Products disagrees with such interpretation (*see supra*, Section IV.A, p. 22), GEM Products nonetheless adopts it for the present analysis to establish the incorrectness of the district court's findings.

Rather, GEM Products' substantial evidence shows Rupp actually sells two other distinct categories of Pulley Clusters never addressed by the district court and that indisputably cause infringement: (1) Pulley Clusters without any stem ("Pulley Clusters *without Stems*"); and (2) Pulley Clusters having stems that are tight (Pulley Clusters *with Tight Stems*"). *See also L&W, Inc. v. Shertech, Inc.,* 471 F.3d 1311, 1317–18 (Fed. Cir. 2006) (vacating summary judgment of infringement based on assumption all accused products were like the single product expert analyzed).

### i. Rupp's Pulley Clusters without Stems

The evidence shows that Rupp actually sells Pulley Clusters *without Stems* (depicted below), and end users use these products:



**Pulley Clusters *without Stems*,**
**from Rupp's catalog**
(Appx3402 (¶ 22))



**Photo of Rupp's Pulley Clusters *without***
***Stems* attached to Rupp outrigger**
(Appx3904 (¶ 99))



Case: 1456   Document: 15-1   Page: 85   Filed: 09/05/2025

**Rupp's Instagram post showing Rupp's Pulley Clusters *without Stems*
attached to disassembled Rupp outrigger**
(Appx3401 (¶ 15))

First, as highlighted to the district court during the Summary Judgment

Hearing, Rupp's communications with customers prove Rupp sells Pulley Clusters

*without Stems*, and confirm the stems that could be used with Rupp's Pulley Clusters

are not standard, but rather optional accessories purchased separately (Rupp refers

to these stems a "Swivel Assembly for Pulley Clusters" or "swivel assembly"). For

example, as highlighted to the district court during the Summary Judgment Hearing,

a May 17, 2024 email from Rupp's Customer Service Manager to a customer stated:

-33-

> *We no longer provide the swivel assemblies on the pulley clusters unless they are requested.* Please note that going forward, *you have to request the swivel assemblies be included* (additional $15.75 retail per shank).

Appx7450 (emphasis added), Appx7484-7485 (Tr. 24:18-25:2). A follow-up email from that Customer Service Manager confirmed:

> The pricing listed on the attached price list is correct *for the pulleys without the swivel assemblies. To add the swivel assemblies*, it will be an additional $15.75 per cluster for all clusters going forward *and you must request they be included.*

Appx7451 (emphasis added), Appx7484-7485 (Tr. 24:18-25:2).

Rupp's only excuse for these communications was attorney argument that these emails must be a mistake, and the "swivel assemblies" referenced in these emails are only for replacement of broken components on Pulley Clusters. Appx7502-7503 (Tr. 42:15–43:1). But this unsupported attorney conjecture cannot rebut actual facts supported by evidence, especially where it contradicted the plain, unambiguous language of the emails. Appx7450-7451 (see above email quotes); *see Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("[T]he defendant's unsworn attorney argument to the contrary—made for the first time at oral argument on appeal—is not evidence…").

Second, Rupp's invoices to customers presented to the district court show the vast majority of Rupp's sales of Pulley Clusters do *not* include the optional swivel assembly. Appx7452-7453. And the rare invoice including a swivel assembly indeed

list it as a separate item, confirming it is not included unless specially ordered. Appx7452 (invoice showing separate "Swivel Assembly for Pulley Clusters" line item). When discussing these Rupp invoices with the district court during the Summary Judgment Hearing, GEM Products' counsel stated:

> There is only a very few number of invoices where end users or customers actually purchase[d] the pulley clusters with the add-on swivel assembly. Because of that this stem, this swivel assembly, no, it doesn't exist in the marketplace.

Appx7485 (Tr. 25:3-10). This referenced that the evidence identified a total of only 47 stems ever sold by Rupp for use with its Pulley Clusters. Appx7500 (Tr. 40:6-9).

Third, Rupp's website advertising and selling its products listed the "Swivel Assembly" as a separate, add-on accessory for Rupp's Pulley Clusters. Appx7449.

Fourth, Rupp's marketing materials, including product catalogs and social media posts, consistently depict Rupp's Pulley Clusters *without Stems*, especially when attached to and used with outriggers. *See, e.g.,* Appx3402 (¶ 22) ((citing Appx4737) (photo reproduced *supra*, p. 32)), Appx 3401 (¶ 15) ((citing Appx4740, Appx4767-4770, Appx4773-4786) (reproduced *supra*, p. 33)), Appx3904 (¶ 99) (photo reproduced *supra*, p. 32), Appx6027 (¶ 1).

Fifth, GEM Products' technical expert provided detailed infringement analyses, opinions, and testimony establishing that Rupp's Pulley Clusters *without Stems*, when attached to and used with outriggers, necessarily meet all the claim limitations of the Asserted Claims causing end users to directly infringe. Appx3898-

3904 (¶¶ 94-99). Rupp made no noninfringement argument or rebuttal addressing its Pulley Clusters *without Stems*.

Significantly, during the Summary Judgment Hearing, Rupp's counsel admitted that Rupp added the stem to the Pulley Clusters as a "redesign" while the reexamination of the '632 Patent was pending in 2015:

> [Rupp] did redesign the product when the original patent was in reexamination, and [Rupp] added a [stem] in order to make it practice what the prior art disclosed, something that moved in response to tension from the halyard line.

Appx7514-7515 (Tr. 54:25-55:4).

Yet the evidence establishes the Pulley Clusters Rupp *actually* sells do *not* include this "redesign" Rupp made during the '632 Patent reexamination (i.e., stem) that purportedly "practice what the prior art disclosed" to allow "movement," which underpinned the district court's entire noninfringement findings. The district court never considered, let alone addressed, any of this evidence. Instead, it ignored the entire category of Rupp's Pulley Clusters *without Stems.*

### ii. Rupp's Pulley Clusters with Tight Stem

GEM Products also presented unrebutted evidence that, in the rare instances when Rupp sells Pulley Clusters with a stem (depicted below), that stem is affixed so tightly that there is "no movement" of the housing of the Pulley Cluster relative to the outrigger ("Pulley Clusters *with Tight Stems*"). Appx6035 (¶¶ 2–5) (*citing*

Appx3898-3899, Appx3905-3906, Appx3907, Appx3908-3909, Appx3932 (¶¶ 94, 101, 104, 106, 158)).



**Rupp's Pulley Clusters *with Tight Stem*
from Rupp's Catalog**
(Appx3405 (¶ 44))

The district court's inspection of Rupp's Pulley Clusters during the Summary Judgment Hearing confirmed this. Indeed, during the Summary Judgment Hearing, the district court had an exchange with Rupp's counsel regarding the condition of physical samples of Rupp's Pulley Clusters the district court was inspecting. Appx12 (n. 4). Specifically, when comparing (1) a sample of Rupp's Pulley Cluster having a stem provided by Rupp's counsel—notably not in any packaging, modified, and lacking evidentiary foundation—with (2) a sample of Rupp's Pulley Cluster having a stem provided by GEM Products' counsel—notably in Rupp's packaging in a new, unopened condition—the district court noted the stem on the Pulley Cluster provided by Rupp's counsel was loose, whereas the stem on the Pulley Cluster in Rupp's

original packaging provided by GEM Products' counsel was tightly attached. On this point, the district court and Rupp's counsel had the following exchange:

> THE COURT: You are saying that this item that [GEM Products' counsel] handed me in a package is the same as the one you gave me. [referring to the demonstratives of the sealed-package Pulley Cluster provided GEM Products' counsel and Pulley Clusters with loose stem outside of packaging provided by Rupp's counsel].
>
> MR. LOCKTON: That is correct.
>
> THE COURT: It is just screwed down more tightly?
>
> MR. LOCKTON: Correct, your Honor.

Appx7504 (Tr. 44:1-5).

Moments later when inspecting the unopened sample of Rupp's Pulley Cluster GEM Products' counsel provided again, the district court noted to Rupp's counsel: "I don't think it moves at all. Here, you can take a look at it. It is the one that is still in the packaging." Appx7505 (Tr. 45:1-3). Rupp's counsel responded: "I can't tell whether it spins or not." Appx7505 (Tr. 45:4-6). And when the district court asked Rupp's counsel whether this sample would infringe if attached "like it is in the package tightly," Rupp's counsel conceded "I would have to inspect the specific one you are looking at to see how much it actually moves." Appx7504 (Tr. 44:18-24).

Rupp's counsel then hypothesized, without any evidence, "[t]hat stem [in the Pulley Cluster provided by GEM Products' counsel] is packaged tightly for shipping

purposes" (Appx7503 (Tr. 43:14)), and the discrepancies between the samples provided to the district court are because:

> [The stem] is designed to be adjustable because people want to have different degrees of movement of those products. In order to be adjustable, it has to be able to thread in and out.

Appx7503 (Tr. 43:21-25). Yet none of this attorney conjecture has any anchor in evidence. For example, there is no evidence of any: (1) reason why the stems would be packaged tightly for shipping purposes; (2) end users adjusting the stem; (3) end users wanting "different degrees of movement"; (4) Rupp advertising any adjustability; (5) instructions explaining to end users to adjust the stem, let alone why adjusting may be desired; or (6) documents mentioning adjustability of the stem. Rupp's counsel's speculation is not evidence and cannot support summary judgment, let alone rebut any of GEM Products' substantial, contradictory evidence. *Gemtron*, 572 F.3d at 1380; *Sandstrom v. Int'l Trade Comm'n*, No. 2025-1269, 2026 WL 71399, at *3 (Fed. Cir. Jan. 9, 2026).

More telling is Rupp's counsel's admission that the sample Pulley Cluster *with Loose Stem* he provided to the district court during the Summary Judgment Hearing was one Rupp's counsel "had in my desk. I have been playing with that since this case started…" Appx7513 (Tr. 53:10-13). Because it was apparent that the Pulley Cluster *with Loose Stem* provided to the district court by Rupp's counsel was not what Rupp actually sells, GEM Products' counsel advised the district court it

had been modified and was not representative. Appx7485 (Tr. 25:11-14), Appx7503-7504 (Tr. 43:14-19, 44:1-7).

Yet the district court did not acknowledge any of this in the Summary Judgment Order, let alone explain why it credited Rupp's attorney's unsupported conjecture over all other fact evidence, including Rupp's Pulley Cluster *with Tight Stem* still in Rupp's sealed-packaging that GEM Products' counsel provided. The district court ignored this entire category of Pulley Clusters *with Tight Stems*, but still found noninfringement of **all** Pulley Clusters based on a sample of Pulley Clusters *with Loose Stem* presented during the Summary Judgment Hearing that is not representative of the products Rupp actually sells. *See* Appx12 (n.4).

*****

The district court's failure to draw all reasonable inferences in GEM Products' favor, as the non-movant, constitutes reversible error. *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1557–58 (Fed. Cir. *1990)* (The district court is required to "view all evidence in the light most favorable to the non-movant."). The district court ignored these distinct categories of accused products (Pulley Clusters *without Stems* and Pulley Clusters *with Tight Stems*) that Rupp actually sells and end users use, while broadly finding noninfringement of *all* Pulley Clusters based on Pulley Clusters *with Loose Stems* that Rupp neither actually sells nor end users use.

Therefore, the Summary Judgment Order and Final Judgment should be vacated. *See ISCO Int'l, Inc. v. Conductus, Inc.*, 279 F. Supp. 2d 489 (D. Del. 2003) (an infringement inquiry focuses on the actual accused product rather than hypothetical or modified versions of the device); *L&W*, 471 F.3d at 1318 (finding summary judgment cannot rest on assumption that distinct accused products are interchangeable). At minimum, GEM Products' substantial evidence created genuine issue of material fact concerning the products that Rupp actually sells, and whether those products cause infringement, precluding summary judgment in Rupp's favor, as a matter of law.

## C. The District Court Ignored Disputed Issues of Material Facts Relating to Infringement

The district court also ignored all of GEM Products' substantial evidence relating to infringement, including pertaining to the function, operation, and use of Rupp's Pulley Clusters. In fact, the district court never even acknowledged the existence of any GEM Products' evidence.

For its noninfringement findings, the district court declared as irrefutable fact that all of Rupp's Pulley Clusters "allow movement" and are thus not covered by any of the Asserted Claims, without citation to any record evidence—let alone any *undisputed* fact. Appx12. The district court's factual recitation of how Rupp's Pulley Clusters purportedly function, operate, and are used by end users was based solely on:

(1) a self-serving declaration of Rupp's vice-president and co-owner, Ron Karpanty, that Rupp submitted for purposes of summary judgment (Appx5252-5258) ("Karpanty Declaration") (*see* Appx6 (*citing* Karpanty Decl. ¶¶ 11, 15, 18, 19)); and

(2) the district court's confused review of the Pulley Cluster with *Loose Stem* Rupp's counsel provided during the Summary Judgment Hearing. Appx12 (n.4); (*see supra*, Section IV.B.i, p. 36).

Yet the district court never cited any fact from the evidentiary record, which included expert and fact evidence provided by GEM Products, end user testimony, and Rupp's own admissions regarding the function, use, and operation of Rupp's Pulley Clusters. The district court instead brushed aside GEM Products' substantial evidence in a footnote, contending GEM Products offered "no factual opposition" to the Karpanty Declaration. Appx3-4 (n.1). This is plainly wrong. GEM Products provided substantial opposing evidence. For example, GEM Products' response to Rupp's *Statement of Material Facts* and GEM Products' own *Statement of Additional Facts* in opposition to Rupp's motion for summary judgment expressly addressed and disputed Karpanty' s assertions *with actual record evidence*, including GEM Products' technical expert's report and testimony, end user testimony, and Rupp's own evidence. *See* Appx6026-6042, Appx6715-6731; *see also* Appx7414-7432 (GEM Products' *Motion for Reconsideration* mapping

unsupported assertions in Karpanty Declaration to GEM Products' contrary record evidence). The district court's reliance on *United States v. Stein*, 881 F.3d 853, 856–59 (11th Cir. 2018) (*en banc*) in its footnote (Appx3-4 (n.1)) is misplaced. *Stein* held ***a non-movant's*** self-serving and uncorroborated affidavit may create a genuine disputed fact to defeat summary judgment. *Stein* did not hold that ***a movant*** may win summary judgment on its own conclusory, self-serving declaration over the non-movant's contrary evidence. If anything, *Stein* only confirms that GEM Products' evidence (being the non-movant) precluded summary judgment.

Still, the district court's reliance on Rupp's self-serving Karpanty Declaration was improper for several reasons. First, the statements, conclusions, and opinions in the Karpanty Declaration are unsupported. Most cite no record material, nor provide any evidence-based rationale for their assertions. *See e.g.,* Appx5253-5257 (¶¶ 9–11, 13–45, 48–49). For example,

- Paragraph 10 asserted Rupp's Pulley Clusters in 2012 "were used by customers to directly attach[] them to outriggers via only a direct bolt through the outrigger into the pulley housing," yet cited no evidence to support this assertion. Appx5253 (¶ 10).
- Paragraph 11 asserted Rupp "redesigned" the pulley clusters to include "an adjustable polyaxial ball joint/stem that allows the pulley housing to move relative to the object it is attached to [sic]," with no evidentiary support. Appx5253 (¶ 11).

- Paragraph 17 asserted "Rupp's website states that these products are sold so that a user can do with them what they want," yet did not even identify the purported portion of the website that supports such assertion. Appx5253 (¶ 17).

Throughout, Karpanty simply asserted opinions and unsupported conclusions, and expected them to be accepted as undisputed fact.

Second, the Karpanty Declaration includes improper opinion and analyses reserved for experts. For example, the Karpanty Declaration asserted:

> if the 'Pulley Clusters' are attached to an outrigger (1) a conventional bolt is used to attach the polyaxial ball joint/stem to the outrigger and (2) the housing, pulley wheels, and 'cord passages of the 'Pulley Cluster' *will move relative to the outrigger in response to tension from the halyard line*.

Appx5253 (¶¶ 11, 15) (emphasis added). The district court specifically relied on this statement as the basis for its noninfringement findings. Appx6. But the ultimate technical question of how Rupp's Pulley Clusters operate and function, including any purported "movement," are issues relating to infringement, and thus is in "the province of qualified experts, not lay witnesses." *HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685, 689 (Fed. Cir. 2020). "[I]t is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art"); *Id.* (internal quotes omitted); *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1362–63 (Fed. Cir. 2008) (affirming exclusion of witness not qualified as expert).

To provide the expert opinions and analyses in the Karpanty Declaration, Karpanty would first need to be *qualified* as an expert. *Id.* But by his own admissions, *he is not an expert in any sense*. For example, he admitted he: (1) never employed a halyard line with the Rupp's Pulley Clusters; (2) used Rupp's Pulley Clusters only "a couple of times" on a small outrigger pole; and (3) lacked experience with outrigger fishing. Appx6515 (Tr. 27:4-16), Appx6517-6518 (Tr. 166:2-6, 167:18-24), Appx6522 (Tr. 181:9-14). In fact, Karpanty' s qualifications do not even meet Rupp's own definition of a person of ordinary skill in the art for the Asserted Patents, let alone an expert. Appx6037 (¶¶ 25-26), Appx5159-5160.

Karpanty was also never disclosed as an expert by Rupp, as required by Federal Rule of Civil Procedure 26. *See* Appx7458. "[T]estimony offered as expert opinion requires the offer of an expert report prior to trial." *Pandrol U.S.A., LP v. Airboss Ry. Prods., Inc.*, 424 F.3d 1161, 1167 (Fed. Cir. 2005) (*citing* Fed. R. Civ. P. 26(a)(2)). Karpanty never provided any expert report. *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 714 (Fed. Cir. 2005) (affirming exclusion of undisclosed expert testimony).

In fact, Karpanty was not even listed in Rupp's Rule 26 Initial Disclosures as having the vast majority of information that he belatedly set forth in the Karpanty Declaration. Appx7458. By failing to list Karpanty as having such information—let

alone disclosing him as a purported expert—GEM Products was never afforded an opportunity to depose him about any of it, let alone test the veracity of his assertions.

GEM Products raised the admissibility issues of Karpanty' s statements made in the Karpanty Declaration with a Motion *in Limine* that sought to preclude Mr. Karpanty from providing inadmissible expert opinions during trial. Appx7365-7367. The district court never considered that motion and instead dismissed it as moot after granting summary judgment in Rupp's favor. Appx1. But the district court should have considered this Motion *in Limine **before*** the summary judgment motions, as the admissibility issues raised in the Motion *in Limine* pertaining to Karpanty' s assertions were germane to the summary judgment motions. *See, e.g., Sunrise of Coral Gables Propco, LLC v. Current Builders, Inc.*, No. 1:22-CV-21456, 2023 WL 6638050 (S.D. Fla. Oct. 12, 2023) (discussing need to consider motion *in limine* regarding admissibility of testimony ***before*** considering summary judgment, as admissibility was pertinent to summary judgment).

Even putting aside the improper substance of the Karpanty Declaration, unsupported and conclusory declarations, like the Karpanty Declaration, have no probative value. *See McKenny v. United States*, 973 F.3d 1291, 1303 (11th Cir. 2020) ("[C]onclusory affidavits lack probative value.") (internal cites omitted); *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005) (summary-judgment facts must have a real basis in the record). A movant cannot carry its summary-judgment burden

with conclusory, unsupported assertions, and the Eleventh Circuit sitting *en banc* confirmed a self-serving summary judgment affidavit weighs only in favor of the non-movant, not the movant. *See Stein*, 881 F.3d at 856-57.

On the other hand, GEM Products presented substantial evidence relating to infringement. For example, GEM Products submitted expert evidence from its technical expert, John Lloyd, showing not only how Rupp's Pulley Clusters function and operate, but that end users' use of: (1) Rupp's Pulley Clusters *without Stems* literally meet all the limitations of the Asserted Claims Appx3906; and (2) Rupp's Pulley Clusters *with Tight Stems* meet the limitations of the Asserted Claims literally and under the Doctrine of Equivalents. Appx3906 (¶ 102), Appx6035, Appx6039 (¶¶ 3, 40), Appx3886-3909 (¶¶ 74-107). Rupp never disputed any of Mr. Lloyd's opinions of infringement under Doctrine of Equivalents, and the district court did not address it.

The district court's finding that GEM Products cannot point to any end user who directly infringed when using Rupp's Pulley Clusters was also legally and factually wrong. Direct infringement may be proven by circumstantial evidence: a patentee may either point to specific instances of direct infringement or show the accused device necessarily infringes. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012). GEM Products did both, yet the district court addressed none of it. For example, GEM Products submitted Mr. Lloyd's detailed expert

testimony and analyses establishing that, even when sold with stems attached, the stems on Rupp's Pulley Clusters are so tightly attached that when they are attached and used on outriggers, the Pulley Clusters: (a) are "fixed against displacement" relative to the outrigger pole, Appx3896-3897 (¶ 91) (for the claims of the '632 Patent); and (b) extend a fixed angular orientation relative to the outrigger (for the claims of the '778, '226 and '566 Patents). Appx6035 (¶ 1), Appx3400 (¶ 23), Appx3897-3899 (¶¶ 91-94), Appx3904-3909 (¶¶ 100-107). GEM Products also provided evidence in the form of testimony from end users that use Rupp's Pulley Clusters on Rupp's outriggers and Rupp's own documents, all confirming that use Rupp's Pulley Clusters cause direct infringement of the Asserted Claims. *See e.g.,* Appx3880-3885 (¶¶ 67-70, 72-73), Appx3405-3407 (¶¶ 50, 53, 64-65), Appx3409 (¶ 87), Appx5040 (Tr. 42:8-11), Appx5049 (Tr. 81:6-20), Appx5056 (Tr. 109:6-10).

Rupp's sole rebuttal to GEM Products' evidence was the Karpanty Declaration, which cannot carry the day for purposes of summary judgment. The district court's reliance on Karpanty's Declaration as support for its noninfringement findings was an abuse of discretion requiring vacating summary judgment. *See Sundance*, 550 F.3d at 1362 ("Because [the defendant's expert] was never offered as a technical expert, and in fact was not qualified as a technical expert, it was an abuse of discretion for the district court to permit him to testify as an expert on the issues of noninfringement or invalidity."). But even if it was proper for the district

court to consider the unsupported statements in the Karpanty Declaration, the contradictory evidence GEM Products presented created genuine issues of material facts precluding summary judgment of noninfringement, as a matter of law.

The only other "evidence" the district court considered for its noninfringement findings was described in a footnote in the Summary Judgment Order: "During oral argument, I examined Defendant's pulleys." Appx12 (n.4). Putting aside the impropriety of district court's analysis of a sample of the Pulley Cluster *with Loose Stem* Rupp's counsel "[had] been playing with [] since this case started" as not representative of Rupp's Pulley Clusters (*supra*, Section IV.B.ii, p. 36), the district court's examination of physical demonstratives during the Summary Judgment Hearing do not constitute the kind of record evidence on which summary judgment can rest. *Laitram Corp. v. Cambridge Wire Cloth Co.*, 919 F.2d 1579, 1581–82 (Fed. Cir. 1990) (vacating summary judgment and criticizing the parties' "reliance on attorney argument and counsel's unsworn fact statements as 'evidence'"), *superseded by statute on other grounds as recognized in Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251–52 (Fed. Cir. 2000). Summary judgment requires facts that "have a real basis in the record." *Ellis*, 432 F.3d at 1325-26. The district court's unqualified handling of a demonstrative exhibit during oral argument without the procedural safeguards of formal evidence is not a "real basis in the record." This is especially true where, as here, the Pulley Clusters *with Loose*

*Stem* demonstrative the district court reviewed and based its noninfringement findings upon (Appx12 (n.4)) was not representative of the Pulley Clusters Rupp actually sells nor used by end users. *See supra*, Section IV.B.ii, p. 36.

The district court rationalized its noninfringement findings by noting "[Rupp] advertises that [its Pulley Clusters] allow[] movement directed by the force on the line which helps eliminate chafing." Appx12. This was legally and factually wrong. There is no evidence in the record—no testing, no user testimony, no expert analysis—demonstrating that, in actual use, any of Rupp's Pulley Clusters allow "movement directed by the force on the line which helps eliminate chafing." This is nothing more than an unsupported assertion in an advertisement, which is not evidence of how a product actually functions in use; at minimum, it creates a genuine issue of material fact concerning a product's capabilities. *See NeuroGrafix v. Brainlab, Inc.*, 787 F. App'x 710, 717 (Fed. Cir. *2019)* ("[The plaintiff] demonstrated that there was a genuine dispute of material fact on the only issue raised by [the accused infringer], namely, whether the [the accused product] was capable of infringing uses.").

Further proving the fallacy of the usability of Rupp's Pulley Clusters *with Loose Stems*, GEM Products' technical expert opined no end user would loosen a stem provided on Rupp's Pulley Clusters when attached to Rupp's outriggers, as doing so would allow the pulley housing of the Pulley Cluster to flap and ultimately

chafe the halyard lines—the very problem the Pulley Clusters were designed and intended to prevent. Appx6035 (¶ 3); Appx3400 (¶ 24); Appx3905-3906, Appx3909 (¶¶ 101, 107).

At minimum, GEM Products' substantial evidence created multiple genuine issues of material facts as to whether Rupp's Pulley Clusters cause direct infringement by end users. The district court's failure to address any of GEM Products' evidence, while relying solely on the self-serving declaration provided by Rupp and a demonstrative of a Pulley Cluster *with a Loose Stem* that Rupp does not actually sell, was an abuse of discretion and constitutes reversible error.

A third, although smaller, category of Rupp's Pulley Clusters the district court found not to cause infringement is Rupp's Clamp-on Pulley Clusters (depicted below).



Appx3920-3921 (¶ 131).

The district court incorrectly summarily concluded, without any analysis, "[t]he clamp pulleys also move relative to the outrigger in response to tension." Appx12.

Here again, GEM Products presented substantial evidence of infringement. For example, GEM Products' technical expert opined that, despite having a peg traveling in an arcuate channel, Rupp's Clamp-on Pulley Clusters directly meet the claim limitations because the pulley housings are still not displaceable relative to the outrigger pole (for the claims of the '632 Patent), and the cord passages defined by the housings still extend at a "fixed angular orientation" relative to the outrigger pole (for the claims of the '778, '226 and '566 Patents). Appx6035 (¶ 5); Appx3404 (¶ 36); Appx3896-3897 (¶ 91). This evidence was unrebutted by Rupp and never addressed by the district court.

In the end, GEM Products' substantial evidence established, at minimum, numerous genuine issues of material facts that precluded summary judgment.

### D. The District Court's "Substantial Noninfringing Use" Findings were Legally Wrong and Unsupported by the Evidence

"Contributory infringement under 35 U.S.C. § 271(c) requires proof that… the accused product is not a staple article or commodity of commerce suitable for a

substantial noninfringing use." *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021) (cleaned up).

GEM Products met its burden establishing Rupp's Pulley Clusters have no substantial noninfringing use with considerable fact and expert evidence. Yet the district court ignored this evidence and instead determined Rupp's Pulley Clusters are "staple articles of commerce suitable for a substantial noninfringing use," without any analysis of Rupp's *actual* Pulley Clusters. Appx11-12. The district court further accepted as irrefutable fact Rupp's unsupported conjecture about a hypothetical noninfringing use, ignoring all of the evidence GEM Products provided showing Rupp's Pulley Clusters have no noninfringing uses, let alone any that are substantial.

The district court's findings are irreconcilable with foundational patent law, especially in light of the evidence GEM Products submitted showing there are no noninfringing uses, which, at minimum, created genuine issues of material fact. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670 (Fed. Cir. 1990)

(summary judgment on contributory infringement inappropriate when disputed material fact issues existed regarding substantial non-infringing use).

### i.  <u>The District Court Failed to Apply the Correct Law</u>

To support its finding of substantial noninfringing uses, the district court recited a general history of generic pulleys, noting:

> A pulley is a general-purpose mechanical component used in countless applications, from elevators and construction cranes to sailboats, exercise equipment and flagpoles. Pulley systems were in use as early as 1500 B.C. in Mesopotamia to hoist water. Archimedes (287-212 BCE) combined fixed and movable pulleys to achieve mechanical advantages.

Appx11 (internal cites omitted).

The district court then concluded that because "[a] pulley is a quintessential staple of commerce," and since Rupp's Pulley Clusters include multiple pulleys, Rupp's Pulley Clusters must have substantial noninfringing uses. Appx11-12. Not only did the district court fail to apply the correct law, but by considering only generic pulleys as a class, it never considered whether Rupp's *actual* Pulley Clusters have any substantial noninfringing use.

First, the plain language of Section 271(c) is directed to the *actual* accused product, and how that product is sold and used; <u>not</u> a sweeping, generic category of a component included in an accused product, divorced from the product's actual design, purpose, and use. 35 U.S.C. § 271(c). The district court never analyzed whether Rupp's Pulley Clusters—which (a) Rupp designed, intended, and

configured to be used exclusively with Rupp's outriggers; (b) a vendor manufactures solely for Rupp using Rupp's proprietary design and specifications; and (c) Rupp advertises and sells exclusively for use with Rupp's outriggers with multiple halyard lines—are suitable for any noninfringing use. Instead, the district court hypothesized that since Rupp's Pulley Clusters include multiple pulleys, they can be genericized, and then concluded that because "[a] pulley is a quintessential staple of commerce," any products that include a pulley, including Rupp's Pulley Clusters, must be "standard and ordinary." Appx11. This violates this Court's well-established law.

For example, in *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987), this Court mandated the substantial noninfringing uses analysis must focus on "the material ***actually sold by the accused*** and the uses made of it by its purchasers." (emphasis added). Thus, it is the accused product that must be assessed for noninfringing use, not a component of the accused product or some generic version of it. *Id.*

Likewise in *Ricoh Co. v. Quanta Computer Inc.,* 550 F.3d 1325, 1337 (Fed. Cir. 2008), *cert. denied*, 557 U.S. 936 (2009), this Court rejected the premise that an otherwise infringing product may escape liability merely because it contains a noninfringing staple ingredient. *Id.* at 1339-40. The Court held:

It does not follow from *Hodosh* that the inclusion of a component with substantial noninfringing uses in a product that contains *other* components useful only to infringe a process patent can or should defeat liability for contributory infringement under § 271(c).

*Id.*

Then in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321 (Fed. Cir. 2009), this Court explained the noninfringing use inquiry under § 271(c) focuses on the specific ways the accused product is intended to be used and the ways it is actually used. An accused infringer cannot circumvent contributory infringement liability merely by pointing to some subcomponent of the accused product that may have noninfringing uses in the abstract. *Id.*

The district court's subjective, genericized characterizations of Rupp's Pulley Clusters based on pulleys included in the Pulley Clusters product were improper. *Id.* The district court never engaged in the inquiry required by § 271(c) and this Court as to whether Rupp's *actual* Pulley Clusters have any noninfringing use. It instead jumped from a truism that since generic pulleys existed "throughout history," then Rupp's Pulley Clusters that include multiple pulleys must be staple articles of commerce with substantial noninfringing uses—without reference to any evidence. Appx11. The district court ignored that Rupp's Pulley Clusters include many components that, as a whole, make it very specific and specialized for its intended use, such as the housing, multiple pulleys that interact and are arranged in a specific

manner, and how the Pulley Clusters are specifically configured, designed, advertised, and adapted by Rupp to be attached to and used exclusively with Rupp's outriggers with multiple halyard lines, and nothing else. *See* Appx3917-3919, Appx3935-3938 (¶¶ 130, 162-66).

The district court's substantial noninfringing use findings would avoid § 271(c) liability whenever an accused product merely includes a component that could be described at a sufficiently high level of generality—e.g., "a pulley," "a fastener," "a processor," or "a chemical compound"—even if the actual accused product is specially manufactured, designed, intended, advertised, adapted, and sold for infringing use, and that infringing use is the sole way it has ever been use, as is the case here. But that is not the law. *See Hodosh*, 833 F.2d at 1578 (substantial noninfringing use analysis under § 271(c) must focus on the product actually sold and how it is used).

Tellingly, during the Summary Judgment Hearing, the district court and Rupp's counsel both seemingly recognized Rupp cannot have it both ways—its Pulley Clusters cannot be both specially designed, yet staple articles of commerce:

> THE COURT: Your argument, then, isn't that this is a staple article, the pulley; your argument is that it is a pulley that is designed in a way that can't infringe; is that right? You can't be both, can you?
>
> RUPP'S COUNSEL: It can't.

Appx7513 (Tr. 53:14-18). Yet the district court adopted both theories, treating Rupp's Pulley Clusters as (1) a generic "quintessential staple of commerce" but also (2) specifically designed products that "attach and move differently." Appx11. The two findings cannot coexist, and neither was tied to the record.

Second, the US Supreme Court's *Sony* decision does not carry the weight the district court attributed to it. Appx10-11. As this Court explained, *Sony*'s noninfringing use analysis does not reach specialized, distinct components suited only for an infringing use. *Ricoh*, 550 F.3d at 1337-40. As in *Ricoh*, this case involves specialized, distinct components suited *only* for an infringing use - Rupp's Pulley Clusters are specifically designed, manufactured, configured, advertised, and intended by Rupp to be exclusively attached to and used with Rupp's outriggers with multiple halyard line in an infringing way, and that is the only evidence of how they have ever been used.

Therefore, the district court's application of the law was improper and requires reversal.

### ii. The District Court Ignored the Evidence

The district court's conclusion that "[t]he undisputed facts fail to support Plaintiff's assertion that Defendant's distribution of outriggers and pulleys is intended to infringe Plaintiff's Patents" was wrong. Appx10. The only way for the district court to make such statement was to ignore the evidence GEM Products

presented relating to the lack of noninfringing uses for Rupp's Pulley Clusters. Tellingly, the district court failed to cite to a single "undisputed fact[]" that support its finding.

Just as it did with its noninfringement analysis (*supra*, Section C, p. 41), the only "evidence" considered by the district court was the self-serving Karpanty Declaration, highlighted by the district court when it summarily concluded "[t]he accused pulleys are not limited to outrigger use and may be used in single-line configurations or on structures other than outriggers." Appx7. Putting aside the legal issues with the Karpanty Declaration (discussed above), there is no evidence that Rupp's Pulley Clusters have ever been used other than with Rupp's outriggers with multiple halyard lines in an infringing manner. But, once again, without any explanation, the district court ignored the extensive evidence GEM Products submitted demonstrating Rupp's Pulley Clusters lack any substantial noninfringing uses. *See Toshiba*, 681 F.3d at 1362 ("To establish contributory infringement liability, the patent owner must show, among other things, that there are no substantial non-infringing uses."). At minimum, GEM Products' substantial evidence created issues of material facts relating to substantial noninfringing uses, precluding summary judgment as a matter of law.

### 1. **GEM Products' Expert Evidence**

The district court did not acknowledge any of the testimony and supporting evidence from GEM Products' technical expert, Mr. Lloyd, who opined Rupp's Pulley Clusters are "especially made or especially adapted" for use in outrigger line-management systems in an infringing manner, and "are not a staple article of commerce suitable for substantial noninfringing uses." Appx6038 (¶ 29), Appx3933-3942 (¶¶ 160–171). For example, Mr. Lloyd explained how Rupp's Pulley Clusters:

(a) were designed by Rupp exclusively for mounting on Rupp's outriggers, and how they attach to such outriggers (Appx3917-3919 (¶ 130), Appx3933-3936 (¶¶ 160-163));

(b) include a female threaded hole specifically sized and adapted to be used with a bolt that replaces the eyebolt/eyenut on Rupp's outriggers (Appx3917-3919 (¶ 130), Appx3938-3940 (¶ 167), Appx5027 (Tr. 146:15-23));

(c) are exclusively advertised by Rupp for use with Rupp's outriggers by replacing the eyebolt on such outriggers (Appx3919-3922 (¶¶ 131-132), Appx3933-3935 (¶ 160)), Appx4646);

(d) are designed and intended to be used with a corresponding number of halyard lines (e.g., two halyard lines for a double-pulley Pulley Cluster, three halyard lines for a triple-pulley Pulley Cluster) (Appx3890 (¶ 81), Appx3936-3938 (¶¶ 164-165)); and

(e) when used as designed and intended by end users, would necessarily cause such end users to directly infringe the Asserted Claims (Appx3938-3940

(¶ 167)).

This was all supported by Mr. Lloyd's: (a) examination of physical samples of Rupp's Pulley Clusters; (b) personal use of Rupp's outriggers with Rupp's Pulley Clusters over the years; (c) decades of experience as a sport, professional, and recreational fisherman; (d) personal observations of others using Rupp's outriggers with Pulley Clusters; and (e) analyses of the factual record. Appx3898-3899 (¶ 94), Appx3938-3940 (¶ 167). To this end, Mr. Lloyd concluded Rupp's Pulley Clusters have no substantial noninfringing use. Appx3936-3937 (¶ 164), Appx3938-3940 (¶ 167) Appx3942-3943 (¶¶ 171-173).

### 2. **Rupp's Marketing Materials**

Rupp's own marketing and instructional materials confirm Rupp's Pulley Clusters are specifically designed, intended, configured, marketed, and advertised to be used exclusively with Rupp's outriggers in an infringing manner, and nothing else. Appx3405 (¶¶ 44-48), Appx3408-3409 (¶¶ 77, 82, 85); Appx3933-3935 (¶ 160), Appx3938-3940 (¶ 167); Appx6035 (¶ 1).

For example, Rupp advertises Rupp's Pulley Clusters "eliminate eye-bolt and halyard line chafing by adding a roller pulley in place of each outrigger eye-bolt" and instructs end users to replace eye-bolts on Rupp's outriggers with Rupp's Pulley Clusters. Appx123, Appx3405 (¶ 44), Appx6031 (¶ 51), Appx6036 (¶ 9), Appx3919-3922 (¶¶ 131-132).



**Rupp instructs users to replace outrigger
eyebolts with Pulley Clusters, from Rupp's Catalog**
(Appx3900 (¶ 95))

Rupp's instructions and rigging diagrams then instruct end users how to rig and use Rupp's outriggers with multiple halyard lines that, when used with Rupp's Pulley Clusters, would necessarily cause direct infringement. Appx3405 (¶¶ 44-46), Appx3914-3923 (¶¶ 122-136).



**Rupp's Rigging Instructions cause direct infringement when used with Pulley Clusters**
(Appx3910 (¶ 110))

**Example Rupp Rigging Diagram that causes direct infringement when used with Pulley Clusters**
(Appx3914 (¶ 123))

Ron Karpanty, Rupp's vice-president and co-owner, confirmed Rupp's instructions are intended to show customers "how to rig the outrigger." Appx3405 (¶ 48), Appx4860 (Tr. 140:9-16). GEM Products' expert, Mr. Lloyd, also confirmed that using Rupp's outriggers with Rupp's Pulley Clusters in accord with Rupp's instructions and diagrams would necessarily cause end users to directly infringe the Asserted Claims. Appx3880 (¶ 65), Appx3914-3923 (¶¶ 122-136).

### 3. Rupp's Admissions

Scott Rupp, president and co-owner of Rupp, acknowledged the intent of Rupp's Pulley Clusters is to be "used as part of [a] halyard line system." Appx3407 (¶¶ 65-66), Appx6626 (¶¶ 65-66). He testified that the impetus for bringing Rupp's

Pulley Clusters to market was to be used with Rupp's triple-rigging kits with Rupp's outriggers. Appx3409 (¶ 85). Mr. Rupp further explained that Rupp's Pulley Clusters not having a commensurate number of halyard lines "is not in use," as not all of the pulleys in the Pulley Cluster would be used. Appx3407 (¶ 66), Appx6626 (¶ 66). Rupp never disputed any of these admissions. *Id.*

### 4. End User Testimony

GEM Products also provided deposition testimony from end users of Rupp's outriggers with Rupp's Pulley Clusters, confirming the real-world use of Rupp's Pulley Clusters. For example, Jose Cortes, a freelance fisherman with fifteen years of sportfishing experience using Rupp's products, testified he commonly uses three halyard lines with Rupp's outriggers having Rupp's Pulley Clusters and that, as a matter of routine practice, end users follow the instructions provided in Rupp's instructions, or at least assemble and use Rupp's outriggers with Rupp's Pulley Clusters consistent with those instructions. Appx3406 (¶ 53), Appx6035 (¶8), Appx5040 (Tr. 42:8-11).

### iii. District Court's "Substantial Noninfringing Use" does not Exist

First, the district court erroneously treated the fact that Rupp may sell its outriggers and Pulley Clusters separately as somehow indicative of noninfringing uses. Appx10. But, a company's decisions on internal inventory cannot avoid infringement liability, and Rupp's decision to inventory and market its outriggers

and Pulley Clusters as separate products has no relevance, and does not relieve Rupp of its infringement culpability. *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363–64 (Fed. Cir. 2006) (affirming contributory infringement when defendant sold a separately packaged component, especially made for the patented combination, with instructions teaching the infringing assembly).

But even assuming selling outriggers and Pulley Clusters separately is relevant, the evidence contradicted this theory. Not only does Rupp regularly sell its outriggers and Pulley Clusters at the same time, but Rupp also regularly sells and delivers outriggers with Rupp's Pulley Clusters installed and attached to those outriggers by Rupp. Appx3404 (¶¶ 39-40); Appx3891-3892 (¶ 84); Appx4854 (Tr. 220:10-20); Appx4855 (Tr. 256:12-15); Appx5019-5020 (Tr. 39:12-40:12); Appx6035 (¶ 6); *see also supra*, p. 33 (showing Rupp's disassembled outrigger with Rupp's Pulley Clusters still installed on the outrigger by Rupp). In fact, Rupp's counsel conceded during the Summary Judgment Hearing that Rupp regularly installs Rupp's Pulley Clusters on Rupp's outriggers. When asked by the district court whether Rupp installs Pulley Clusters on its outriggers sold to customers, he answered, "[i]f there were pulleys in the order and they asked for outriggers to be assembled [Rupp] would put the pulleys on." Appx7512-7513 (Tr. 52:25-53:3). The notion that Rupp sells its outriggers and Pulley Clusters as separate items is a red-herring.

Second, the district court next confusingly concluded that because "Plaintiff agrees that outriggers *with eyebolts* sold by Defendant have substantial non-infringing uses," then Rupp's outriggers with Rupp's Pulley Clusters must have substantial noninfringing uses as well. Appx11 (n.2) (emphasis added). But GEM Products never accused Rupp's outriggers *with eyebolts* (i.e., without Pulley Clusters) as causing infringement. This is not a "noninfringing use," as it is a product that does not include the component that causes infringement. Rather, it is Rupp's outriggers *with* Rupp's Pulley Clusters that cause infringement.

The sole purported "noninfringing use" identified by Rupp adopted by the district court was a theoretical possibility a user "could" use a single halyard line with Rupp's outrigger with Pulley Clusters and not multiple halyard lines. But, this "single-halyard line" use is improper hypothetical conjecture without any real-world evidentiary support. As this Court mandated in *Bio-Rad Labs.*, 998 F.3d at 1336, noninfringing uses be "real," not hypothetical. Substantial noninfringing use cannot be established without *real evidence* of actual use. *Id.* Rupp has not presented a single piece of evidence of Rupp's Pulley Clusters ever being *used* with a single halyard line.

In fact, the evidence directly refutes Rupp's "single-halyard line" theory. For example, GEM Products' technical expert, Mr. Lloyd, opined that the customary and intended use of Rupp's Pulley Clusters, which include multiple pulleys, is with a

corresponding number of halyard lines that matches the number of pulleys (i.e., two halyard lines for a double-pulley Pulley Cluster, three halyard lines for a triple-pulley Pulley Cluster, etc.). Appx6038 (¶ 31), Appx3936-3937 (¶¶ 164-165). Mr. Lloyd also opined that an end user would never purchase Rupp's Pulley Clusters unless to use them with a corresponding number of halyard lines. Appx3927 (¶¶ 164-165). Otherwise, using Rupp's Pulley Cluster with a single halyard line would not be using the Pulley Cluster for its intended purpose, design, and benefit (i.e., it would not be using all of the pulleys in the Pulley Cluster, and it would instead just be using a single pulley). Appx3408 (¶ 75), Appx3937 (¶¶ 164-165).

Rupp's own evidence also shows that Rupp's Pulley Clusters are not designed and intended to be used with a single halyard line. For example, Rupp's website described Rupp's Pulley Clusters for use "in any combination of *double or triple rigging of outrigger halyard lines*." Appx4997 (emphasis added), Appx4990, Appx4994, Appx5481-5483, Appx6637-6638.

Further, "[i]n assessing whether a use is substantial, the fact-finder may consider 'the use's frequency… the use's practicality, the invention's intended purpose, and the intended market.'" *Toshiba*, 681 F.3d at 1362 (*quoting i4i Limited P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010)). While it is theoretically possible a fisherman may decide, on any single given day, to fish with just a single halyard line when multiple halyard lines are available, as Mr. Lloyd

opined, it would be rare and does not negate the fact that Rupp's Pulley Clusters with multiple pulleys are still rigged with a corresponding number of halyard lines, and intended to be used with the multiple halyard lines. Appx3408 (¶ 75), Appx3890 (¶ 81), Appx3909 (¶ 108), Appx3936-3937 (¶ 164), Appx5903 (Tr. 152:17-153:6), Appx5925 (Tr. 239:21-240:4); *see Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1340 (Fed. Cir. 2019) (A noninfringing use is substantial **when it is "not unusual**, farfetched, illusory, impractical, **occasional,** aberrant, or experimental.") (internal cites omitted) (emphasis added)

Still, the Asserted Claims do not require *use* of any specific number of halyard lines, but require only that the outrigger be *rigged* with multiple halyard lines that could be used, even if all are not used at any given moment. *See e.g.,* Appx68. It is undisputed that outriggers are most commonly rigged once per season with multiple halyard lines with respective retention devices. Appx3409 (¶¶ 84, 87), Appx5056 (Tr. 109:6-10). For example, as Mr. Lloyd testified, a rare user who decides not to use all halyard lines on a given day does not remove the unused halyard lines - the system remains configured with multiple lines and retention devices. Appx5056 (Tr. 109:6-10). Rupp's single-halyard-line theory parallels *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330–31 (Fed. Cir. 2010), where this Court held the ability to turn off an infringing feature does not create a noninfringing use.

The entirety of Rupp's substantial noninfringing use theory is based on an impermissible hypothetical, which cannot carry the day. *Bio-Rad Labs.*, 998 F.3d at 1336 (Substantial noninfringing use focuses on "the ***real way*** in which the accused product ***is made, used, and sold***," not on hypothetical alternatives or theoretical possibilities) (emphasis added).

The district court credited Rupp's hypothetical noninfringing uses without acknowledging they were contradicted by evidence submitted by GEM Products. This was clear error. At minimum, the substantial evidence provided by GEM Products created genuine issues of material facts precluding summary judgment.

### E. The District Court's Finding of no Induced Infringement under 35 U.S.C. § 271(b) was Legally Wrong

The district court concluded "the record contains no evidence of any affirmative act—let alone specific intent—encouraging infringement." Appx13-14. This misapplied law governing induced infringement, and failed to consider evidence demonstrating Rupp's active steps that encourage direct infringement.

To establish induced infringement under Section 271(b), a plaintiff must prove the defendant: (1) took an affirmative act to encourage infringement; and (2) the affirmative act came with the knowledge that the induced acts constitute patent infringement. *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (internal citation omitted). Circumstantial evidence of active steps taken to encourage direct infringement, such as advertising or instructing an infringing use,

shows an affirmative intent the accused product is to be used to infringe. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 408 (Fed. Cir. 2018).

First, the district court concluded there could be no inducement because Rupp "provides no instructions, manuals, marketing materials, or communications directing customers to assemble a system." Appx13. This was wrong. As discussed above (*supra*, Section IV.D.ii.2, p. 61), GEM Products presented evidence in the form of Rupp's instructions, manuals, marketing materials and communications. GEM Products' technical expert, in addition to third-party end users, testified that Rupp's instructions and manuals are how outriggers with Rupp's Pulley Clusters are used, and it would necessarily cause direct infringement. (*Supra*, Section D.ii, p. 58).

Second, the district court improperly required that Rupp provide *explicit* instructions that taught step-by-step infringement. *See* Appx13-14. Yet inducement may be proven circumstantially with materials demonstrating infringing use of a product, even when those materials do not explicitly reference patent claims or call out the infringing nature of the use. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1335 (Fed. Cir. 2016) (affirming induced infringement resting on circumstantial evidence directed to a class of direct infringers, without proof tying advertisements or instructions to an act of infringement).

Third, the district court held there could be no inducement because Rupp "has no direct interaction with end users at all." Appx13. Not only is this factually wrong, as Rupp admitted its instructions on its website are intended to be used by end users (Appx3405 (¶ 48), Appx4860 (Tr. 140:4-16)), but this ignored the law. Inducement can exist where the accused directed materials "to a class of direct infringers (e.g., customers, end users)" through advertisements, manuals, or other materials, "without requiring hard proof that any individual third-party direct infringer was actually persuaded to infringe by that material." *Power Integrations,* 843 F.3d at 1336. That is what has occurred here. Appx3405 (¶ 48), Appx4860 (Tr. 140:4-16).

Nor is there any dispute that Rupp acted with the requisite knowledge. Rupp admittedly knew of the '632 Patent since at least 2014, it received follow-up infringement correspondence from Mr. Mercier's counsel in 2017 about the '632, '778, and '226 Patents, and then again in 2024 for all four Asserted Patents from GEM Products' counsel. Appx5-6, Appx370-371 (¶¶ 52-60).

Therefore, the district court's misapplication of law requires reversal. At minimum, GEM Products raised issues of material facts precluding summary judgment.

## V. <u>CONCLUSION</u>

As discussed above, the district court committed several errors, any one of which requires vacatur. At minimum, the substantial evidence presented by GEM Products raised several genuine disputes of material facts precluding summary judgment of noninfringement in Rupp's favor, as a matter of law. GEM Products requests that this Court vacate the Final Judgment and the grant of Summary Judgment of noninfringement in Rupp's favor, and remand for trial.

**Dated: July 13, 2026**          **Respectfully submitted,**

*/s/* Joseph R. Lanser
Joseph R. Lanser
   *Principal Counsel*
Jaimin H. Shah
TAFT STETTINIUS & HOLLISTER, LLP
111 E. Wacker Dr.
Suite 2600
Chicago, IL 60601
Tel. (312) 527-4000
Fax (312) 527-4011
Email: jlanser@taftlaw.com

Charles D. Pfister
TAFT STETTINIUS & HOLLISTER, LLP
40 N. Main St.
Suite 1700
Dayton, OH 45423
Tel. (937) 641-2071
Fax (937) 228-2816
Email: cpfister@taftlaw.com

Alex M. Matthews
TAFT STETTINIUS & HOLLISTER, LLP
One Indiana Square
Suite 3500
Indianapolis, IN 46204
Tel. (317) 713-3500
Fax (317) 713-3699
Email: amatthews@taftlaw.com

***Counsel for Plaintiff- Appellant GEM Products, LLC***

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1817

**Short Case Caption:** GEM Products, LLC v. Rupp Marine, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13,980__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __07/13/2026__

Signature: __/s/ Joseph Lanser__

Name: __Joseph Lanser__

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Final Judgment (Dated May 4, 2026)..........................................................Appx1

Order on Cross Motions for Summary Judgment
(dated February 5, 2026)....................................................................Appx2

U.S. Patent No. 8,656,632 .................................................................Appx52

U.S. Patent No. 9,392,778 .................................................................Appx70

U.S. Patent No. 9,717,226 .................................................................Appx87

U.S. Patent No. 11,589,566 ...............................................................Appx104

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 2:25-cv-14047-MIDDLEBROOKS

GEM PRODUCTS, LLC,

      Plaintiff/Counterclaim-Defendant,

v.

RUPP MARINE, INC.,

      Defendant/Counterclaimant.

_____/

**FINAL JUDGMENT**

      THIS CAUSE is before the Court pursuant to my previous Order on Cross Motions for Summary Judgement (DE 211) and my Order Granting Joint Motion for Dismissal Without Prejudice of Defendant's Counterclaims for Patent Invalidity.  Final judgment is entered pursuant to Federal Rule of Civil Procedure 58, as set forth below.

      It is hereby **ORDERED** and **ADJUDGED** that:

1.  Pursuant to the Court's summary judgment order of non-infringement (DE 211), final Judgment of non-infringement is ENTERED in favor of Defendant/Counter-Plaintiff, Rupp Marine, Inc., and against Plaintiff/Counter-Defendant, GEM Products, LLC.

2.  All pending motions are **DENIED AS MOOT**.

3.  The Clerk of Court shall **CLOSE THIS CASE**.

      **SIGNED** in Chambers at West Palm Beach, Florida this 4th day of May, 2026.

_____
Donald M. Middlebrooks
United States District Judge

**APPX1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 25-cv-14047-MIDDLEBROOKS

GEM PRODUCTS, LLC,

      Plaintiff/Counter-Defendant,

vs.

RUPP MARINE, INC.,

      Defendant/Counter-Plaintiff.

_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff GEM Products, LLC manufacturers fishing and boating hardware, and it holds patents for line management systems for fishing boats with outriggers. An outrigger line is a fishing line run from a long pole (the outrigger) extending from the side of a boat. It is generally used in offshore trolling to spread multiple lines wider apart, which aids in keeping bait out of the boat's wake and results in a more natural distribution of the lines to attract fish. Defendant Rupp Marine, Inc. sells sportfishing hardware and outrigger accessories, including pulleys, outriggers, and mounting systems.

In this case, I am called upon to decide whether Defendant is infringing upon Plaintiff's claimed patent rights on outrigger line management systems by selling a series of pulleys as part of an outrigger cord management system. Plaintiff has brought claims for indirect and contributory infringement of four different patents. (First Amended Complaint, DE 43). Defendant asserts counterclaims for non-infringement and invalidity of the four patents. (Counterclaims, DE 46). Before me are cross motions for summary judgment (DE 150 and DE 153), which I have carefully considered, along with the Parties' oral arguments, the voluminous and technical record of

**APPX2**

exhibits, and applicable law. For the reasons explained below, I conclude that Defendant is not liable for infringement.

## I.     <u>BACKGROUND</u>

On a fishing boat, a pulley is a simple machine (a wheel on an axle) used in rigging to change the direction of force, reduce effort for lifting heavy items like sails or outriggers, or as a key component in specialized fishing rigs, which helps keep the bait near the hook and brings the fish up away from snags when reeled in, often using beads and swivels to allow line movement.   Plaintiff has several patents relating to its outrigger line management systems: 8,656,632 ('632 Patent); 9,392,778 ('778 Patent); 9,717,226 ('226 Patent); and 11,589,566 ('566 Patent) (collectively "Plaintiff's Patents") (DE 43-1). Plaintiff's system works by connecting pulleys to outriggers in a manner that does not fray halyard lines.

The issue in this case, distilled down to its simplest framing, is whether Defendant Rupp Marine's pulley products and outriggers are ordinary, multipurpose components with substantial lawful uses, or whether they are specially adapted parts that, when used as intended, necessarily result in infringement of Plaintiff's asserted patents. Plaintiff characterizes the accused products as integral components of the patented outrigger system, while Defendant maintains that its products are generic rigging hardware capable of non-infringing applications. The facts relevant to determining these questions are set out below.[1] They are derived from the Parties' respective

---

[1] In support of its Motion for Summary Judgment, Rupp Marine filed a Statement of Material Facts. (DE 154). Attached to that motion was an affidavit by Ron Karpanty, vice-president and co-owner of Rupp Marine, who attests he has been with Rupp Marine for 19 years and is involved in all aspects of its business. (DE 154-1). His affidavit includes, as Exhibit A, engineering files for Rupp Marine's outriggers and pulleys (DE 154-2); Exhibit B, engineering files for the accused "Pulley Clusters" and "Accused Clamp Pulleys" (DE 154-3); Exhibit C, photographs of the "Accused Pulleys" (the photographs were provided by Plaintiffs but said to be accurate) (DE 154-4); Exhibit D, photographs of Rupp Marine's website reflecting the advertising and promotional language  pertaining to their pulleys (these photographs were also produced by Plaintiffs) (DE

<span style="text-align:center">2</span>

<span style="text-align:center">**APPX3**</span>

Statements of Material Fact and responses thereto, filed contemporaneously with the Motions for Summary Judgment. (DE 151, 154, 166, 169, 176, 182), and are undisputed unless otherwise noted.

### A.      Plaintiff's Patents

The Plaintiff's Patents all originate from the inventive work of Craig Mercier, who is listed as the named inventor on each. Collectively, the patents address outrigger-rigging systems used in sportfishing, including arrangements of halyard lines, retention devices, and pulley-based components designed to advance fishing, teaser, or dredge lines along an outrigger. (First Am. Compl. ¶¶ 1, 32, 40). A general understanding of the nature of Plaintiff's Patents, when they were issued, and the relationship between them is necessary to understanding why Plaintiff's infringement claims ultimately fail.

The '632 Patent (U.S. Patent No. 8,656,632). This is the earliest of the four asserted patents and forms the foundation for the later filings. It issued in February 2014. The patent originally claimed systems for rigging multiple halyard lines on an outrigger using retention devices that allow lines to advance longitudinally along the pole. (First Am. Compl. ¶ ¶ 1, 40; Answer ¶ 40, DE 46).  This patent was subject to a Notice and Reexamination in 2015, when Mercier contacted

---

154-5); Exhibit F, a picture from the home page of Rupp Marine's website showing the pulleys attached to an outrigger (once again supplied by Plaintiff) (DE 154-7).

Plaintiff provides no factual opposition to Mr. Karpanty's description of Rupp Marine's products or the accompanying engineering plans, photographs and website materials (much of which were produced by Plaintiff itself in discovery). Instead, Plaintiff only argues that the description of the products are "not supported by a citation to record material or any other support except Karpanty's similarly phrased, conclusory assertion." But Mr. Karpanty's assertions, based upon personal knowledge and observation, particularly when supported by engineering plans and photographs are admissible at summary judgment. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018*); Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999); *see also* Fed. R. Civ. P. 56(c)(4) (declarations of facts based on personal knowledge are admissible summary judgment evidence).

**APPX4**

Defendant, alleging infringement of the then-existing '632 patent and inquiring about a potential license. (First Am. Compl. ¶¶ 52–53; Answer ¶¶ 52–53). Defendant responded by filing a Request for Ex Parte Reexamination on September 23, 2015. (First Am. Compl. ¶ 54; Answer ¶ 54). The USPTO issued a Reexamination Certificate on August 23, 2016, confirming the patentability of the amended and narrowed claims. (First Am. Compl. ¶ 56; Answer ¶ 56).

The '778 Patent (U.S. Patent No. 9,392,778). This patent issued in July 2016 and is part of the same inventive lineage. It expands on the outrigger-rigging concepts disclosed in the '632 patent and includes additional claims directed to multi-line outrigger systems and associated components. (First Am. Compl. ¶¶ 3–4, 13–16).  Defendant admits it became aware of the '778 Patent by November 2017, when Mercier's counsel sent correspondence asserting infringement of the '632, '778, and '226 patents. (First Am. Compl. ¶¶ 57–58; Answer ¶¶ 14, 58).

The '226 Patent (U.S. Patent No. 9,717,226). This patent issued in August 2017. Like the '632 and '778 patents, it addresses outrigger-rigging systems involving multiple halyard lines and retention devices and continues the same technological theme as the earlier Mercier inventions. (First Am. Compl. ¶¶ 5–6, 17–20).  Defendant acknowledges awareness of the '226 Patent by November 2017, but denies receiving a substantive explanation of alleged infringement at that time. (First Am. Compl. ¶ 58; Answer ¶ 18).

The '566 Patent (U.S. Patent No. 11,589,566). This is the most recent of the four, issuing in February 2023. It further develops the outrigger-rigging concepts and includes additional claim refinements and embodiments. (First Am. Compl. ¶¶ 7–8).  Defendant became aware of the '566 Patent by September 2024, when Plaintiff contacted Defendant regarding alleged infringement of all four patents. (First Am. Compl. ¶¶ 59–60; Answer ¶¶ 22, 60).

4

**APPX5**

**B.      Communications Between the Parties Regarding the Patents**

In 2015, Mercier contacted Defendant alleging infringement of the original '632 patent and proposed a license. (First Am. Compl. ¶ ¶ 52–53; Answer ¶ ¶ 52–53).  That same year, Defendant filed a request for ex parte reexamination of the '632 Patent. (First Am. Compl. ¶ 54; Answer ¶ 54). As explained above, in 2016, the USPTO issued a reexamination certificate for the '632 Patent. (First Am. Compl. ¶ 56; Answer ¶ 56). Then, in 2017, Mercier's counsel again contacted Defendant, asserting infringement of the reexamined '632 patent, as well as the '778, and '226 Patents. (First Am. Compl.  ¶¶ 57–58; Answer ¶ 57).

**C.      The Accused Products**

Defendant sells two pulley-block products: CA-0145, a single pulley block containing two sheaves, and CA-0146, a single pulley block containing three sheaves. (Karpanty Decl. ¶ ¶ 7–8, DE 154-1; Ex. A at 120–21, 128–29; Ex. B at 2–3, 5–6, DE 154).  A pulley block serves a variety of marine uses, such as reducing friction on a halyard line. Defendant began selling the "Pulley Clusters" in 2012. (Karpanty Declaration ¶ 9).  In 2015, Defendant redesigned the "Pulley Clusters" to incorporate an adjustable polyaxial ball-joint stem that allows the pulley housing to pivot relative to the structure to which it is mounted. (Karpanty Declaration ¶ 11). When attached to an outrigger, the pulley housing, sheaves, and cord-routing openings move relative to the outrigger in response to halyard-line tension. (Karpanty Decl. ¶ 15; Ex. D at 2–4; Ex. B at 1–3, 5–6, 13–14; Ex. C at 3, 8, 10, 14, 19, 23–24).

Defendant also sells "Accused Clamp Pulleys," which include a pivot connection attaching the pulley housing to the clamp via a pair of pins. (Karpanty Decl. ¶ 18; Ex. B at 4, 7–12).  When mounted on an outrigger, these pulleys likewise move relative to the outrigger in response to halyard line tension. (Karpanty Declaration ¶ 19).

5

**APPX6**

None of Defendant's accused pulley products have a housing that attaches directly to an outrigger with at least one fastener, and none contain a housing that forms the "cord passage" on the outer side of the pulley wheel or on the side opposite the outrigger as claimed in the asserted patents. (Karpanty Declaration ¶¶ 20, 24-25; Ex. B at 4, 7-12).

Defendant sells outriggers and pulley products separately. The design files for outriggers and pulleys are distinct, and the company does not offer for sale or sell any outrigger with pulleys pre-installed. (Karpanty Decl. ¶¶ 26–28; Ex. A at 1–115, 119–121, 125–127, 128–137). When customers purchase both outriggers and pulleys, the items appear as separate line items on invoices, and customers pay separate prices for each. (Karpanty Decl. ¶ 29).

Defendant markets the accused Pulley Clusters as components that may be used "in any combination for single, double or triple rigging of halyard lines," and states that users may employ them in any way, including with a single halyard line and a single retention device. (Karpanty Decl. ¶¶ 14, 17; Ex. D at 2–4).

Defendant's outriggers are sold with eyebolts and can be used without pulleys. (Karpanty Decl. ¶ 30). Defendant sells outriggers and accessories so that end users may configure their systems as they choose. (Karpanty Decl. ¶ 31).

The accused pulleys are not limited to outrigger use and may be used in single-line configurations or on structures other than outriggers. (Karpanty Decl. ¶¶ 16–17). Defendant's outriggers can be used without the accused pulleys, including with eyebolts or with pulleys attached by clips or shackles. (Karpanty Decl. ¶ 30).

Defendant provides no instructions or advertisements directing customers to assemble a system meeting the limitations of the '632, '226, or '566 patents, nor any materials instructing users how to perform the method of the '778 patent. (Karpanty Decl. ¶¶ 32–34). For products sold

6

**APPX7**

to distributors, boat builders, or retailers, Defendant does not interact with end users, and there is no communication between Defendant and any alleged direct infringer. (Karpanty Decl.¶¶ 35–36).

## II.   <u>**DISCUSSION**</u>

Defendant argues for summary judgment on all counts of the First Amended Complaint and all Counterclaims. Defendant argues that its accused products—including outriggers, pulley clusters, and clamp pulleys—do not infringe Plaintiff's asserted patents because they are staple articles of commerce with substantial non-infringing uses. Defendant further contends there is no evidence of contributory or induced infringement, emphasizing it never sold combined "outriggers with pulleys" nor instructed customers to use its products in infringing ways. It also challenges the validity of GEM Products' patents under 35 U.S.C. § 112 for lack of written description and definiteness, and raises additional defenses based on prior art, priority dates, and damages limitations.

Plaintiff, in turn, moves for summary judgment on contributory infringement of Claim 1 of Patent '632. It argues that Defendant's outriggers and pulley assemblies are material components of the patented outrigger system and necessarily result in third-party direct infringement when used as intended. Plaintiff asserts that Defendant had knowledge of the '632 patent and its infringement, and that the accused products lack substantial non-infringing uses because they are designed and marketed specifically for outrigger systems requiring multiple halyard lines and retention devices.

Under the governing legal standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material for the purposes of summary judgment only if it 'might affect the outcome of the suit under the governing law.'" *Kerr v.*

**APPX8**

*McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005) (citation omitted). The party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. Moreover, "[t]he court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1557–58 (11th Cir. 1990) (citation omitted).

The initial complaint in this case included claims for both direct and indirect infringement of four patents, the '632, '778, '226, and '566. Subsequently, Plaintiff filed an amended complaint alleging contributory and induced infringement. (DE 43). Plaintiff is no longer alleging that direct infringement against Defendant. However, both contributory and induced infringement require proof of direct infringement by a third party. *See In re Bill Lading Transmission and Processing Sys. Pat. Litig,,* 681 F.3d 1323, 1333 (Fed. Cir. 2012) (it is axiomatic that there can be no inducement or contributory inducement without an underlying act of direct infringement). Plaintiff has not, and cannot, in view of the manner of operation of Defendant's products as explained below, point to any end user, or third party, who has directly infringed the Plaintiff's Patents by using Defendant's products.

### A. Contributory Infringement

Contributory infringement arises when one "sells within the United States . . . a component of a patented machine . . .constituting a material part of the invention, knowing the same to be

**APPX9**

especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c). The language of the contributory infringement statute "deals with the material actually sold by the accused and the uses made of it by its purchasers*." Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987).

The most fulsome explanation of the staple article of commerce doctrine by the United States Supreme Court is in *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). The Court, while considering a copyright, looked to the patent law in stating: "[t]he prohibition against contributory infringement is confined to the knowing sale of a component especially made for use in a particular patent." *Id.* at 440.

> Unless a commodity has no use except through the practice of the patented method, the patentee has no right to claim that its distribution constitutes contributory infringement. To form the basis for contributory infringement, the item must almost be uniquely suited as a component of the patented invention. A sale of an article which though adapted to an infringing use is also adapted to other and lawful uses, is not enough to make the seller a contributory infringer. Such a rule would block the wheels of commerce.

*Id.* at 441 (cleaned up). Thus,

"[t]he staple article of commerce doctrine must state a balance between a . . . legitimate demand for effective – not merely symbolic --- protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce." *Id.* at 442.

The undisputed facts fail to support Plaintiff's assertion that Defendant's distribution of outriggers and pulleys is intended to infringe Plaintiff's Patents. Defendant sells and markets outriggers and pulleys as separate items.

9

**APPX10**

First, outriggers. Defendant sells outriggers but the outriggers it sells have eyebolts through which lines pass. It does not sell outriggers with pulleys.[2]

Defendant also separately sells pulleys. A pulley is a quintessential staple of commerce – a simple machine that has seen use throughout history.[3] A pulley is a general-purpose mechanical component used in countless applications, from elevators and construction cranes to sailboats, exercise equipment and flagpoles. Pulley systems were in use as early as 1500 B.C. in Mesopotamia to hoist water. Archimedes (287-212 BCE) combined fixed and movable pulleys to achieve mechanical advantages. https://www.newworldencyclopedia.org/entry/Pulley.

Defendant began selling pulleys for use in fishing in 2012, prior to the issuance of the Plaintiff's Patents. Defendant sells a single pulley block with two sheaves and a single pulley block with three sheaves. Defendant's website and marketing materials advertise that the pulleys can be used for a single line or multiple lines.

The pulleys are standard and ordinary, not "uniquely suited" as a component of Plaintiff's rigging system. When used with an outrigger, they attach and move differently than contemplated by the Plaintiff's Patents.

The way Defendant's pulleys move is significant. During reexamination of Plaintiff's '632 patent by the Patent and Trademark Office, Plaintiff amended claim 1. That claim, among others,

---

[2] Plaintiff agrees that outriggers with eyebolts sold by Defendant have substantial non-infringing uses. "[Plaintiff] is not asserting that [Defendant]'s outriggers *without pulleys* cause infringements. So whether [Defendant]'s outriggers without pulleys have other uses is entirely irrelevant to the contributory infringement assessment—they do not infringe to begin with." (DE 154 at 11).

[3] A simple machine is an object used to help complete a task by changing the direct of motion or the amount of required force. There are six simple machines: screw, inclined plane, wedge, lever, wheel and axle, and pulley.
https://www.nasa.gov/wpcontent/uploads/2022/06/simple_machines_classroom_connection_508 .pdf.

was rejected as anticipated by the Malin Outrigger Pulleys. The Malin double and single pulleys were configured with loop attachments which could be hooked on to the eyebolts of an outrigger. The pulleys therefore would move relative to the outrigger as dictated by the tensioning force at the line. Plaintiff addressed the issue by adding to claim 1 that its pulleys (and cord management units) would define and maintain a plurality of cord passages "in fixed angular orientation relative to the outrigger structure. . ."

Plaintiff explained how the fixed angular orientation differed from the Malin approach:

> The eye-linked coupling leaves the "snapped" pulley essentially free to take on whatever orientation relative to the outrigger that a tensioning force on the cord may dictate. Such "snap" coupling negates any notion of defining a plurality of cord passages "which are transversely offset" from another and each "maintained in fixed angular orientation relative to the outrigger structure as claim 1 further clarifies.

(DE 154-10, p. 13). While not using an eyebolt coupling similar to that of Malin, the Defendant's pulleys allow movement. Defendant's pulley clusters have an adjustable polyaxial ball-joint stem that allows the pulley housing to pivot relative to the outrigger. Defendant advertises that this allows movement directed by the force on the line which helps eliminate chafing. The clamp pulleys also move relative to the outrigger in response to tension.

Plaintiff's change to a fixed angular orientation relative to the outrigger structure disclaimed movement of the kind the Defendant pulleys allow.[4] Since the Defendant's pulleys do not attach or operate in the manner directed by the Plaintiff's Patents, they were not designed or uniquely suited as a component of Plaintiff's patented invention.

In short, Plaintiff did not invent pulleys or the concept of attaching pulleys to outriggers. To differentiate from prior uses, Plaintiff utilizes a patent with a fixed attachment mechanism

---

[4] During oral argument, I examined Defendant's pulleys.

**APPX12**

which is unlike the pulleys sold by Defendant. The Defendant pulleys cannot contributorily infringe.

### B. Inducement Liability

Where, as here, an article is suitable for substantial noninfringing use, to show induced infringement, an evidentiary showing is required that the defendant intended that the article be used for direct infringement. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokser, Ltd.*, 545 U.S. 913 (2005). Liability for active inducement may be found "where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement." *Id.* at 935 and n.10.

> Evidence of active steps… taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, shows an affirmative intent that the product be sued to infringe and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial  product suitable for some lawful use.

*Id.* at 936. (quotation and citation omitted).  "Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).

The undisputed facts foreclose such a finding. Defendant provides no instructions, manuals, marketing materials, or communications directing customers to assemble a system meeting the limitations of the asserted patents or to perform the method claimed in the '778 patent. For products sold through distributors or retailers, Defendant has no interaction with end users at all. The record contains no evidence of any affirmative act  - let alone specific intent – encouraging infringement. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020) (a defendant

12

**APPX13**

is only liable for induced infringement if the defendant took certain affirmative acts to bring about commission by others of acts of infringement).

<strong>CONCLUSION</strong>

For these reasons, I conclude, as a matter of law, that the accused products do not infringe Plaintiff's Patents. Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1) Defendant's Motion for Summary Judgment (DE 153) is **GRANTED IN PART** with respect to a finding of non-infringement on Counterclaims II, III, VI, VII, X, XI, XIV, XV.[5]

2) Plaintiff's Motion for Summary Judgment (DE 150) is **DENIED.**

**SIGNED** in Chambers at West Palm Beach, Florida, this 5th day of February, 2026.

Donald M. Middlebrooks
United States District Judge

---

[5] The counterclaims for judgment of invalidity (counterclaims IV, VIII, XII, XVI) are not being decided by this Order. Counterclaims I, V, IX and XIII were previously dismissed. (DE 129).

US008656632B1

## (12) United States Patent
### Mercier

(10) **Patent No.:** **US 8,656,632 B1**
(45) **Date of Patent:** **Feb. 25, 2014**

(54) **OUTRIGGER LINE MANAGEMENT SYSTEM**

(76) Inventor: **Craig Mercier**, Harmans, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 760 days.

(21) Appl. No.: **12/726,695**

(22) Filed: **Mar. 18, 2010**

(51) **Int. Cl.**
*A01K 91/08* (2006.01)
*B63B 35/14* (2006.01)
*A01K 91/053* (2006.01)

(52) **U.S. Cl.**
USPC ........... **43/27.4**; 43/43.12; 43/42.74; 114/255

(58) **Field of Classification Search**
USPC ............... 43/27.4, 43.12, 43.13, 42.74, 27.2, 43/21.2; 114/255, 364; 211/119.01, 211/119.02, 119.03, 119.1, 119.11, 119.12, 211/119.13, 119.14
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

|  |  |  |  |  |
|---|---|---|---|---|
| 53,797 | A | * | 4/1866 | Epperson et al. .......... 211/119.1 |
| 133,530 | A | * | 12/1872 | Hadden ....................... 211/119.1 |
| 398,490 | A | * | 2/1889 | Bried .......................... 211/119.1 |
| 667,453 | A | * | 2/1901 | Parker ..................... 211/119.02 |
| 790,336 | A | * | 5/1905 | Yoehger ....................... 43/42.74 |
| 1,032,395 | A | * | 7/1912 | Foss ........................... 211/119.1 |
| 1,134,850 | A | * | 4/1915 | Hebert et al. .............. 211/119.1 |
| 1,157,502 | A | * | 10/1915 | Budaji ..................... 211/119.01 |
| 1,163,193 | A | * | 12/1915 | Althoff ........................ 43/27.2 |
| 1,336,186 | A | * | 4/1920 | Baron ........................ 211/119.1 |
| 1,840,762 | A | * | 1/1932 | Akervick ..................... 43/42.74 |
| 2,037,232 | A | * | 4/1936 | Hendriks ....................... 43/27.2 |
| 2,196,472 | A | * | 4/1940 | Moriarty ........................ 43/27.4 |
| 2,206,174 | A | * | 7/1940 | Falk ........................... 211/119.1 |
| 2,292,415 | A | * | 8/1942 | Waldheim ................ 211/119.02 |
| 2,303,753 | A | * | 12/1942 | Merle .......................... 43/42.74 |
| 2,340,608 | A | * | 2/1944 | Merle .......................... 43/42.74 |
| 2,352,631 | A | * | 7/1944 | Guarnieri ...................... 43/42.74 |
| 2,550,282 | A | * | 4/1951 | McAvoy ........................ 43/27.2 |
| 2,594,158 | A | * | 4/1952 | Hannameyer ............ 211/119.01 |
| 2,599,081 | A | * | 6/1952 | Waddell ................... 211/119.13 |
| 2,834,476 | A | * | 5/1958 | Picone, Jr. .............. 211/119.02 |
| 2,838,866 | A | * | 6/1958 | Labin ........................... 43/43.12 |
| 2,912,782 | A | * | 11/1959 | Maximov ...................... 43/27.2 |
| 2,951,307 | A | * | 9/1960 | Joy et al. ...................... 43/27.4 |
| 3,060,614 | A | * | 10/1962 | Prince .......................... 43/21.2 |
| 3,193,964 | A | * | 7/1965 | Hurst .......................... 43/43.12 |
| 3,355,835 | A | * | 12/1967 | Lyons .......................... 43/27.4 |
| 3,358,399 | A | * | 12/1967 | Waldmann .................. 43/43.12 |
| 3,462,870 | A | * | 8/1969 | Terilli .......................... 43/27.4 |
| 3,650,063 | A | * | 3/1972 | Pierce et al. ................ 43/42.74 |
| 3,656,630 | A | * | 4/1972 | Miguel .................... 211/119.11 |
| 3,787,995 | A | * | 1/1974 | Watanabe .................... 43/43.12 |
| 3,835,567 | A | * | 9/1974 | Humbert et al. ................ 43/6.5 |
| 3,959,913 | A | * | 6/1976 | Weber .......................... 43/43.12 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| FR | 2613905 | A1 | * | 10/1988 | ............. | A01K 91/08 |
| JP | 08214747 | A | * | 8/1996 | ............. | A01K 91/18 |

(Continued)

*Primary Examiner* — Darren W Ark
(74) *Attorney, Agent, or Firm* — Rosenberg, Klein & Lee

(57) **ABSTRACT**

A line management system for an outrigger structure is provided for guiding outrigger cords through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. The system includes a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure.

**17 Claims, 6 Drawing Sheets**



APPX52

US 8,656,632 B1

Page 2

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,968,587 | A | * | 7/1976 | Kammeraad .................. 43/27.4 |
| 4,248,002 | A | * | 2/1981 | McNellis ........................ 43/27.4 |
| 4,388,774 | A | * | 6/1983 | Thoemke ........................ 43/27.4 |
| 4,610,409 | A | * | 9/1986 | Emory, Jr. ..................... 43/27.4 |
| 4,632,050 | A | * | 12/1986 | Rupp ............................. 114/255 |
| 4,756,115 | A | * | 7/1988 | Reyen ......................... 43/42.74 |
| 4,807,386 | A | * | 2/1989 | Emory, Jr. ...................... 43/27.4 |
| 4,875,428 | A | * | 10/1989 | Schlesch et al. ............... 43/21.2 |
| 5,301,451 | A | * | 4/1994 | VanAssche ................... 43/27.4 |
| 5,363,975 | A | * | 11/1994 | Meade .................... 211/119.01 |
| 5,375,727 | A | * | 12/1994 | Lavi ......................... 211/119.01 |
| D366,445 | S | * | 1/1996 | Seggern ....................... D12/317 |
| 5,673,507 | A | * | 10/1997 | Stokes, Jr. ..................... 43/21.2 |
| 5,921,196 | A | * | 7/1999 | Slatter ............................ 43/27.4 |
| 6,149,020 | A | * | 11/2000 | Gumpel et al. ......... 211/119.01 |
| 6,454,109 | B1 | * | 9/2002 | Doyle et al. ............. 211/119.01 |
| 6,505,431 | B1 | * | 1/2003 | Christian et al. ............. 43/43.12 |
| 6,769,377 | B2 | | 8/2004 | Rupp, II |
| 6,834,459 | B2 | * | 12/2004 | van Weenen ................... 43/27.4 |
| 7,111,574 | B2 | * | 9/2006 | Slatter ............................ 43/27.4 |
| 7,343,709 | B2 | * | 3/2008 | van Weenen ................... 43/27.4 |
| 7,654,214 | B2 | * | 2/2010 | Rupp, II ........................ 114/255 |
| 7,878,342 | B1 | * | 2/2011 | Lewis et al. .............. 211/119.01 |
| 8,109,034 | B1 | * | 2/2012 | McCauley ..................... 43/27.4 |
| 2006/0231009 | A1 | * | 10/2006 | Slatter ........................... 114/255 |
| 2009/0188422 | A1 | | 7/2009 | Rupp, II |
| 2010/0005702 | A1 | * | 1/2010 | Palacios Cortell ............. 43/27.4 |

### FOREIGN PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| JP | | 11056184 | A | * | 3/1999 | ............ A01K 91/18 |
| JP | | 2007000143 | A | * | 1/2007 | ............ A01K 91/18 |
| WO | WO 03005813 | A1 | * | 1/2003 | ............ A01K 91/18 |
| WO | WO 2009056135 | A1 | * | 5/2009 | ............ A01K 91/08 |

* cited by examiner



FIG.1A

FIG.1

APPX54



FIG.2A

FIG.2



FIG.3



FIG.3A

FIG.4

APPX57



FIG.5



FIG.6

APPX58



FIG.7

US 8,656,632 B1

**1**

## OUTRIGGER LINE MANAGEMENT SYSTEM

### BACKGROUND OF THE INVENTION

The subject outrigger line management system is generally directed to a system for enabling convenient displacement of articles along an outrigger structure. More specifically, the outrigger line management system maintains smooth and efficient displacement of individual lines, cords, or other mechanical link employed to so displace articles along a given outrigger support structure.

Outrigger structures are used on surface vessels to extend the lateral reach of the vessel for various purposes. Cast line fishing applications provide one example where outrigger structures provide useful extension of support points for concurrent use of multiple fishing lines. Typically, a fishing rod feeds a fishing line on which one or more baited hooks are provided. The baited ends of the fishing lines are cast into the water to attract fish about the given boat or other surface vessel. Where more than a few fishing lines are so cast from the same vessel into surrounding waters, inter-tangling remains a persistent problem, particularly where the vessel continues moving to, for example, troll the lines through the water. Tangling becomes an even greater threat when the vessel undergoes abrupt turns or encounters fast moving currents. To prevent such interference and tangling, fishing lines may be supported through one or more pivot points displaced along the length of an outrigger structure. The baited ends of different fishing lines are thereby spaced to be dragged through the water, each held safely away from the vessel and one another to avoid interference.

In this manner, outrigger support structures extend fishing/trolling lines laterally out beyond the wake of a moving boat. They allow the safe deployment of multiple fishing lines cast out from the boat each pivoted at different points along the outrigger structure to remain separated by sufficient fishing space (until release of the lines from their pivot points is triggered) to prevent entanglement.

Outrigger structures are usually installed on a boat to be moved inline with the hull or folded into a mast when not in service. Typically, a pair of outrigger structures are installed at starboard and port gunwale locations.

Known outrigger structures are often provided with a plurality of fixed eyehooks longitudinally spaced therealong. A plurality of outrigger cords are then passed through the eyehooks and a pulley assembly disposed at a fixed point on the boat. Each outrigger cord forms a displaceable loop about the pulley assembly and one or more supporting eyehooks, and each carries a clip on which a fishing line may be secured for movement along an outrigger structure with the outrigger cord. A user may retract or advance the clip by pulling the corresponding outrigger cord in one direction or the other through its loop. So when a fishing line is to be baited, the user pulls one outrigger cord to draw the clip within reach, 'loads' the clip with an appropriately baited fishing line that has been cast, then pulls the outrigger cord in a reverse direction to return the loaded clip to a deployment position on the outrigger structure. This process is repeated for each baited fishing line that has been cast out from a certain point on the boat. When a 'bite' occurs, or when a fishing line encounters sufficient tension, the clip releases, so that the line returns to form a direct line between its feeding point (i.e., fishing rod) for active user control.

This process is not without significant practical obstacles to smooth, proper operation. FIG. **7** depicts a portion of an outrigger structure **10'** having an eye hook **30'** for pivotally retaining its outrigger cords **20'**, as used in the prior art.

**2**

Normally, multiple outrigger cords **20'** are used to concurrently deploy multiple fishing lines. The multiple outrigger cords **20'** passing through the collar-like eyehook **30'** invariably bunch together during operation, getting tightly intertwined when subjected to tension and manipulation. Much friction results between the tightly packed outrigger cords **20'** themselves, as well as between each cord **20'** and eye hook **30'**. Being that the outrigger cords are normally supported snugly between the eye hook **30'** and other pivot points, a particularly high friction point is created at the sharp bend typically formed at one or more of the eye hooks **30'**. The friction makes it very difficult to displace individual outrigger cords to load and deploy their clips, at least not without mighty physical exertion. Moreover, the considerable friction that must be overcome to effect such cord movement causes premature wearing on the cords themselves.

Various outrigger structures are known in the art. By way of example, U.S. Pat. No. 3,462,870 discloses several embodiments of a fishing system that uses a buoy line maintained in a desired area by an airborne kite. The system can have a plurality of lines operated by a fisherman having a reel with a plurality of spools which may be individually wound without disturbing the others. The lines can also be operated by individual fishermen each having a reel. The individual lines may be secured to the buoy line with a releasable clip that disengages when a fish applies tension to the line, allowing that particular line to be cleared of the remaining fishing lines and to be reeled in.

U.S. Pat. No. 3,060,614 is directed to a multiple pole trolling device for mounting on a boat. The multiple pole trolling devices are spaced apart and rotatably mounted on a pole base that is rotatable and tiltably adjustable. Each of the poles has a fixed trolling line located in the water when set to a rearward position. When the assembly is rotated, the line comes out of the water over the boat so that the fish can be removed.

U.S. Pat. No. 2,196,472 is directed to a fishing apparatus in the form of a tree formed of tubular members that support a plurality of fishing lines. The tree may be thrust into the bottom of a body of water. The mast as shown has a set of screws that may be used to adjust the coaxial tubular members for use in water of different depths.

U.S. Pat. No. 3,358,399 is directed to a kite fishing apparatus having two reels, one for a kite line, and the other for a fishing line. A three-in-one glider-type structure is provided and functions to carry the fishing line over the body of water. The baited end of the fishing line is cast out by the outgoing kite line and by means provided to detachably and adjustably connect the kite line to the fishing line.

U.S. Pat. No. 4,388,774 is directed to a fishing line system for use on a boat that supports six fishing rods each spaced from the other to prevent the fishing lines from tangling during trolling. A pull on either side of the boat is mounted on roller booms that can be extended or retracted as required. A rearwardly extending pair of fishing poles are carried by holders mounted on the stern of the boat to position lines laterally inward of lines. The booms are disposed transversely to the left of the boat and are supported by antifriction assemblies which support the booms.

A significant drawback remains in the prior art for effectively managing the outrigger cords to enable loading and deploying of articles along an outrigger structure. There is, therefore, a need for a system that enables sufficiently free, unrestricted individual displacement of the outrigger cords along the outrigger structure.

**APPX60**

US 8,656,632 B1

3

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a line management system for an outrigger structure which maintains guiding outrigger cords in convenient, independently displaceable manner.

These and other objects are attained by the outrigger line management system formed in accordance with the present invention. The system comprises of a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The plurality of retention devices are each coupled to one of the outrigger cords. Each of the retention devices defines a retention point for advancing a fishing line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

In certain exemplary embodiments, the system also includes a pivot unit laterally offset from the outrigger structure displaceably retaining each of the outrigger cords. Each of the outrigger cords extends from the pivot unit and through predetermined ones of cord management units in an endless loop.

In another exemplary embodiment, a method for managing the outrigger cords comprises the steps of (1) establishing a plurality of outrigger cords, (2) establishing a plurality of cord management positions, (3) defining each cord management positions, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices. The cord management positions are established longitudinally spaced one from the other along the outrigger structure. Each of the cord management positions are then defined to include a plurality of transversely offset cord passages respectively guiding predetermined ones of the outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The cord management positions are arranged to define a portion of the outrigger structure a progressively decreasing number of cord passages. The retention devices are established to define a retention point for advancing a line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

Those skilled in the art will appreciate the scope of the present invention and realize aspects thereof after reading the following detailed description of the preferred embodiments in association with the accompanying illustrative figures.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying illustrative figures incorporated in and forming a part of this specification depict several aspects of the invention, and together with the description serve to explain the principles of the invention.

FIG. 1 is a diagram illustrating a view of a line management system installed on a surface vessel in accordance with one exemplary embodiment of the present invention;

FIG. 1A is a diagram illustrating an enlarged view of the pivot unit in the embodiment depicted in FIG. 1;

FIG. 2 is a diagram schematically illustrating a portion of the line management system operation on an outrigger structure in accordance with an exemplary embodiment of the present invention;

FIG. 2A is an exploded plan view of a retention device depicted in FIG. 2;

4

FIG. 3 is a perspective view schematically illustrating a cord management unit formed in accordance with an exemplary embodiment of the present invention;

FIG. 3A is a perspective view schematically illustrating a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. 4 is a perspective view of a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. 5 is a schematic perspective view of a cord management unit formed in accordance with another alternate embodiment of the present invention;

FIG. 6 is an exploded perspective view of a clamp member formed in accordance with another alternate embodiment of the clamp member depicted in FIG. 5; and,

FIG. 7 is a perspective view of an eye hook employed in the prior art for guiding cords on an outrigger structure.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments set forth below represent the necessary information to enable those skilled in the art to practice the invention and illustrate the best mode of practicing the invention. In light of the illustrated figures and the following description, those skilled in the art will understand the concepts of the invention and will recognize applications of these concepts not particularly addressed herein. It should be understood that these concepts and applications fall within the scope of the disclosure and accompanying claims.

Wherever possible in the following description, similar reference numerals will refer to corresponding elements on parts of different Drawings unless otherwise indicated.

Referring to FIGS. 1 and 2, there is a depiction of an exemplary embodiment of the line management system 1 for a surface vessel or boat 5. The line management system 1, installed as shown on a boat, includes a plurality of outrigger cords 20, a plurality of cord management units 30, and a plurality of retention devices 40 all coupled to the outrigger structure 10. As depicted in FIG. 1, the outrigger structure 10 may be mounted on top of a surface vessel, to the gunwale or bow, or any other suitable part of the vessel for supporting a plurality of articles therealong. System 1 may be applied to various applications to aid in the smooth loading and deployment of suitable articles to be supported along the outrigger structure 10. The fishing application shown for illustrative purposes herein is but one of numerous such applications where system 1 may be employed in accordance with various aspects of the present invention.

In the fishing application illustrated, the outrigger structure 10 allows the deployment of more fishing lines 60 cast out from the boat each separated from the other by adequate fishing space than would normally be possible. The spacing prevents fishing lines 60 from entangling during trolling with other fishing lines 60 originating from the same boat 5. The number of fishing lines 60 being trolled increases the chances of catching fish and permits multiple individuals to fish from the boat 5. Use of outrigger structure 10 equipped with system 1 in accordance with the present invention mitigates the inherent entanglement risk while preserving ease of use. Each outrigger structure 10 may be suitably formed as one piece, or made up of individual outrigger sections joined together.

In accordance the present invention, a line management system 1 is coupled to each outrigger structure 10 used for support extension purposes—such as to extend support for a fishing line 60 to the side of a boat during trolling. The line management system 1 is used for safely guiding outrigger

US 8,656,632 B1

5

cords 20 through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. Typically, when the outrigger structure 10 is in use, it is extended transversely to the length of a boat 5 for trolling fishing lines 60 coupled to the retention device 40. The outrigger structure 10 thus serves to increase the span of the boat to allow more fishing lines 60 to be trolled. By way of example, a 28 foot fishing boat having a 16 foot wide fishing platform can have a pair of outrigger structures 10, with each outrigger structure 10 being 40 foot long. Once the fishing boat 5 is ready to fish, each of the outrigger structures 10 is extended transversely from the boat in opposite directions to effectively create a 96 foot wide fishing platform from which to suspend multiple fishing lines 60.

In one preferred embodiment, a plurality of outrigger cords 20 are supported along the longitudinal length of the outrigger structure 10 by at least one cord management unit 30. Typically, a plurality of cord management units 30 is employed, with each cord management unit 30 firmly coupled to the outrigger structure 10. The cord management units 30 are longitudinally spaced one from the other along the outrigger structure 10.

Each outrigger cord 20 is coupled with a retention device 40 for securing a retention point 400 on a fishing line 60. The retention device 40 facilitates individual management of each fishing line 60 during, for example, sport fishing. When multiple baited fishing lines 60 are being cast out from a boat 5, the retention device 40 allows for each fishing line 60 fed from a certain point on the boat 5, by a fishing rod 70 for instance, to be maintained without interfering with the other fishing lines 60 being trolled.

Each outrigger cord 20 is preferably looped through a pivot unit 50 spaced from an outrigger structure 10 and at least one cord management unit 30 provided on such outrigger structure 10 (as described in following paragraphs). Each outrigger cord 20 remains longitudinally displaceable relative to the outrigger structure 10 so that a user may retract or advance the retention point 400. Each of the retention devices 40 defines a retention point 400 for pivotally supporting a fishing line. This retention point 400 is preferably displaceable longitudinally along the outrigger structure responsive to a displacement of the outrigger cord 20. Typically, the outrigger cord 20 is displaced to retract the retention point 400 or retention device 40 when seeking to attach or manage a fishing line 60. Once the fishing line 60 is attached to the retention device 40, the outrigger cord 20 is then advanced by displacing the outrigger cord 20 to a relative position that gives adequate longitudinal spacing with respect to the other fishing lines 60.

In certain embodiments, the retention device 40 pivotally retains a fishing line 60 at the retention point 400 until sufficient resistance is encountered on the line 60. When a fish bites the line, for instance, the pull on line 60 will cause its release from the retention device 40.

Once retracted, a user may bait, then releasably attach a fishing line 60 to a retention point 400. When the retention point 400 is advanced back out along the given outrigger structure 10, the retention point preferably serves as a point from which the line's baited end extends into the water. One or more fishing lines 60 may be so retained to extend in pivoted manner from a portion of each outrigger cord 20, so long as suitable spacing is maintained to avoid undue line cluttering and tangling. In the embodiment illustrated, one retention device 40 is shown connected to each individual cord 20.

As depicted in FIG. 2, the outrigger cords 20 are individually coupled to a stop cork 80 that acts to limit the displacement of the outrigger cords past a predetermined point. The

6

stop cork 80 limits the displacement by preventing the retention device 40 from unintentionally getting wedged in the cord management unit 30.

In the preferred embodiment, the line management system 1 also includes a pivot unit 50 preferably anchored to a fixed point on the boat 5, laterally offset from the outrigger structure 10 for displaceably retaining a portion of each outrigger cord 20. The pivot unit 50 acts as a pivotal support about which the outrigger cords 20 may be displaced. Each of the outrigger cords 20 extends from the pivot unit 50 and through respective cord management units 30, preferably in an endless loop.

In an exemplary embodiment, the pivot unit 50 includes a plurality of rotatable members 500 individually receiving a respective outrigger cord 20. However, the pivot unit 50 is not limited to a rotatable structure and may be any structure of suitable type to provide a pivot support for displacement of the outrigger cords 20.

Each retention device 40, as depicted in FIG. 2A, is coupled to an outrigger cord 20 and used to transport an intermediate portion of a fishing line 60 relative to outrigger structure 10. Among other things, the retention device 40 comprises of a clip portion 402 and retention point 400. The clip portion 402 allows for the free release of the line 60 when the line is caused to apply sufficient resistance pressure thereon.

When multiple fishing lines 60 are being trolled in the water, in the illustrated embodiment, the lines 60 are preferably maintained by system 1 in such a way that each fishing line 60 clears every other fishing line 60 on its way back towards its feed point (such as the corresponding fishing pole 70) upon released from the clip portion 402. The originating/feed points of the fishing lines 60 are suitably arranged, so that when one fishing line 60 releases from its retention device 40, the fishing line 60 does not physically contact or otherwise interfere with the other deployed fishing lines 60 on its return to a direct line extension from the originating point. It is not unusual to have the retention devices 40 coupled to respective outrigger cords 20 to be displaced in height 8 feet relative to each other, to ensure a clear path of return as a direct line from the feed point (to the water) is restored by a released fishing line 60.

In a typical application, one end of a fishing line 60 may be fed to originate from a fishing rod 70 temporarily secured to a support bracket provided on the boat 5. A distal end 600 is baited and drawn in the water during trolling. The retention point 400 is located between the originating end and distal end 600 of the fishing line. The retention point 400 provides a pivot point from which the distal portion (having the end 600) of the fishing line 60 may be suspended from the outrigger structure 10 for safe trolling. The clip portion 402, which may be made of any suitably resilient or rigid material having enough structural strength to hold the fishing line 60 in place, is configured to open when there is tension on the fishing line 60. For example, when a fish takes the bait at the distal end 600 of the fishing line 60 and causes sufficient tension thereon, the clip portion 402 of the retention device 40 will release. Thereafter, the fishing line 60 must be re-loaded onto the retention device 40 if that line is to be deployed again at its trolling position.

To re-couple fishing line 60 (to re-load a retention device 40), the particular outrigger cord 20 for the clip portion 402 that released the fishing line 60 is pulled to draw the retention device 40/clip portion 402 back in towards the boat until it is within a user's reach. The clip portion 402 is re-loaded by coupling a newly-baited fishing line 60. Once the retention device 40 is drawn in for re-coupling, the clip portion 402

US 8,656,632 B1

7

may be snapped open or pulled away from the retention device **40** to an open position so that the fishing line **60** may be hooked by the retention point **400**. Thereafter, the retention device **40** is advanced outward again by accordingly displacing its outrigger cord **20**. In accordance with one aspect of the present invention, the outrigger cords **20** are independently maintained along respective transversely offset cord passages **304** as described in following paragraphs, such that each may be freely displaced, and the longitudinal displacement of any of the outrigger cords **20** will not interfere with the rest of the outrigger cords **20**.

As depicted in FIG. **3**, the line management system **1** also includes at least one a cord management unit **30** for each cord **20**. In broad concept, the cord management unit **30** defines a plurality of transversely offset cord passages **304** which independently guide the outrigger cords **20** longitudinally along the outrigger structure **10**. The cord management unit **30** allows for multiple outrigger cords **20** to be independently controlled without undue interference from the other outrigger cords **20**.

Each cord management unit **30** preferably includes independently displaceable pulley members **300** to engage respective outrigger cords **20**. In the disclosed embodiment, the pulley members **300** are made wheel-like to be freely rotatable. Since each pulley member **300** is freely rotatable and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members **300**, depending on the specific requirements of a particular application. For example, the pulley members **300** may be suitably sealed. Preferably, the pulley members **300** are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members **300** define transversely offset cord passages **304** whose concave profiles are directed radially outward to receive and guide respective outrigger cords **20**, and maintain their independent longitudinal displacement relative to the outrigger structure **10**. The transversely offset cord passages **304** may are formed with annular grooves **310** having, for example U-shaped or V-shaped sectional profiles. The annular grooves **310** are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords **20** therefrom.

In preferred embodiments, a plurality of cord management units **30** are arranged along a length of each outrigger structure **10**, so that decreasing numbers of transversely offset cord passages **304** are provided by successive unit **30**. For example, a system **1** configured to support three separate outrigger cords **20***a*, **20***b*, **20***c* on an outrigger structure **10**, as illustrated in FIG. **2**, would employ with the pivot unit **50** four cord management units **30***a*, **30***b*, **30***c*, **30***d*. The cord management units **30***a*-**30***d* are then arranged to define, along a portion of the outrigger structure **10**, a progressively decreasing number of cord passages **304**.

In the embodiment illustrated in FIG. **2**, for example, the first two cord management units **30***a*, **30***b* closest to the boat **5**, would preferably each define three cord passages **304** to participate in guiding all three outrigger cords **20***a*, **20***b*, **20***c*. The third cord management unit **30***c* would preferably define one less cord passage, or two cord passages **304**, to participate in guiding just two of the outrigger cords **20***b*, **20***c*, since the first outrigger cord **20***a* pivots at the second cord management unit **30***b* to return to the pivot unit **50**. The next cord management unit **30***d* may then define even fewer cord passages, or one cord passage **304** in this case, to participate in guiding the

8

one remaining outrigger cords **20***c*, since the first outrigger cord **20***b* pivots at the third cord management unit **30***c* to return to the pivot unit **50**.

In certain alternate embodiments, of course, the number of cord management units **30**, as well as the arrangement and extent of cord passages defined by respective cord management units **30**, may be varied to suit the particular requirements of the intended applications. While not the most efficient, for example, each outrigger cord **20** may be looped about the pivot unit **50** and a set of cord management units **30** whose cord passages pass that outrigger cord **20** only, to the exclusion of the other outrigger cords **20**. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord **20**) are maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord **20**) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units **30** may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules **300** may be disposed in replaceable manner within the housing **306** of a cord management unit **30**, such that numbers and even the precise positions of the individual pulley or other members **300** within the unit **30** may be adjustably varied to suit different needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module **30**, or its re-positioning, within the housing **306**.

In preferred embodiments, the pulley members **300** are coaxially aligned, sharing the same shaft. The outrigger cords **20** are secured in the cord passages **304** by a bridge member **302**. Preferably, the bridge member **302** is reconfigurably coupled to a housing **306** structure to contain the plurality of outrigger cords **20** in one position and allow their removal in another. The housing **306** is suitably formed to provide structural support and containment for the pulley members **300** and the outrigger cords **20**. In the embodiment of FIG. **3**, the bridge member **302** is displaceable relative to the pulley members **300** about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively. The plurality of cord management units **30** are longitudinally spaced along the outrigger structure **10** and their housings **306** releasably fastened by clamp member **308**. The clamp member **308** may be sleeved onto the outrigger structure **10**, selectively positioned on the outrigger structure **10**, and fastened by a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The fasteners serve to secure the clamp member **308** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

FIG. **3A** is an alternate embodiment of the line management system **1** depicted in FIG. **3**. The line management system **1** also includes at least one a cord management unit **30** for each cord **20**. In broad concept, the cord management unit **30** defines a plurality of transversely offset cord passages **304** which independently guide the outrigger cords **20** longitudinally along the outrigger structure **10**. The cord management unit **30** allows for multiple outrigger cords **20** to be independently controlled without undue interference from the other outrigger cords **20**.

Each cord management unit **30** preferably includes independently displaceable pulley members **300** to engage respective outrigger cords **20**. In the disclosed embodiment, the pulley members **300** are made wheel-like to be freely rotatable. Since each pulley member **300** is freely rotatable

US 8,656,632 B1

9

and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members **300**, depending on the specific requirements of a particular application. For example, the pulley members **300** may be suitably sealed. Preferably, the pulley members **300** are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members **300** define transversely offset cord passages **304** whose concave profiles are directed radially outward to receive and guide respective outrigger cords **20**, and maintain their independent longitudinal displacement relative to the outrigger structure **10**. The transversely offset cord passages **304** may are formed with annular grooves **310** having, for example U-shaped or V-shaped sectional profiles. The annular grooves **310** are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords **20** therefrom.

In preferred embodiments, a plurality of cord management units **30** are arranged along a length of each outrigger structure **10**, so that decreasing numbers of transversely offset cord passages **304** are provided by successive unit **30**. For example, a system **1** configured to support three separate outrigger cords **20**a, **20**b, **20**c on an outrigger structure **10**, as illustrated in FIG. **2**, would employ with the pivot unit **50** four cord management units **30**a, **30**b, **30**c, **30**d. The cord management units **30**a-**30**d are then arranged to define, along a portion of the outrigger structure **10**, a progressively decreasing number of cord passages **304**.

In the embodiment illustrated in FIG. **2**, for example, the first two cord management units **30**a, **30**b closest to the boat **5**, would preferably each define three cord passages **304** to participate in guiding all three outrigger cords **20**a, **20**b, **20**c. The third cord management unit **30**c would preferably define one less cord passage, or two cord passages **304**, to participate in guiding just two of the outrigger cords **20**b, **20**c, since the first outrigger cord **20**a pivots at the second cord management unit **30**b to return to the pivot unit **50**. The next cord management unit **30**d may then define even fewer cord passages, or one cord passage **304** in this case, to participate in guiding the one remaining outrigger cords **20**c, since the first outrigger cord **20**b pivots at the third cord management unit **30**c to return to the pivot unit **50**.

In certain alternate embodiments, of course, the number of cord management units **30**, as well as the arrangement and extent of cord passages defined by respective cord management units **30**, may be varied to suit the particular requirements of the intended applications. While not the most efficient, for example, each outrigger cord **20** may be looped about the pivot unit **50** and a set of cord management units **30** whose cord passages pass that outrigger cord **20** only, to the exclusion of the other outrigger cords **20**. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord **20**) are maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord **20**) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units **30** may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules **300** may be disposed in replaceable manner within the housing **306** of a cord management unit **30**, such that numbers and even the precise positions of the individual pulley or other members **300** within the unit **30** may be adjustably varied to suit dif-

10

ferent needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module **30**, or its re-positioning, within the housing **306**.

In preferred embodiments, the pulley members **300** are coaxially aligned, sharing the same shaft. The outrigger cords **20** are secured in the cord passages **304** by a bridge member **302**. Preferably, the bridge member **302** is reconfigurably coupled to a housing **306** structure to contain the plurality of outrigger cords **20** in one position and allow their removal in another. The housing **306** is suitably formed to provide structural support and containment for the pulley members **300** and the outrigger cords **20**. In the embodiment of FIG. **3**, the bridge member **302** is displaceable relative to the pulley members **300** about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively.

In this embodiment, the housing **306** is coupled to the outrigger structure **10** by a coupling member **309** that is secured by a securing member **311**. The coupling member **309** may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member **309** serve to secure the housing **306** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

The plurality of cord management units **30** are longitudinally spaced along the outrigger structure **10** and their housings **306** releasably fastened by coupling member **309** that is secured by a securing member **311**. The coupling member **309** may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member **309** serve to secure the housing **306** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

In certain alternate embodiments, such as depicted in FIG. **4**, the cord management unit **30** may include a spool-like structure that is integrally formed with a plurality of grooves **310** for receiving respective outrigger cords **20**. The cord passages **304** defined within the grooves **310** may be formed of materials with a very low friction coefficient so as to allow individual outrigger cords **20** to smoothly glide along them when displaced. Among other things, the low friction material making up the cord passage **304** in this embodiment would obviate the need for independent pulley members **300** as depicted in FIG. **3**. However, this embodiment has the drawback of generating more friction between the outrigger cords **20** and the respective receiving grooves **310**.

FIG. **5** depicts another alternate embodiment of cord management unit **30**. In this embodiment, the independently displaceable pulley members **300** define cord passages **304** that are laterally offset one from the other to respectively guide outrigger cords **20** to maintain independent longitudinal displacement relative to the outrigger structure. The independent pulley members **300** are respectively coupled to individual shafts which allow independent rotation of each pulley member **300**. Each bridge member **302** is provided as shown to guard against unwanted release of a cord **20** from its pulley member **300**, and thereby retain the outrigger cords **20** operably engaged with the pulley members **300**.

With respect to FIG. **6**, there is shown an alternate embodiment of clamp member **308**. In this embodiment, the clamp member **308** is made up of two separate pieces contoured to conform and easily fasten to the given outrigger structure **10**. The clamp member **308** may be releasably fastened by clamping the separate pieces about the outrigger structure **10** and securing the same with a fastener. The fastener may be a bolt,

US 8,656,632 B1

11

snap, strap, fire tie, or any other suitable means for fastening the collar-like clamp member **308** pieces to the outrigger structure **10**.

The clamping/fastening measures shown in the illustrated embodiments enable each cord management unit **30** to be retrofitted to existing outrigger structures **10**. The clamp member **308** may be sleeved onto the outrigger structure **10** or releasably fastened by a suitable fastener. Alternatively, where requirements permit, one or more cord management units **30** may also be formed as a fixed or integral part of an outrigger structure **10** itself.

The application of the cord management system **1** of the present inventions is not limited necessarily to fishing. Its use is relevant in any application that requires an outrigger structure, on or off water, where effective management of outrigger cords **20** is necessary to realize the benefits of the structure. For example, system **1** may be employed to set and deploy traps, set and service instrument buoys, or otherwise facilitate the outrigger-aided use and deployment of various other such articles.

The illustrated embodiments implement a method for managing the outrigger cords which generally includes the steps of: (1) establishing a plurality of outrigger cords **20**, (2) establishing a plurality of cord management positions, (3) defining at each cord management position a plurality of transversely offset cord passages **304**, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices **40**. The cord management positions are established longitudinally spaced one from the other along the outrigger structure **10**. A plurality of transversely offset cord passages **304** are defined at certain of the cord management positions to respectively guide predetermined ones of the outrigger cords **20** to maintain independent longitudinal displacement relative to the outrigger structure **10**. The cord management positions **304** are arranged to define along at least a portion of the outrigger structure **10** a progressively decreasing number of cord passages **304**. The retention devices **40** are thereby established to each define a retention point **400** for advancing a line longitudinally along the outrigger structure **10** responsive to a displacement of the outrigger cord **20**.

Although this invention has been described in connection with specific forms and embodiments thereof, it will be appreciated that various modifications other than those discussed above may be resorted to without departing from the spirit or scope of the invention as defined in the appended claims. For example, functionally equivalent elements may be substituted for those specifically shown and described, certain features may be used independently of other features, and in certain cases, particular locations of the elements as well as particular method steps may be reversed or interposed, all without departing from the spirit or scope of the invention as defined in the appended claims.

What is claimed is:

1. A line management system for a surface vessel, comprising:

an outrigger structure;

a plurality of outrigger cords;

a plurality of cord management units coupled to the outrigger structure, said cord management units being longitudinally spaced one from the other along the outrigger structure, each of said cord management units defining a plurality of cord passages transversely offset one from the other, said cord passages respectively guiding predetermined ones of said outrigger cords to extend substantially in parallel to the outrigger structure so as to extend through respective ones of said cord passages of

12

at least two of said plurality of cord management units and remain independently displaceable longitudinally relative to the outrigger structure; and

a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords, each of said retention devices defining a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

2. The line management system as recited in claim **1**, wherein at least one of said cord management units includes a plurality of independently displaceable pulley members each engaging one of said outrigger cords.

3. The line management system as recited in claim **2**, wherein said at least one of said cord management units further includes at least one bridge member displaceable relative to said pulley members between first and second positions, said at least one bridge member in said first position retaining the engagement of at least one of said outrigger cords with a corresponding one of said pulley members.

4. The line management system as recited in claim **2**, wherein said pulley members of said at least one of said cord management units are coaxially disposed one relative to the other.

5. The line management system as recited in claim **1**, wherein at least one of said cord management units is releasably fastened to the outrigger structure.

6. The line management system as recited in claim **5**, wherein said at least one cord of said management units includes a housing and a clamp member detachably coupled thereto.

7. The line management system as recited in claim **1**, wherein each of said retention devices includes a clip portion for releasably retaining a line and a stop cork.

8. The line management system as recited in claim **1**, wherein said cord passages of each of said cord management units comprise a plurality of grooves with each of said grooves receiving one of said outrigger cords.

9. An outrigger cord management system for a surface vessel, comprising:

an outrigger structure;

a plurality of outrigger cords;

a plurality of cord management units coupled to the outrigger structure, said cord management units being longitudinally spaced one from the other along the outrigger structure, each of said cord management units defining a plurality of cord passages transversely offset one from the other, said cord passages respectively receiving predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure;

at least one pivot unit laterally offset from the outrigger structure, said at least one pivot unit displaceably retaining each of said outrigger cords, each of said outrigger cords extending from said at least one pivot unit and through predetermined ones of said cord management units in an endless loop; and,

a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords, each of said retention devices defining a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

10. The outrigger cord management system as recited in claim **9**, wherein each of said cord management units includes a plurality of independently displaceable pulley members each engaging one of said outrigger cords.

US 8,656,632 B1

13

11. The outrigger cord management system as recited in claim 10, wherein said pulley members of each of said cord management units are coaxially disposed one relative to the other.

12. The outrigger cord management system as recited in claim 11, wherein each of said cord management units further includes a housing supporting said pulley members, and at least one bridge member coupled to said housing for displacement between first and second positions, said at least one bridge member in said first position retaining the engagement of at least one of said outrigger cords with a corresponding one of said pulley members.

13. The outrigger cord management system as recited in claim 12, wherein each of said cord management units is releasably fastened to the outrigger structure, and each of said cord management units further includes a clamp member detachably coupled thereto.

14. The outrigger cord management system as recited in claim 10, wherein said at least one pivot unit includes a plurality of rotatable members receiving said outrigger cords respectively thereabout.

15. The outrigger cord management system as recited in claim 9, wherein said cord passages of each of said cord management units comprise a plurality of grooves with each of said grooves receiving one of said outrigger cords.

16. A line management system for a surface vessel, comprising:

an outrigger structure;

a plurality of outrigger cords;

14

a plurality of cord management units coupled to the outrigger structure, said cord management units being longitudinally spaced one from the other along the outrigger structure, each of said cord management units defining a plurality of cord passages transversely offset one from the other, said cord passages respectively guiding predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, wherein at least one of said cord management units includes a plurality of independently displaceable pulley members each engaging one of said outrigger cords;

a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords, each of said retention devices defining a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords; and,

at least one pivot point unit laterally offset from the outrigger structure, said at least one pivot unit displaceably retaining each of said outrigger cords, each of said outrigger cords extending from said at least one pivot unit and through predetermined ones of said cord management units in an endless loop.

17. The line management system as recited in claim 16, wherein said at least one pivot unit includes a plurality of rotatable members receiving said outrigger cords respectively thereabout.

\* \* \* \* \*

US008656632C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (10925th)

# United States Patent
### Mercier

(10) **Number:**     **US 8,656,632 C1**

(45) **Certificate Issued:     Aug. 23, 2016**

(54) **OUTRIGGER LINE MANAGEMENT SYSTEM**

(76) Inventor:   **Craig Mercier**, Harmans, MD (US)

**Reexamination Request:**
No. 90/013,594, Sep. 23, 2015

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **8,656,632** |
| Issued: | **Feb. 25, 2014** |
| Appl. No.: | **12/726,695** |
| Filed: | **Mar. 18, 2010** |

(51) **Int. Cl.**
| | |
|---|---|
| *A01K 91/08* | (2006.01) |
| *B63B 35/14* | (2006.01) |
| *A01K 91/053* | (2006.01) |
| *B63B 21/04* | (2006.01) |
| *B63B 21/10* | (2006.01) |

(52) **U.S. Cl.**
CPC ............... *A01K 91/08* (2013.01); *B63B 21/04* (2013.01); *B63B 35/14* (2013.01); *B63B 21/10* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,594, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Joseph Kaufman

(57)     **ABSTRACT**

A line management system for an outrigger structure is provided for guiding outrigger cords through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. The system includes a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure.



APPX67

US 8,656,632 C1

# EX PARTE REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **6**, **9**, **12** and **16** are determined to be patentable as amended.

Claims **2-5**, **7**, **8**, **10**, **11**, **13-15** and **17**, dependent on an amended claim, are determined to be patentable.

1. A line management system for a surface vessel, comprising:
an outrigger structure;
a plurality of outrigger cords;
a plurality of cord management units coupled to the outrigger structure, said cord management units being longitudinally spaced one from the other along the outrigger structure, *each of said cord management units including a housing secured by at least one fastener against displacement relative to the outrigger structure,* each of said cord management units defining *and maintaining* a plurality of cord passages transversely offset one from the other, said cord passages respectively guiding predetermined ones of said outrigger cords to extend substantially in parallel to the outrigger structure [so as to extend], *said outrigger cords thereby extending* through respective ones of said cord passages of at least two of said plurality of cord management units and [remain] *remaining* independently displaceable longitudinally relative to the outrigger structure; and
a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords, each of said retention devices defining a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

6. The line management system as recited in claim **5**, wherein said at least one [cord] of said *cord* management units includes [a housing and] a clamp member detachably coupled [thereto] *to said housing*.

9. An outrigger cord management system for a surface vessel, comprising:
an outrigger structure;
a plurality of outrigger cords;
a plurality of cord management units coupled to the outrigger structure, said cord management units being longitudinally spaced one from the other along the outrigger structure, *each of said cord management units including a housing secured by at least one fastener against displacement relative to the outrigger structure,* each of said cord management units defining a plurality of cord passages transversely offset one from the other, said cord passages respectively receiving predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure;
at least one pivot unit laterally offset from the outrigger structure, said at least one pivot unit displaceably retaining each of said outrigger cords, each of said outrigger cords extending from said at least one pivot unit and through predetermined ones of said cord management units in an endless loop; and,
a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords, each of said retention devices defining a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

12. The outrigger cord management system as recited in claim **11**, wherein each of said cord management units further includes [a] *said* housing supporting said pulley members, and at least one bridge member coupled to said housing for displacement between first and second positions, said at least one bridge member in said first position retaining the engagement of at least one of said outrigger cords with a corresponding one of said pulley members.

16. A line management system for a surface vessel, comprising:
an outrigger structure;
a plurality of outrigger cords;
a plurality of cord management units coupled to the outrigger structure, said cord management units being longitudinally spaced one from the other along the outrigger structure, *each of said cord management units including a housing secured by at least one fastener against displacement relative to the outrigger structure,* each of said cord management units defining a plurality of cord passages transversely offset one from the other, said cord passages respectively guiding predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, wherein at least one of said cord management units includes a plurality of independently displaceable pulley members each engaging one of said outrigger cords;
a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords, each of said retention devices defining a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords; and,
at least one pivot point unit laterally offset from the outrigger structure, said at least one pivot unit displaceably retaining each of said outrigger cords, each of said outrigger cords extending from said at least one pivot unit and through predetermined ones of said cord management units in an endless loop.

\* \* \* \* \*

US009392778B1

## (12) United States Patent
### Mercier

(10) **Patent No.:** **US 9,392,778 B1**
(45) **Date of Patent:** **Jul. 19, 2016**

(54) **OUTRIGGER LINE MANAGEMENT SYSTEM**

(71) Applicant: **Craig Mercier**, Harmans, MD (US)

(72) Inventor: **Craig Mercier**, Harmans, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/188,180**

(22) Filed: **Feb. 24, 2014**

### Related U.S. Application Data

(62) Division of application No. 12/726,695, filed on Mar. 18, 2010, now Pat. No. 8,656,632.

(51) **Int. Cl.**
| | |
|---|---|
| *A01K 91/08* | (2006.01) |
| *B63B 35/14* | (2006.01) |
| *A01K 91/053* | (2006.01) |
| *A01K 79/00* | (2006.01) |
| *A01K 91/18* | (2006.01) |
| *A01K 99/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............... *A01K 79/00* (2013.01); *A01K 91/053* (2013.01); *A01K 91/18* (2013.01); *A01K 99/00* (2013.01); *B63B 35/14* (2013.01)

(58) **Field of Classification Search**
CPC ..... A01K 91/053; A01K 91/08; A01K 91/18; A01K 79/00; A01K 99/00
USPC ................ 43/27.4, 43.12, 43.13, 42.74, 27.2, 43/21.2, 4.5; 114/255, 364; 211/119.01, 211/119.02, 119.03, 119.1, 119.11, 119.12, 211/119.13, 119.14
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 53,797 | A | * | 4/1866 | Epperson et al. .......... | 211/119.1 |
| 133,530 | A | * | 12/1872 | Hadden ...................... | 211/119.1 |
| 398,490 | A | * | 2/1889 | Bried ......................... | 211/119.1 |
| 667,453 | A | * | 2/1901 | Parker ...................... | 211/119.02 |
| 790,336 | A | * | 5/1905 | Yoerger ........................ | 43/42.74 |
| 1,032,395 | A | * | 7/1912 | Foss ........................... | 211/119.1 |
| 1,134,850 | A | * | 4/1915 | Hebert et al. .............. | 211/119.1 |
| 1,157,502 | A | * | 10/1915 | Budaji ..................... | 211/119.01 |
| 1,163,193 | A | * | 12/1915 | Althoff .......................... | 43/27.2 |

(Continued)

#### FOREIGN PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| FR | 2613905 | A1 | * | 10/1988 | ............. | A01K 91/08 |
| JP | 08214747 | A | * | 8/1996 | ............. | A01K 91/18 |

(Continued)

#### OTHER PUBLICATIONS

Malin Big Boat Rigging Kit Drawing; Available website: https://web.archive.org/web/20021104002444/http://malinco.com/marine/big_boat__rig__drawing.html; Capture of a website at www.malinco.com on Nov. 4, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

(Continued)

*Primary Examiner* — Darren W Ark
(74) *Attorney, Agent, or Firm* — Rosenberg, Klein & Lee

(57) **ABSTRACT**

A line management system for an outrigger structure is provided for guiding outrigger cords through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. The system includes a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure.

**20 Claims, 6 Drawing Sheets**



**APPX70**

**US 9,392,778 B1**

Page 2

(56)                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,336,186 | A | * | 4/1920 | Baron ........................ 211/119.1 |
| 1,840,762 | A | * | 1/1932 | Akervick ..................... 43/42.74 |
| 2,037,232 | A | * | 4/1936 | Hendriks ...................... 43/27.2 |
| 2,196,472 | A | * | 4/1940 | Moriarty ...................... 43/27.4 |
| 2,206,174 | A | * | 7/1940 | Falk ........................... 211/119.1 |
| 2,292,415 | A | * | 8/1942 | Waldheim ................ 211/119.02 |
| 2,303,753 | A | * | 12/1942 | Merle .......................... 43/42.74 |
| 2,340,608 | A | * | 2/1944 | Merle .......................... 43/42.74 |
| 2,352,631 | A | * | 7/1944 | Guarnieri .................... 43/42.74 |
| 2,550,282 | A | * | 4/1951 | McAvoy ........................ 43/27.2 |
| 2,594,158 | A | * | 4/1952 | Hannameyer ........... 211/119.01 |
| 2,599,081 | A | * | 6/1952 | Waddell .................. 211/119.13 |
| 2,834,476 | A | * | 5/1958 | Picone, Jr. ............... 211/119.02 |
| 2,838,866 | A | * | 6/1958 | Labin ......................... 43/43.12 |
| 2,912,782 | A | * | 11/1959 | Maximov ..................... 43/27.2 |
| 2,951,307 | A | * | 9/1960 | Joy et al. ...................... 43/27.4 |
| 3,060,614 | A | * | 10/1962 | Prince .......................... 43/21.2 |
| 3,193,964 | A | * | 7/1965 | Hurst .......................... 43/43.12 |
| 3,355,835 | A | * | 12/1967 | Lyons .......................... 43/27.4 |
| 3,358,399 | A | * | 12/1967 | Waldmann .................. 43/43.12 |
| 3,462,870 | A | * | 8/1969 | Terilli ........................... 43/27.4 |
| 3,650,063 | A | * | 3/1972 | Pierce et al. ................ 43/42.74 |
| 3,656,630 | A | * | 4/1972 | Miguel ................... 211/119.11 |
| 3,787,995 | A | * | 1/1974 | Watanabe .................... 43/43.12 |
| 3,835,567 | A | * | 9/1974 | Humbert et al. ................ 43/6.5 |
| RE28,380 | E | * | 4/1975 | Tison ........................... 43/27.4 |
| 3,959,913 | A | * | 6/1976 | Weber ......................... 43/43.12 |
| 3,968,587 | A | * | 7/1976 | Kammeraad .................. 43/27.4 |
| 4,248,002 | A | * | 2/1981 | McNellis ...................... 43/27.4 |
| 4,388,774 | A | * | 6/1983 | Thoemke ...................... 43/27.4 |
| 4,524,535 | A | * | 6/1985 | Bates ........................... 43/27.4 |
| 4,610,409 | A | * | 9/1986 | Emory, Jr. ..................... 43/27.4 |
| 4,611,423 | A | * | 9/1986 | Rupp ..................... A01K 91/08 43/43.12 |
| 4,625,450 | A | * | 12/1986 | Roemer, Jr. .................. 43/43.12 |
| 4,632,050 | A | * | 12/1986 | Rupp ........................... 114/255 |
| 4,756,115 | A | * | 7/1988 | Reyen ......................... 43/42.74 |
| 4,807,386 | A | * | 2/1989 | Emory, Jr. ..................... 43/27.4 |
| 4,875,428 | A | * | 10/1989 | Schlesch et al. .............. 43/21.2 |
| 5,301,451 | A | * | 4/1994 | VanAssche ................... 43/27.4 |
| 5,363,975 | A | * | 11/1994 | Meade .................... 211/119.01 |
| 5,375,727 | A | * | 12/1994 | Lavi ........................ 211/119.01 |
| D366,445 | S | * | 1/1996 | Seggern ........................ D12/317 |
| 5,673,507 | A | * | 10/1997 | Stokes, Jr. ..................... 43/21.2 |
| 5,921,196 | A | * | 7/1999 | Slatter .......................... 43/27.4 |
| 6,149,020 | A | * | 11/2000 | Gumpel et al. ......... 211/119.01 |
| 6,286,245 | B1 | * | 9/2001 | Broberg ........................ 43/27.4 |
| 6,454,109 | B1 | * | 9/2002 | Doyle et al. ............. 211/119.01 |
| 6,505,431 | B1 | * | 1/2003 | Christian et al. ............. 43/43.12 |
| 6,834,459 | B2 | * | 12/2004 | van Weenen ................... 43/27.4 |
| 7,111,574 | B2 | * | 9/2006 | Slatter .......................... 43/27.4 |
| 7,343,709 | B2 | * | 3/2008 | van Weenen .................. 43/27.4 |
| 7,654,214 | B2 | * | 2/2010 | Rupp, II ........................ 114/255 |
| 7,878,342 | B1 | * | 2/2011 | Lewis et al. .............. 211/119.01 |
| 8,109,034 | B1 | * | 2/2012 | McCauley ..................... 43/27.4 |
| 8,656,632 | B1 | * | 2/2014 | Mercier ................. A01K 91/08 43/27.4 |
| 8,683,735 | B1 | * | 4/2014 | Figari ........................... 43/27.4 |
| 2006/0231009 | A1 | * | 10/2006 | Slatter .......................... 114/255 |
| 2010/0005702 | A1 | * | 1/2010 | Palacios Cortell ............ 43/27.4 |
| 2014/0041282 | A1 | * | 2/2014 | Karpanty ............... A01K 91/08 43/27.4 |

### FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| JP | 11056184 | A | * | 3/1999 | ............. A01K 91/18 |
| JP | 2007000143 | A | * | 1/2007 | ............. A01K 91/18 |
| WO | WO 03005813 | A1 | * | 1/2003 | ............. A01K 91/18 |
| WO | WO 2009056135 | A1 | * | 5/2009 | ............. A01K 91/08 |

### OTHER PUBLICATIONS

Malin Outrigger Pulleys; Available web site: https://web.archive.org/web/20010728111649/http://www.malinco.com/marine/outrig__pulleys.html; Capture of a website at www.malinco.com on Jul. 28, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Quicklip Outrigger Clip; Available web site: https://web.archive.org/web/20010728112009/http://www.malinco.com/marine/outrig__clip.html; Capture of a website at www.malinco.com on Jul. 28, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

www.ifish.net, Ifish Fishing and Hunting, The Salty Dogs, Need help & ideas rigging new custom outriggers; Available web site: http://www.ifish.net/board/showthread.php?t=131929; created on Nov. 3, 2006; downloaded on Sep. 28, 2015.*

Tigress Outriggers & Gear, Rigging Instructions, How to Rig Your Outriggers; Available web site: http://www.tigressoutriggers.com/outriggerset.pdf; created on Aug. 13, 2004; downloaded on Sep. 28, 2015.*

Marine & Outdoor Products, HAL-LOCK, HL3 Triple; Available web site: http://www.gotomop.com/product/hl3/; downloaded on Sep. 28, 2015.*

Melton International Tackle, Hal Lock Outrigger Shock Cords; Available web site: http://www.meltontackle.com/products/marine-outdoor-products-hal-lock-outrigger-shock-cords.html; downloaded on Sep. 28, 2015.*

Rupp Rigging Instructions; Available web site: http://www.ruppmarine.com/wp-content/uploads/2012/06/RiggingDiagram-Instructions.pdf; created on Mar. 28, 2008; downloaded on Sep. 28, 2015.*

Malin Complete Rigging Kit Drawing; Available web site: https://web.archive.org/web/20021104002338/http://malinco.com/marine/completerig__drawing.html; Capture of a website at www.malinco.com on Nov. 4, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Shock Cords, Pulleys, and Snaps; Available web site: https://web.archive.org/web/20010731134510/http://www.malinco.com/marine/shock__cords.html; Capture of a website at www.malinco.com on Jul. 31, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Halyard Tensioning Drawing, Available web site: https://web.archive.org/web/20020628204508/http://malinco.com/marine/halyard__drawing.html; Capture of a website at www.malinco.com on Jun. 28, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Big Boat Top Gun Rigging Kit; Available web site: https://web.archive.org/web/20010726142407/http://www.malinco.com/marine/big__boat__rig__kit.html; Capture of a website at www.malinco.com on Jul. 26, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

https://web.archive.org/web/20010728111649/http://www.malinco.com/marine/outrig__pulleys.html; Capture of a website page at www.malinco.com on Jul. 28, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Aug. 7, 2015.

Outrigger Line Kits sold by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally screen capture of http://web.archive.org/web/20010406175616/http://www.malinco.com/marine/index.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Pulleys sold by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally a screen capture of http://web.archive.org/web/20010410013028/http://www.malinco.com/marine/outrig__pulleys.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Complete Rigging Kits by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally screen capture of http://web.archive.org/web/20010726142436/http://www.malinco.com/marine/complete__rig__kit.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Line Kits sold by Malin in 2015, as illustrated on their current website as of Sep. 10, 2015. (originally screen capture of http://www.malinco.com/marine.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

J-Mar Tackle Inc., (now known as Malin Marine) Outrigger System referenced in a Jun. 22, 1989, magazine entitled "The Fisherman"

## US 9,392,778 B1

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

through an article on p. 8 describing the J-Mar Outrigger System. A photocopy of the front of the magazine and the article on p. 8 of the magazine as presented on Oct. 21, 2015 to applicant in related U.S. Appl. No. 90/013,594.

J-Mar Tackle, Inc. New Product release sheet illustrating Outrigger Rigging Kits and Outrigger Pulley, including a Rigging Diagram that illustrates outrigger pulley placement and Quicklip.TM. placement.

Undated, but written as J-Mar Tackle which became Malim Marine in 2001 as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

Rupp catalogue and pricing sheet dated Feb. 1, 2000, disclosing outrigger rigging kits (p. 19 of the catalog) as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

Rupp advertisement that references p. 19 of the Rupp catalog as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

* cited by examiner

**U.S. Patent**        Jul. 19, 2016        Sheet 1 of 6        US 9,392,778 B1



FIG.1A

FIG.1

APPX73



FIG.2A

FIG.2



FIG.3

APPX75



FIG.3A

FIG.4



FIG.5



FIG.6

APPX77



FIG.7

**APPX78**

US 9,392,778 B1

# 1
## OUTRIGGER LINE MANAGEMENT SYSTEM

### RELATED APPLICATIONS

This application is a Divisional patent application of co-pending application Ser. No. 12/726,695, filed on 18 Mar. 2010, now pending. The entire disclosure of the prior application Ser. No. 12/726,695, from which an oath or declaration is supplied, is considered a part of the disclosure of the accompanying Divisional application and is hereby incorporated by reference.

### BACKGROUND OF THE INVENTION

The subject outrigger line management system is generally directed to a system for enabling convenient displacement of articles along an outrigger structure. More specifically, the outrigger line management system maintains smooth and efficient displacement of individual lines, cords, or other mechanical link employed to so displace articles along a given outrigger support structure.

Outrigger structures are used on surface vessels to extend the lateral reach of the vessel for various purposes. Cast line fishing applications provide one example where outrigger structures provide useful extension of support points for concurrent use of multiple fishing lines. Typically, a fishing rod feeds a fishing line on which one or more baited hooks are provided. The baited ends of the fishing lines are cast into the water to attract fish about the given boat or other surface vessel. Where more than a few fishing lines are so cast from the same vessel into surrounding waters, inter-tangling remains a persistent problem, particularly where the vessel continues moving to, for example, troll the lines through the water. Tangling becomes an even greater threat when the vessel undergoes abrupt turns or encounters fast moving currents. To prevent such interference and tangling, fishing lines may be supported through one or more pivot points displaced along the length of an outrigger structure. The baited ends of different fishing lines are thereby spaced to be dragged through the water, each held safely away from the vessel and one another to avoid interference.

In this manner, outrigger support structures extend fishing/trolling lines laterally out beyond the wake of a moving boat. They allow the safe deployment of multiple fishing lines cast out from the boat each pivoted at different points along the outrigger structure to remain separated by sufficient fishing space (until release of the lines from their pivot points is triggered) to prevent entanglement.

Outrigger structures are usually installed on a boat to be moved inline with the hull or folded into a mast when not in service. Typically, a pair of outrigger structures are installed at starboard and port gunwale locations.

Known outrigger structures are often provided with a plurality of fixed eyehooks longitudinally spaced therealong. A plurality of outrigger cords are then passed through the eyehooks and a pulley assembly disposed at a fixed point on the boat. Each outrigger cord forms a displaceable loop about the pulley assembly and one or more supporting eyehooks, and each carries a clip on which a fishing line may be secured for movement along an outrigger structure with the outrigger cord. A user may retract or advance the clip by pulling the corresponding outrigger cord in one direction or the other through its loop. So when a fishing line is to be baited, the user pulls one outrigger cord to draw the clip within reach, 'loads' the clip with an appropriately baited fishing line that has been cast, then pulls the outrigger cord in a reverse direction to return the loaded clip to a deployment position on the outrig-

# 2
ger structure. This process is repeated for each baited fishing line that has been cast out from a certain point on the boat. When a 'bite' occurs, or when a fishing line encounters sufficient tension, the clip releases, so that the line returns to form a direct line between its feeding point fishing rod) for active user control.

This process is not without significant practical obstacles to smooth, proper operation. FIG. **7** depicts a portion of an outrigger structure **10'** having an eye hook **30'** for pivotally retaining its outrigger cords **20'**, as used in the prior art. Normally, multiple outrigger cords **20'** are used to concurrently deploy multiple fishing lines. The multiple outrigger cords **20'** passing through the collar-like eyehook **30'** invariably bunch together during operation, getting tightly intertwined when subjected to tension and manipulation. Much friction results between the tightly packed outrigger cords **20'** themselves, as well as between each cord **20'** and eye hook **30'**. Being that the outrigger cords are normally supported snugly between the eye hook **30'** and other pivot points, a particularly high friction point is created at the sharp bend typically formed at one or more of the eye hooks **30'**. The friction makes it very difficult to displace individual outrigger cords to load and deploy their clips, at least not without mighty physical exertion. Moreover, the considerable friction that must be overcome to effect such cord movement causes premature wearing on the cords themselves.

Various outrigger structures are known in the art. By way of example, U.S. Pat. No. 3,462,870 discloses several embodiments of a fishing system that uses a buoy line maintained in a desired area by an airborne kite. The system can have a plurality of lines operated by a fisherman having a reel with a plurality of spools which may be individually wound without disturbing the others. The lines can also be operated by individual fishermen each having a reel. The individual lines may be secured to the buoy line with a releasable clip that disengages when a fish applies tension to the line, allowing that particular line to be cleared of the remaining fishing lines and to be reeled in.

U.S. Pat. No. 3,060,614 is directed to a multiple pole trolling device for mounting on a boat. The multiple pole trolling devices are spaced apart and rotatably mounted on a pole base that is rotatable and tiltably adjustable. Each of the poles has a fixed trolling line located in the water when set to a rearward position. When the assembly is rotated, the line comes out of the water over the boat so that the fish can be removed.

U.S. Pat. No. 2,196,472 is directed to a fishing apparatus in the form of a tree formed of tubular members that support a plurality of fishing lines. The tree may be thrust into the bottom of a body of water. The mast as shown has a set of screws that may be used to adjust the coaxial tubular members for use in water of different depths.

U.S. Pat. No. 3,358,399 is directed to a kite fishing apparatus having two reels, one for a kite line, and the other for a fishing line. A three-in-one glider-type structure is provided and functions to carry the fishing line over the body of water. The baited end of the fishing line is cast out by the outgoing kite line and by means provided to detachably and adjustably connect the kite line to the fishing line.

U.S. Pat. No. 4,388,774 is directed to a fishing line system for use on a boat that supports six fishing rods each spaced from the other to prevent the fishing lines from during trolling. A pull on either side of the boat is mounted on roller booms that can be extended or retracted as required. A rearwardly extending pair of fishing poles are carried by holders mounted on the stern of the boat to position lines laterally

US 9,392,778 B1

3

inward of lines. The booms are disposed transversely to the left of the boat and are supported by antifriction assemblies which support the booms.

A significant drawback remains in the prior art for effectively managing the outrigger cords to enable loading and deploying of articles along an outrigger structure. There is, therefore, a need for a system that enables sufficiently free, unrestricted individual displacement of the outrigger cords along the outrigger structure.

SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a line management system for an outrigger structure which maintains guiding outrigger cords in convenient, independently displaceable manner.

These and other objects are attained by the outrigger line management system formed in accordance with the present invention. The system comprises of a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The plurality of retention devices are each coupled to one of the outrigger cords. Each of the retention devices defines a retention point for advancing a fishing line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

In certain exemplary embodiments, the system also includes a pivot unit laterally offset from the outrigger structure displaceably retaining each of the outrigger cords. Each of the outrigger cords extends from the pivot unit and through predetermined ones of cord management units in an endless loop.

In another exemplary embodiment, a method for managing the outrigger cords comprises the steps of (1) establishing a plurality of outrigger cords, (2) establishing a plurality of cord management positions, (3) defining each cord management positions, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices. The cord management positions are established longitudinally spaced one from the other along the outrigger structure. Each of the cord management positions are then defined to include a plurality of transversely offset cord passages respectively guiding predetermined ones of the outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The cord management positions are arranged to define a portion of the outrigger structure a progressively decreasing number of cord passages. The retention devices are established to define a retention point for advancing a line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

Those skilled in the art will appreciate the scope of the present invention and realize aspects thereof after reading the following detailed description of the preferred embodiments in association with the accompanying illustrative figures.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying illustrative figures incorporated in and forming a part of this specification depict several aspects of the invention, and together with the description serve to explain the principles of the invention.

4

FIG. 1 is a diagram illustrating a view of a line management system installed on a surface vessel in accordance with one exemplary embodiment of the present invention;

FIG. 1A is a diagram illustrating an enlarged view of the pivot unit in the embodiment depicted in FIG. 1;

FIG. 2 is a diagram schematically illustrating a portion of the line management system operation on an outrigger structure in accordance with an exemplary embodiment of the present invention;

FIG. 2A is an exploded plan view of a retention device depicted in FIG. 2;

FIG. 3 is a perspective view schematically illustrating a cord management unit formed in accordance with an exemplary embodiment of the present invention;

FIG. 3A is a perspective view schematically illustrating a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. 4 is a perspective view of a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. 5 is a schematic perspective view of a cord management unit formed in accordance with another alternate embodiment of the present invention;

FIG. 6 is an exploded perspective view of a clamp member formed in accordance with another alternate embodiment of the clamp member depicted in FIG. 5; and,

FIG. 7 is a perspective view of an eye hook employed in the prior art for guiding cords on an outrigger structure.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments set forth below represent the necessary information to enable those skilled in the art to practice the invention and illustrate the best mode of practicing the invention. In light of the illustrated figures and the following description, those skilled in the art will understand the concepts of the invention and will recognize applications of these concepts not particularly addressed herein. It should be understood that these concepts and applications fall within the scope of the disclosure and accompanying claims.

Wherever possible in the following description, similar reference numerals will refer to corresponding elements on parts of different Drawings unless otherwise indicated.

Referring to FIGS. 1 and 2, there is a depiction of an exemplary embodiment of the line management system 1 for a surface vessel or boat 5. The line management system 1, installed as shown on a boat, includes a plurality of outrigger cords 20, a plurality of cord management units 30, and a plurality of retention devices 40 all coupled to the outrigger structure 10. As depicted in FIG. 1, the outrigger structure 10 may be mounted on top of a surface vessel, to the gunwale or bow, or any other suitable part of the vessel for supporting a plurality of articles therealong. System 1 may be applied to various applications to aid in the smooth loading and deployment of suitable articles to be supported along the outrigger structure 10. The fishing application shown for illustrative purposes herein is but one of numerous such applications where system 1 may be employed in accordance with various aspects of the present invention.

In the fishing application illustrated, the outrigger structure 10 allows the deployment of more fishing lines 60 cast out from the boat each separated from the other by adequate fishing space than would normally be possible. The spacing prevents fishing lines 60 from entangling during trolling with other fishing lines 60 originating from the same boat 5. The number of fishing lines 60 being trolled increases the chances

APPX80

US 9,392,778 B1

5

of catching fish and permits multiple individuals to fish from the boat **5**. Use of outrigger structure **10** equipped with system **1** in accordance with the present invention mitigates the inherent entanglement risk while preserving ease of use. Each outrigger structure **10** may be suitably formed as one piece, or made up of individual outrigger sections joined together.

In accordance the present invention, a line management system **1** is coupled to each outrigger structure **10** used for support extension purposes—such as to extend support for a fishing line **60** to the side of a boat during trolling. The line management system **1** is used for safely guiding outrigger cords **20** through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. Typically, when the outrigger structure **10** is in use, it is extended transversely to the length of a boat **5** for trolling fishing lines **60** coupled to the retention device **40**. The outrigger structure **10** thus serves to increase the span of the boat to allow more fishing lines **60** to be trolled. By way of example, a 28 foot fishing boat having a 16 foot wide fishing platform can have a pair of outrigger structures **10**, with each outrigger structure **10** being 40 foot long. Once the fishing boat **5** is ready to fish, each of the outrigger structures **10** is extended transversely from the boat in opposite directions to effectively create a 96 foot wide fishing platform from which to suspend multiple fishing lines **60**.

In one preferred embodiment, a plurality of outrigger cords **20** are supported along the longitudinal length of the outrigger structure **10** by at least one cord management unit **30**. Typically, a plurality of cord management units **30** is employed, with each cord management unit **30** firmly coupled to the outrigger structure **10**. The cord management units **30** are longitudinally spaced one from the other along the outrigger structure **10**.

Each outrigger cord **20** is coupled with a retention device **40** for securing a retention point **400** on a fishing line **60**. The retention device **40** facilitates individual management of each fishing line **60** during, for example, sport fishing. When multiple baited fishing lines **60** are being cast out from a boat **5**, the retention device **40** allows for each fishing line **60** fed from a certain point on the boat **5**, by a fishing rod **70** for instance, to be maintained without interfering with the other fishing lines **60** being trolled.

Each outrigger cord **20** is preferably looped through a pivot unit **50** spaced from an outrigger structure **10** and at least one cord management unit **30** provided on such outrigger structure **10** (as described in following paragraphs). Each outrigger cord **20** remains longitudinally displaceable relative to the outrigger structure **10** so that a user may retract or advance the retention point **400**. Each of the retention devices **40** defines a retention point **400** for pivotally supporting a fishing line. This retention point **400** is preferably displaceable longitudinally along the outrigger structure responsive to a displacement of the outrigger cord **20**. Typically, the outrigger cord **20** is displaced to retract the retention point **400** or retention device **40** when seeking to attach or manage a fishing line **60**. Once the fishing line **60** is attached to the retention device **40**, the outrigger cord **20** is then advanced by displacing the outrigger cord **20** to a relative position that gives adequate longitudinal spacing with respect to the other fishing lines **60**.

In certain embodiments, the retention device **40** pivotally retains a fishing line **60** at the retention point **400** until sufficient resistance is encountered on the line **60**. When a fish bites the line, for instance, the pull on line **60** will cause its release from the retention device **40**.

Once retracted, a user may bait, then releasably attach a fishing line **60** to a retention point **400**. When the retention point **400** is advanced back out along the given outrigger

6

structure **10**, the retention point preferably serves as a point from which the line's baited end extends into the water. One or more fishing lines **60** may be so retained to extend in pivoted manner from a portion of each outrigger cord **20**, so long as suitable spacing is maintained to avoid undue line cluttering and tangling. In the embodiment illustrated, one retention device **40** is shown connected to each individual cord **20**.

As depicted in FIG. **2**, the outrigger cords **20** are individually coupled to a stop cork **80** that acts to limit the displacement of the outrigger cords past a predetermined point. The stop cork **80** limits the displacement by preventing the retention device **40** from unintentionally getting wedged in the cord management unit **30**.

In the preferred embodiment, the line management system **1** also includes a pivot unit **50** preferably anchored to a fixed point on the boat **5**, laterally offset from the outrigger structure **10** for displaceably retaining a portion of each outrigger cord **20**. The pivot unit **50** acts as a pivotal support about which the outrigger cords **20** may be displaced. Each of the outrigger cords **20** extends from the pivot unit **50** and through respective cord management units **30**, preferably in an endless loop.

In an exemplary embodiment, the pivot unit **50** includes a plurality of rotatable members **500** individually receiving a respective outrigger cord **20**. However, the pivot unit **50** is not limited to a rotatable structure and may be any structure of suitable type to provide a pivot support for displacement of the outrigger cords **20**.

Each retention device **40**, as depicted in FIG. **2A**, is coupled to an outrigger cord **20** and used to transport an intermediate portion of a fishing line **60** relative to outrigger structure **10**. Among other things, the retention device **40** comprises of a clip portion **402** and retention point **400**. The clip portion **402** allows for the free release of the line **60** when the line is caused to apply sufficient resistance pressure thereon.

When multiple fishing lines **60** are being trolled in the water, in the illustrated embodiment, the lines **60** are preferably maintained by system **1** in such a way that each fishing line **60** clears every other fishing line **60** on its way back towards its feed point (such as the corresponding fishing pole **70**) upon released from the clip portion **402**. The originating/feed points of the fishing lines **60** are suitably arranged, so that when one fishing line **60** releases from its retention device **40**, the fishing line **60** does not physically contact or otherwise interfere with the other deployed fishing lines **60** on its return to a direct line extension from the originating point. It is not unusual to have the retention devices **40** coupled to respective outrigger cords **20** to be displaced in height 8 feet relative to each other, to ensure a clear path of return as a direct line from the feed point (to the water) is restored by a released fishing line **60**.

In a typical application, one end of a fishing line **60** may be fed to originate from a fishing rod **70** temporarily secured to a support bracket provided on the boat **5**. A distal end **600** is baited and drawn in the water during trolling. The retention point **400** is located between the originating end and distal end **600** of the fishing line. The retention point **400** provides a pivot point from which the distal portion (having the end **600**) of the fishing line **60** may be suspended from the outrigger structure **10** for safe trolling. The clip portion **402**, which may be made of any suitably resilient or rigid material having enough structural strength to hold the fishing line **60** in place, is configured to open when there is tension on the fishing line **60**. For example, when a fish takes the bait at the distal end **600** of the fishing line **60** and causes sufficient

US 9,392,778 B1

7

tension thereon, the clip portion **402** of the retention device **40** will release. Thereafter, the fishing line **60** must be re-loaded onto the retention device **40** if that line is to be deployed again at its trolling position.

To re-couple fishing line **60** (to re-load a retention device **40**), the particular outrigger cord **20** for the clip portion **402** that released the fishing line **60** is pulled to draw the retention device **40**/clip portion **402** back in towards the boat until it is within a user's reach. The clip portion **402** is re-loaded by coupling a newly-baited fishing line **60**. Once the retention device **40** is drawn in for re-coupling, the clip portion **402** may be snapped open or pulled away from the retention device **40** to an open position so that the fishing line **60** may be hooked by the retention point **400**. Thereafter, the retention device **40** is advanced outward again by accordingly displacing its outrigger cord **20**. In accordance with one aspect of the present invention, the outrigger cords **20** are independently maintained along respective transversely offset cord passages **304** as described in following paragraphs, such that each may be freely displaced, and the longitudinal displacement of any of the outrigger cords **20** will not interfere with the rest of the outrigger cords **20**.

As depicted in FIG. **3**, the line management system **1** also includes at least one a cord management unit **30** for each cord **20**. In broad concept, the cord management unit **30** defines a plurality of transversely offset cord passages **304** which independently guide the outrigger cords **20** longitudinally along the outrigger structure **10**. The cord management unit **30** allows for multiple outrigger cords **20** to be independently controlled without undue interference from the other outrigger cords **20**.

Each cord management unit **30** preferably includes independently displaceable pulley members **300** to engage respective outrigger cords **20**. In the disclosed embodiment, the pulley members **300** are made wheel-like to be freely rotatable. Since each pulley member **300** is freely rotatable and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members **300**, depending on the specific requirements of a particular application. For example, the pulley members **300** may be suitably sealed. Preferably, the pulley members **300** are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members **300** define transversely offset cord passages **304** whose concave profiles are directed radially outward to receive and guide respective outrigger cords **20**, and maintain their independent longitudinal displacement relative to the outrigger structure **10**. The transversely offset cord passages **304** may are formed with annular grooves **310** having, example shaped or V-shaped sectional profiles. The annular grooves **310** are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords **20** therefrom.

In preferred embodiments, a plurality of cord management units **30** are arranged along a length of each outrigger structure **10**, so that decreasing numbers of transversely offset cord passages **304** are provided by successive unit **30**. For example, a system **1** configured to support three separate outrigger cords **20a**, **20b**, **20c** on an outrigger structure **10**, as illustrated in FIG. **2**, would employ with the pivot unit **50** four cord management units **30a**, **30b**, **30c**, **30d**. The cord management units **30a**-**30d** are then arranged to define, along a portion of the outrigger structure **10**, a progressively decreasing number of cord passages **304**.

8

In the embodiment illustrated in FIG. **2**, for example, the first two cord management units **30a**, **30b** closest to the boat **5**, would preferably each define three cord passages **304** to participate in guiding all three outrigger cords **20a**, **20b**, **20c**. The third cord management unit **30c** would preferably define one less cord passage, or two cord passages **304**, to participate in guiding just two of the outrigger cords **20b**, **20e**, since the first outrigger cord **20a** pivots at the second cord management unit **30b** to return to the pivot unit **50**. The next cord management unit **30d** may then define even fewer cord passages, or one cord passage **304** in this case, to participate in guiding the one remaining outrigger cords **20c**, since the first outrigger cord **20b** pivots at the third cord management unit **30c** to return to the pivot unit **50**.

In certain alternate embodiments, of course, the number of cord management units **30**, as well as the arrangement and extent of cord passages defined by respective cord management units **30**, may be varied to suit the particular requirements of the intended applications. While not the most efficient, for example, each outrigger cord **20** may be looped about the pivot unit **50** and a set of cord management units **30** whose cord passages pass that outrigger cord **20** only, to the exclusion of the other outrigger cords **20**. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord **20**) are maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord **20**) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units **30** may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules **300** may be disposed in replaceable manner within the housing **306** of a cord management unit **30**, such that numbers and even the precise positions of the individual pulley or other members **300** within the unit **30** may be adjustably varied to suit different needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module **30**, or its re-positioning, within the housing **306**.

In preferred embodiments, the pulley members **300** are coaxially aligned, sharing the same shaft. The outrigger cords **20** are secured in the cord passages **304** by a bridge member **302**. Preferably, the bridge member **302** is reconfigurably coupled to a housing **306** structure to contain the plurality of outrigger cords **20** in one position and allow their removal in another. The housing **306** is suitably formed to provide structural support and containment for the pulley members **300** and the outrigger cords **20**. In the embodiment of FIG. **3**, the bridge member **302** is displaceable relative to the pulley members **300** about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively. The plurality of cord management units **30** are longitudinally spaced along the outrigger structure **10** and their housings **306** releasably fastened by clamp member **308**. The clamp member **308** may be sleeved onto the outrigger structure **10**, selectively positioned on the outrigger structure **10**, and fastened by a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The fasteners serve to secure the clamp member **308** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

FIG. **3A** is an alternate embodiment of the line management system **1** depicted in FIG. **3**. The line management system **1** also includes at least one a cord management unit **30** for each cord **20**. In broad concept, the cord management unit

US 9,392,778 B1

9

30 defines a plurality of transversely offset cord passages 304 which independently guide the outrigger cords 20 longitudinally along the outrigger structure 10. The cord management unit 30 allows for multiple outrigger cords 20 to be independently controlled without undue interference from the other outrigger cords 20.

Each cord management unit 30 preferably includes independently displaceable pulley members 300 to engage respective outrigger cords 20. In the disclosed embodiment, the pulley members 300 are made wheel-like to be freely rotatable. Since each pulley member 300 is freely rotatable and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members 300, depending on the specific requirements of a particular application. For example, the pulley members 300 may be suitably sealed. Preferably, the pulley members 300 are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members 300 define transversely offset cord passages 304 whose concave profiles are directed radially outward to receive and guide respective outrigger cords 20, and maintain their independent longitudinal displacement relative to the outrigger structure 10. The transversely offset cord passages 304 may are formed with annular grooves 310 having, for example U-shaped or V-shaped sectional profiles. The annular grooves 310 are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords 20 therefrom.

In preferred embodiments, a plurality of cord management units 30 are arranged along a length of each outrigger structure 10, so that decreasing numbers of transversely offset cord passages 304 are provided by successive unit 30. For example, a system 1 configured to support three separate outrigger cords 20a, 20b, 20c on an outrigger structure 10, as illustrated in FIG. 2, would employ with the pivot unit 50 four cord management units 30a, 30b, 30c, 30d. The cord management units 30a-30d are then arranged to define, along a portion of the outrigger structure 10, a progressively decreasing number of cord passages 304.

In the embodiment illustrated in FIG. 2, for example, the first two cord management units 30a, 30b closest to the boat 5, would preferably each define three cord passages 304 to participate in guiding all three outrigger cords 20a, 20b, 20e. The third cord management unit 30e would preferably define one less cord passage, or two cord passages 304, to participate in guiding just two of the outrigger cords 20b, 20c, since the first outrigger cord 20a pivots at the second cord management unit 30b to return to the pivot unit 50. The next cord management unit 30d may then define even fewer cord passages, or one cord passage 304 in this case, to participate in guiding the one remaining outrigger cords 20c, since the first outrigger cord 20b pivots at the third cord management unit 30e to return to the pivot unit 50.

In certain alternate embodiments, of course, the number of cord management units 30, as well as the arrangement and extent of cord passages defined by respective cord management units 30, may be varied to suit the particular requirements of the intended applications. While not the most efficient, for example, each outrigger cord 20 may be looped about the pivot unit 50 and a set of cord management units 30 whose cord passages pass that outrigger cord 20 only, to the exclusion of the other outrigger cords 20. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord 20) are

10

maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord 20) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units 30 may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules 300 may be disposed in replaceable manner within the housing 306 of a cord management unit 30, such that numbers and even the precise positions of the individual pulley or other members 300 within the unit 30 may be adjustably varied to suit different needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module 30, or its re-positioning, within the housing 306.

In preferred embodiments, the pulley members 300 are coaxially aligned, sharing the same shaft. The outrigger cords 20 are secured in the cord passages 304 by a bridge member 302. Preferably, the bridge member 302 is reconfigurably coupled to a housing 306 structure to contain the plurality of outrigger cords 20 in one position and allow their removal in another. The housing 306 is suitably formed to provide structural support and containment for the pulley members 300 and the outrigger cords 20. In the embodiment of FIG. 3, the bridge member 302 is displaceable relative to the pulley members 300 about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively.

In this embodiment, the housing 306 is coupled to the outrigger structure 10 by a coupling member 309 that is secured by a securing member 311. The coupling member 309 may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member 309 serve to secure the housing 306 to the outrigger structure 10 to prevent the cord management unit 30 from being unintentionally displaced relative to the outrigger structure 10.

The plurality of cord management units 30 are longitudinally spaced along the outrigger structure 10 and their housings 306 releasably fastened by coupling member 309 that is secured by a securing member 311. The coupling member 309 may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member 309 serve to secure the housing 306 to the outrigger structure 10 to prevent the cord management unit 30 from being unintentionally displaced relative to the outrigger structure 10.

In certain alternate embodiments, such as depicted in FIG. 4, the cord management unit 30 may include a spool-like structure that is integrally formed with a plurality of grooves 310 for receiving respective outrigger cords 20. The cord passages 304 defined within the grooves 310 may be formed of materials with a very low friction coefficient so as to allow individual outrigger cords 20 to smoothly glide along them when displaced. Among other things, the low friction material making up the cord passage 304 in this embodiment would obviate the need for independent pulley members 300 as depicted in FIG. 3. However, this embodiment has the drawback of generating more friction between the outrigger cords 20 and the respective receiving grooves 310.

FIG. 5 depicts another alternate embodiment of cord management unit 30. In this embodiment, the independently displaceable pulley members 300 define cord passages 304 that are laterally offset one from the other to respectively guide outrigger cords 20 to maintain independent longitudinal displacement relative to the outrigger structure. The independent pulley members 300 are respectively coupled to individual shafts which allow independent rotation of each pulley mem-

US 9,392,778 B1

**11**

ber **300**. Each bridge member **302** is provided as shown to guard against unwanted release of a cord **20** from its pulley member **300**, and thereby retain the outrigger cords **20** operably engaged with the pulley members **300**.

With respect to FIG. **6**, there is shown an alternate embodiment of clamp member **308**. In this embodiment, the clamp member **308** is made up of two separate pieces contoured to conform and easily fasten to the given outrigger structure **10**. The clamp member **308** may be releasably fastened by clamping the separate pieces about the outrigger structure **10** and securing the same with a fastener. The fastener may be a bolt, snap, strap, fire tie, or any other suitable means for fastening the collar-like clamp member **308** pieces to the outrigger structure **10**.

The clamping/fastening measures shown in the illustrated embodiments enable each cord management unit **30** to be retrofitted to existing outrigger structures **10**. The clamp member **308** may be sleeved onto the outrigger structure **10** or releasably fastened by a suitable fastener. Alternatively, where requirements permit, one or more cord management units **30** may also be formed as a fixed or integral part of an outrigger structure **10** itself.

The application of the cord management system **1** of the present inventions is not limited necessarily to fishing. Its use is relevant in any application that requires an outrigger structure, on or off water, where effective management of outrigger cords **20** is necessary to realize the benefits of the structure. For example, system **1** may be employed to set and deploy traps, set and service instrument buoys, or otherwise facilitate the outrigger-aided use and deployment of various other such articles.

The illustrated embodiments implement a method for managing the outrigger cords which generally includes the steps of: (1) establishing a plurality of outrigger cords **20**, (2) establishing a plurality of cord management positions, (3) defining at each cord management position a plurality of transversely offset cord passages **304**, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices **40**. The cord management positions are established longitudinally spaced one from the other along the outrigger structure **10**. A plurality of transversely offset cord passages **304** are defined at certain of the cord management positions to respectively guide predetermined ones of the outrigger cords **20** to maintain independent longitudinal displacement relative to the outrigger structure **10**. The cord management positions **304** are arranged to define along at least a portion of the outrigger structure **10** a progressively decreasing number of cord passages **304**. The retention devices **40** are thereby established to each define a retention point **400** for advancing a line longitudinally along the outrigger structure **10** responsive to a displacement of the outrigger cord **20**.

Although this invention has been described in connection with specific forms and embodiments thereof, it will be appreciated that various modifications other than those discussed above may be resorted to without departing from the spirit or scope of the invention as defined in the appended claims. For example, functionally equivalent elements may be substituted for those specifically shown and described, certain features may be used independently of other features, and in certain cases, particular locations of the elements as well as particular method steps may be reversed or interposed, all without departing from the spirit or scope of the invention as defined in the appended claims.

What is claimed is:

1. A method of managing outrigger cords for a surface vessel having an outrigger structure, comprising:

**12**

establishing a plurality of outrigger cords;

establishing a plurality of cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure;

defining at each of said cord management positions within the portion of the outrigger structure a plurality of cord passages transversely offset one from the other, said cord passages respectively guiding predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, and retaining said cord management positions such that the cord passages extend at fixed angular orientations relative to the outrigger structure;

arranging said cord management positions along the portion of the outrigger structure with consecutive cord management positions within the portion of the outrigger structure respectively guiding a progressively decreasing number of outrigger cords; and,

establishing a plurality of retention devices, each of said retention devices coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

2. The method as recited in claim **1**, further comprising establishing for each said cord a pivot point laterally offset from the outrigger structure, each said outrigger cord being displaceably retained by said pivot point to extend from said pivot point and through predetermined ones of said cord management positions in an endless loop.

3. The method as recited in claim **1**, wherein a guide groove is established to define each said cord passage at said cord management positions, said groove receiving one of said outrigger cords.

4. The method as recited in claim **1**, further comprising establishing said lines to troll transversely to said outrigger structure, each of said lines being secured on one end thereof to said surface vessel by a rod, and a distal end of each of said lines being baited and drawn in water; whereby causing tension on said distal end causes said retention device to release said line to cause the rod to directly troll said distal end and bypassing each of every other line.

5. The method as recited in claim **1**, wherein said cord management positions include a proximate position nearest the surface vessel, a distal position farthest from the surface vessel, and a plurality of intermediate positions defined along the outrigger structure therebetween, said proximate position and one of the intermediate positions each concurrently passing an equal number of cords, the remaining intermediate position and said distal position respectively passing a progressively decreasing number of outrigger cords.

6. The method as recited in claim **1**, wherein said cord passages of said cord management positions are each defined by a rotatable pulley member.

7. The method as recited in claim **6**, wherein the plurality of cord passages of said cord management positions are respectively defined by a plurality of independently rotatable pulley members.

8. The method as recited in claim **7**, wherein said pulley members of each said cord management position are coaxially disposed.

9. The method as recited in claim **1**, wherein at least one of said cord management positions is releasably established on the outrigger structure.

10. The method as recited in claim **1**, wherein at least one pivot point is established to include a plurality of rotatable members receiving the outrigger cords respectively thereabout.

US 9,392,778 B1

13

**11**. The method as recited in claim **1**, wherein each said retention device is established to include a clip portion for releasably retaining a line and stop cork.

**12**. A method of managing outrigger cords for a surface vessel having an outrigger structure, comprising:

establishing a plurality of outrigger cords;

establishing a plurality of cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure;

defining at each of said cord management positions within the portion of the outrigger structure a plurality of cord passages transversely offset one from the other, the cord passages each forming a guide groove receiving and guiding a predetermined one of said outrigger cords to maintain independent displacement thereof relative to the outrigger structure, and retaining said cord management positions such that the cord passages extend at fixed angular orientations relative to the outrigger structure;

arranging said cord management positions along the portion of the outrigger structure with consecutive cord management positions within the portion respectively guiding a progressively decreasing number of outrigger cords; and,

establishing a plurality of retention devices each coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said outrigger cord.

**13**. The method as recited in claim **12**, wherein the plurality of cord passages of said cord management positions are respectively defined by a plurality of independently rotatable pulley members.

**14**. The method as recited in claim **13**, wherein said pulley members of each said cord management position are coaxially disposed.

**15**. A method of managing outrigger cords for a surface vessel having an outrigger structure, comprising:

establishing a plurality of outrigger cords;

establishing a plurality of cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure;

14

fixedly positioning a plurality of rotatable pulley members coaxially disposed at each of said cord management positions within the portion of the outrigger structure to define a plurality of cord passages transversely offset one from the other, the cord passages each guiding a predetermined one of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, and retaining said rotatable pulley members such that the cord passages extend at fixed angular orientations relative to the outrigger structure;

arranging said cord management positions along the portion of the outrigger structure with consecutive cord management positions within the portion of the outrigger structure respectively guiding a progressively decreasing number of outrigger cords; and, establishing a plurality of retention devices each coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said outrigger cord.

**16**. The method as recited in claim **15**, wherein the plurality of cord passages of said cord management positions are respectively defined by a plurality of independently rotatably pulley members disposed within a housing fastened to the outrigger structure.

**17**. The method as recited in claim **16**, wherein said pulley members at each of said cord management positions are coaxially disposed.

**18**. The method as recited in claim **15**, wherein said pulley members of at least one of said cord management positions are releasably fastened to the outrigger structure.

**19**. The method as recited in claim **15**, further comprising establishing for each said cord a pivot point laterally offset from the outrigger structure, each said outrigger cord being displaceably retained by said pivot point to extend from said pivot point and through predetermined ones of said cord management positions in an endless loop.

**20**. The method as recited in claim **15**, wherein said pulley members of at least one of said cord management positions are supported by a housing releasably fastened to the outrigger structure.

\*    \*    \*    \*    \*

US009717226B1

(12) **United States Patent**
Mercier

(10) **Patent No.:**      **US 9,717,226 B1**
(45) **Date of Patent:**      *Aug. 1, 2017

(54) **OUTRIGGER LINE MANAGEMENT SYSTEM**

(71) Applicant: **Craig Mercier**, Pasadena, MD (US)

(72) Inventor: **Craig Mercier**, Pasadena, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/212,571**

(22) Filed: **Jul. 18, 2016**

**Related U.S. Application Data**

(60) Continuation of application No. 14/188,180, filed on Feb. 24, 2014, now Pat. No. 9,392,778, which is a
(Continued)

(51) **Int. Cl.**
*A01K 91/08*          (2006.01)
*B63B 35/14*          (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *A01K 91/08* (2013.01); *A01K 91/053* (2013.01); *A01K 91/18* (2013.01); *B63B 21/04* (2013.01); *B63B 35/14* (2013.01)

(58) **Field of Classification Search**
CPC ...... A01K 91/053; A01K 91/08; A01K 91/18; A01K 79/00; A01K 99/00
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 53,797 A * | 4/1866 | Epperson et al. | ...... | D06F 53/04 |
| | | | | 211/119.02 |
| 133,530 A * | 12/1872 | Hadden | ................... | D06F 53/04 |
| | | | | 211/119.1 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| ES | WO 03005813 A1 * | 1/2003 | ............. | A01K 87/00 |
| FR | 2613905 A1 * | 10/1988 | ............. | A01K 91/08 |

(Continued)

OTHER PUBLICATIONS

Malin Big Boat Rigging Kit Drawing; Available website: https://web.archive.org/web/20021104002444/http://malinco.com/marine/big_boat_rig_drawing.html; Capture of a website at www.malinco.com on Nov. 4, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

(Continued)

*Primary Examiner* — Darren W Ark
(74) *Attorney, Agent, or Firm* — Rosenberg, Klein & Lee

(57)      **ABSTRACT**

A line management system for an outrigger structure is provided for guiding outrigger cords through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. The system includes a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure.

**20 Claims, 6 Drawing Sheets**



APPX87

## US 9,717,226 B1

Page 2

### Related U.S. Application Data

division of application No. 12/726,695, filed on Mar. 18, 2010, now Pat. No. 8,656,632.

(51) **Int. Cl.**
| | |
|---|---|
| *A01K 91/053* | (2006.01) |
| *A01K 91/18* | (2006.01) |
| *B63B 21/04* | (2006.01) |

(58) **Field of Classification Search**
USPC ..... 43/27.4, 43.12, 43.13, 42.74, 27.2, 21.2; 114/255, 364; 254/405
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 279,916 | A | * | 6/1883 | Cochran | B66D 3/046 254/405 |
| 398,490 | A | * | 2/1889 | Bried | D06F 53/04 211/119.1 |
| 402,208 | A | * | 4/1889 | Uren | B66D 3/046 16/45 |
| 430,028 | A | * | 6/1890 | Jackson, Jr. | B66D 3/046 254/405 |
| 430,518 | A | * | 6/1890 | Ferrall | B66D 3/046 254/405 |
| 430,519 | A | * | 6/1890 | Ferrall | B66D 3/046 254/405 |
| 516,192 | A | * | 3/1894 | Ferrall | B66D 3/046 254/405 |
| 667,453 | A | * | 2/1901 | Parker | D06F 53/02 211/119.02 |
| 790,336 | A | * | 5/1905 | Yoerger | A01K 91/053 43/42.74 |
| 798,652 | A | * | 9/1905 | Baughman, Sr. | B66D 3/046 254/405 |
| 847,955 | A | * | 3/1907 | Lindsay | B66D 3/046 254/405 |
| 1,032,395 | A | * | 7/1912 | Foss | D06F 53/04 211/119.1 |
| 1,134,850 | A | * | 4/1915 | Herbert et al. | D06F 53/04 211/119.1 |
| 1,157,502 | A | * | 10/1915 | Budaji | D06F 53/02 211/119.01 |
| 1,163,193 | A | * | 12/1915 | Althoff | A01K 91/10 43/15 |
| 1,164,919 | A | * | 12/1915 | Carlson et al. | B66D 3/046 254/405 |
| 1,209,739 | A | * | 12/1916 | Marvin | B66D 3/046 254/405 |
| 1,336,186 | A | * | 4/1920 | Baron | D06F 53/02 211/119.1 |
| 1,428,118 | A | * | 9/1922 | Robeson | B66D 3/046 254/405 |
| 1,753,084 | A | * | 4/1930 | Kappel | D06F 57/00 254/405 |
| 1,840,762 | A | * | 1/1932 | Akervick | A01K 91/18 43/42.74 |
| 2,037,232 | A | * | 4/1936 | Hendriks | A01K 91/18 114/303 |
| 2,196,472 | A | * | 4/1940 | Moriarty | A01K 91/053 43/21.2 |
| 2,206,174 | A | * | 7/1940 | Falk | D06F 53/045 211/119.1 |
| 2,292,415 | A | * | 8/1942 | Waldheim | D06F 53/02 211/119.02 |
| 2,303,753 | A | * | 12/1942 | Merle | A01K 95/00 43/42.74 |
| 2,340,608 | A | * | 2/1944 | Merle | A01K 95/00 43/42.74 |
| 2,352,631 | A | * | 7/1944 | Guarnieri | A01K 91/10 236/1 E |
| 2,550,282 | A | * | 4/1951 | McAvoy | A01K 97/12 177/245 |
| 2,594,158 | A | * | 4/1952 | Hannameyer | A47B 37/00 108/25 |
| 2,599,081 | A | * | 6/1952 | Waddell | D06F 53/02 211/119.13 |
| 2,800,300 | A | * | 7/1957 | Johnson | B66D 3/046 254/402 |
| 2,834,476 | A | * | 5/1958 | Picone, Jr. | D06F 53/04 211/119.02 |
| 2,838,866 | A | * | 6/1958 | Labin | A01K 87/04 43/25 |
| 2,912,782 | A | * | 11/1959 | Maximov | A01K 91/06 43/27.2 |
| 2,951,307 | A | * | 9/1960 | Joy | A01K 91/02 43/26.1 |
| 3,060,614 | A | * | 10/1962 | Prince | A01K 91/08 114/255 |
| 3,193,964 | A | * | 7/1965 | Hurst | A01K 91/08 43/43.12 |
| 3,275,301 | A | * | 9/1966 | Read | B66D 3/046 254/405 |
| 3,355,835 | A | * | 12/1967 | Lyons | A01K 89/017 43/27.4 |
| 3,358,399 | A | * | 12/1967 | Waldmann | A01K 91/02 244/153 R |
| 3,462,870 | A | * | 8/1969 | Terilli | A01K 91/02 43/27.4 |
| 3,650,063 | A | * | 3/1972 | Pierce | A01K 91/04 43/42.74 |
| 3,656,630 | A | * | 4/1972 | Miguel | D06F 53/02 211/119.11 |
| 3,787,995 | A | * | 1/1974 | Watanabe | A01K 91/08 43/43.12 |
| 3,835,567 | A | * | 9/1974 | Humbert | A01K 91/08 43/6.5 |
| RE28,380 | E | * | 4/1975 | Tison | A01K 91/18 43/27.4 |
| 3,959,913 | A | * | 6/1976 | Weber | A01K 91/08 24/542 |
| 3,968,587 | A | * | 7/1976 | Kammeraad | A01K 91/08 242/397.1 |
| 4,248,002 | A | * | 2/1981 | McNellis | A01K 91/08 242/397.1 |
| 4,388,774 | A | * | 6/1983 | Thoemke | A01K 91/08 114/255 |
| 4,524,535 | A | * | 6/1985 | Bates | A01K 73/04 43/27.4 |
| 4,610,409 | A | * | 9/1986 | Emory, Jr. | A01K 91/08 254/326 |
| 4,611,423 | A | * | 9/1986 | Rupp | A01K 91/08 43/43.12 |
| 4,625,450 | A | * | 12/1986 | Roemer, Jr. | A01K 91/08 43/43.12 |
| 4,632,050 | A | * | 12/1986 | Rupp | A01K 91/08 114/221 R |
| 4,756,115 | A | * | 7/1988 | Reyen | A01K 91/053 43/42.74 |
| 4,760,993 | A | * | 8/1988 | Du Preez | B66D 3/046 254/411 |
| 4,807,386 | A | * | 2/1989 | Emory, Jr. | A01K 91/08 43/15 |
| 4,875,428 | A | * | 10/1989 | Schlesch | A01K 91/08 114/255 |
| 5,301,451 | A | * | 4/1994 | VanAssche | A01K 91/08 43/21.2 |
| 5,363,975 | A | * | 11/1994 | Meade | D06F 57/04 211/119.01 |
| 5,375,727 | A | * | 12/1994 | Lavi | D06F 57/12 211/119.01 |
| D366,445 | S | * | 1/1996 | Seggern | D12/303 |
| 5,673,507 | A | * | 10/1997 | Stokes, Jr. | A01K 97/10 114/364 |
| 5,921,196 | A | * | 7/1999 | Slatter | A01K 91/08 114/255 |

## US 9,717,226 B1

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,149,020 | A | * | 11/2000 | Gumpel ................. D06F 57/125 |
| | | | | 211/119.01 |
| 6,286,245 | B1 | * | 9/2001 | Broberg ................. A01K 91/08 |
| | | | | 254/394 |
| 6,386,516 | B1 | * | 5/2002 | Lenders ................... B66D 3/06 |
| | | | | 254/393 |
| 6,454,109 | B1 | * | 9/2002 | Doyle .................... D06F 53/00 |
| | | | | 211/119.01 |
| 6,505,431 | B1 | * | 1/2003 | Christian ............... A01K 91/08 |
| | | | | 43/19.2 |
| 6,769,377 | B2 | | 8/2004 | Rupp, II |
| 6,834,459 | B2 | * | 12/2004 | van Weenen .......... A01K 91/08 |
| | | | | 43/27.4 |
| 7,111,574 | B2 | * | 9/2006 | Slatter ................... A01K 91/08 |
| | | | | 114/255 |
| 7,343,709 | B2 | * | 3/2008 | van Weenen .......... A01K 91/08 |
| | | | | 43/27.4 |
| 7,533,870 | B2 | * | 5/2009 | Camrass ................ B66D 3/046 |
| | | | | 254/402 |
| 7,654,214 | B2 | * | 2/2010 | Rupp, II ................ B63B 35/20 |
| | | | | 114/255 |
| 7,878,342 | B1 | * | 2/2011 | Lewis .................... D06F 53/00 |
| | | | | 211/119.01 |
| 8,109,034 | B1 | * | 2/2012 | McCauley ............. A01K 87/02 |
| | | | | 43/18.1 R |
| 8,656,632 | B1 | * | 2/2014 | Mercier ................ A01K 91/08 |
| | | | | 114/255 |
| 8,683,735 | B1 | * | 4/2014 | Figari ................... A01K 91/08 |
| | | | | 43/18.1 CT |
| 9,392,778 | B1 | * | 7/2016 | Mercier ................ A01K 91/08 |
| 2006/0231009 | A1 | * | 10/2006 | Slatter ................... A01K 91/08 |
| | | | | 114/255 |
| 2009/0188422 | A1 | | 7/2009 | Rupp, II |
| 2010/0005702 | A1 | * | 1/2010 | Palacios Cortell .... A01K 91/08 |
| | | | | 43/26.1 |
| 2014/0041282 | A1 | * | 2/2014 | Karpanty ............... A01K 91/08 |
| | | | | 43/27.4 |
| 2015/0298945 | A1 | * | 10/2015 | Fayal ..................... B66D 3/046 |
| | | | | 254/405 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| JP | 08214747 | A | * | 8/1996 |
| JP | 11056184 | A | * | 3/1999 |
| JP | 2007000143 | A | * | 1/2007 |
| WO | 2009056135 | A1 | | 5/2009 |

OTHER PUBLICATIONS

Malin Outrigger Pulleys; Available web site: https://web.archive.org/web/20010728111649/http://www.malinco.com/marine/outrig_pulleys.html; Capture of a website at www.malinco.com on Jul. 28, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Quicklip Outrigger Clip; Available web site: https://web.archive.org/web/20010728112009/http://www.malinco.com/marine/outrig_clip.html; Capture of a website at www.malinco.com on Jul. 28, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

www.ifish.net, Ifish Fishing and Hunting, The Salty Dogs, Need help & ideas rigging new custom outriggers; Available web site: http://www.ifish.net/board/showthread.php?t=131929; created on Nov. 3, 2006; downloaded on Sep. 28, 2015.*

Tigress Outriggers & Gear, Rigging Instructions, How to Rig Your Outriggers; Available web site: http://www.tigressoutriggers.com/outriggerset.pdf; created on Aug. 13, 2004; downloaded on Sep. 28, 2015.*

Marine & Outdoor Products, HAL-LOCK, HL3 Triple; Available web site: http://www.gotomop.com/product/hl3/; downloaded on Sep. 28, 2015.*

Melton International Tackle, Hal Lock Outrigger Shock Cords; Available web site: http://www.meltontackle.com/products/marine-outdoor-products-hal-lock-outrigger-shock-cords.html; downloaded on Sep. 28, 2015.*

Rupp Rigging Instructions; Available web site: http://www.ruppmarine.com/wp-content/uploads/2012/06/RiggingDiagram-Instructions.pdf; created on Mar. 28, 2008; downloaded on Sep. 28, 2015.*

Malin Complete Rigging Kit Drawing; Available web site: https://web.archive.org/web/20021104002338/http://malinco.com/marine/completerig_drawing.html; Capture of a website at www.malinco.com on Nov. 4, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Shock Cords, Pulleys, and Snaps; Available web site: https://web.archive.org/web/20010731134510/http://www.malinco.com/marine/shock_cords.html; Capture of a website at www.malinco.com on Jul. 31, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Halyard Tensioning Drawing, Available web site: https://web.archive.org/web/20020628204508/http://malinco.com/marine/halyard_drawing.html; Capture of a website at www.malinco.com on Jun. 28, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Malin Big Boat Top Gun Rigging Kit; Available web site: https://web.archive.org/web/20010726142407/http://www.malinco.com/marine/big_boat_rig_kit.html; Capture of a website at www.malinco.com on Jul. 26, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.*

Outrigger Line Kits sold by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally screen capture of http://web.archive.org/web/20010406175616/http://www.malinco.com/marine/index.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Pulleys sold by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally a screen capture of http://web.archive.org/web/20010410013028/http://www.malinco.com/marine/outrig_pulleys.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Complete Rigging Kits by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally screen capture of http://web.archive.org/web/20010726142436/http://www.malinco.com/marine/complete_rig_kit.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Line Kits sold by Malin in 2015, as illustrated on their current website as of Sep. 10, 2015. (originally screen capture of http://www.malinco.com/marine.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

J-Mar Tackle Inc., (now known as Malin Marine) Outrigger System referenced in a Jun. 22, 1989, magazine entitled "The Fisherman" through an article on p. 8 describing the J-Mar Outrigger System. A photocopy of the front of the magazine and the article on p. 8 of the magazine as presented on Oct. 21, 2015 to applicant in related U.S. Appl. No. 90/013,594.

J-Mar Tackle, Inc. New Product release sheet illustrating Outrigger Rigging Kits and Outrigger Pulley, including a Rigging Diagram that illustrates outrigger pulley placement and Quicklip.TM. placement. Undated, but written as J-Mar Tackle which became Malim Marine in 2001 as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

Rupp catalogue and pricing sheet dated Feb. 1, 2000, disclosing outrigger rigging kits (p. 19 of the catalog) as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

Rupp advertisement that references p. 19 of the Rupp catalog as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

* cited by examiner

**APPX89**



FIG. 1A

FIG. 1



FIG.2A

FIG.2



FIG.3

APPX92



FIG.3A

FIG.4

APPX93



FIG.5



FIG.6

APPX94



FIG.7

APPX95

US 9,717,226 B1

**1**

## OUTRIGGER LINE MANAGEMENT SYSTEM

### RELATED APPLICATIONS

This application is a Continuation of co-pending application Ser. No. 14/188,180, filed 24 Feb. 2014, which is a Divisional of application Ser. No. 12/726,695, filed on 18 Mar. 2010, now U.S. Pat. No. 8,656,632. The entire disclosure of the prior application Ser. No. 14/188,180 is considered a part of the disclosure of the accompanying Continuation application and is hereby incorporated by reference.

### BACKGROUND OF THE INVENTION

The subject outrigger line management system is generally directed to a system for enabling convenient displacement of articles along an outrigger structure. More specifically, the outrigger line management system maintains smooth and efficient displacement of individual lines, cords, or other mechanical link employed to so displace articles along a given outrigger support structure.

Outrigger structures are used on surface vessels to extend the lateral reach of the vessel for various purposes. Cast line fishing applications provide one example where outrigger structures provide useful extension of support points for concurrent use of multiple fishing lines. Typically, a fishing rod feeds a fishing line on which one or more baited hooks are provided. The baited ends of the fishing lines are cast into the water to attract fish about the given boat or other surface vessel. Where more than a few fishing lines are so cast from the same vessel into surrounding waters, intertangling remains a persistent problem, particularly where the vessel continues moving to, for example, troll the lines through the water. Tangling becomes an even greater threat when the vessel undergoes abrupt turns or encounters fast moving currents. To prevent such interference and tangling, fishing lines may be supported through one or more pivot points displaced along the length of an outrigger structure. The baited ends of different fishing lines are thereby spaced to be dragged through the water, each held safely away from the vessel and one another to avoid interference.

In this manner, outrigger support structures extend fishing/trolling lines laterally out beyond the wake of a moving boat. They allow the safe deployment of multiple fishing lines cast out from the boat each pivoted at different points along the outrigger structure to remain separated by sufficient fishing space (until release of the lines from their pivot points is triggered) to prevent entanglement.

Outrigger structures are usually installed on a boat to be moved inline with the hull or folded into a mast when not in service. Typically, a pair of outrigger structures are installed at starboard and port gunwale locations.

Known outrigger structures are often provided with a plurality of fixed eyehooks longitudinally spaced therealong. A plurality of outrigger cords are then passed through the eyehooks and a pulley assembly disposed at a fixed point on the boat. Each outrigger cord forms a displaceable loop about the pulley assembly and one or more supporting eyehooks, and each carries a clip on which a fishing line may be secured for movement along an outrigger structure with the outrigger cord. A user may retract or advance the clip by pulling the corresponding outrigger cord in one direction or the other through its loop. So when a fishing line is to be baited, the user pulls one outrigger cord to draw the clip within reach, 'loads' the clip with an appropriately baited fishing line that has been cast, then pulls the outrigger cord in a reverse direction to return the loaded clip to a deploy-

**2**

ment position on the outrigger structure. This process is repeated for each baited fishing line that has been cast out from a certain point on the boat. When a 'bite' occurs, or when a fishing line encounters sufficient tension, the clip releases, so that the line returns to form a direct line between its feeding point (i.e., fishing rod) for active user control.

This process is not without significant practical obstacles to smooth, proper operation. FIG. **7** depicts a portion of an outrigger structure **10'** having an eye hook **30'** for pivotally retaining its outrigger cords **20'**, as used in the prior art. Normally, multiple outrigger cords **20'** are used to concurrently deploy multiple fishing lines. The multiple outrigger cords **20'** passing through the collar-like eyehook **30'** invariably bunch together during operation, getting tightly intertwined when subjected to tension and manipulation. Much friction results between the tightly packed outrigger cords **20'** themselves, as well as between each cord **20'** and eye hook **30'**. Being that the outrigger cords are normally supported snugly between the eye hook **30'** and other pivot points, a particularly high friction point is created at the sharp bend typically formed at one or more of the eye hooks **30'**. The friction makes it very difficult to displace individual outrigger cords to load and deploy their clips, at least not without mighty physical exertion. Moreover, the considerable friction that must be overcome to effect such cord movement causes premature wearing on the cords themselves.

Various outrigger structures are known in the art. By way of example, U.S. Pat. No. 3,462,870 discloses several embodiments of a fishing system that uses a buoy line maintained in a desired area by an airborne kite. The system can have a plurality of lines operated by a fisherman having a reel with a plurality of spools which may be individually wound without disturbing the others. The lines can also be operated by individual fishermen each having a reel. The individual lines may be secured to the buoy line with a releasable clip that disengages when a fish applies tension to the line, allowing that particular line to be cleared of the remaining fishing lines and to be reeled in.

U.S. Pat. No. 3,060,614 is directed to a multiple pole trolling device for mounting on a boat. The multiple pole trolling devices are spaced apart and rotatably mounted on a pole base that is rotatable and tiltably adjustable. Each of the poles has a fixed trolling line located in the water when set to a rearward position. When the assembly is rotated, the line comes out of the water over the boat so that the fish can be removed.

U.S. Pat. No. 2,196,472 is directed to a fishing apparatus in the form of a tree formed of tubular members that support a plurality of fishing lines. The tree may be thrust into the bottom of a body of water. The mast as shown has a set of screws that may be used to adjust the coaxial tubular members for use in water of different depths.

U.S. Pat. No. 3,358,399 is directed to a kite fishing apparatus having two reels, one for a kite line, and the other for a fishing line. A three-in-one glider-type structure is provided and functions to carry the fishing line over the body of water. The baited end of the fishing line is cast out by the outgoing kite line and by means provided to detachably and adjustably connect the kite line to the fishing line.

U.S. Pat. No. 4,388,774 is directed to a fishing line system for use on a boat that supports six fishing rods each spaced from the other to prevent the fishing lines from tangling during trolling. A pull on either side of the boat is mounted on roller booms that can be extended or retracted as required. A rearwardly extending pair of fishing poles are carried by holders mounted on the stern of the boat to

US 9,717,226 B1

3

position lines laterally inward of lines. The booms are disposed transversely to the left of the boat and are supported by antifriction assemblies which support the booms.

A significant drawback remains in the prior art for effectively managing the outrigger cords to enable loading and deploying of articles along an outrigger structure. There is, therefore, a need for a system that enables sufficiently free, unrestricted individual displacement of the outrigger cords along the outrigger structure.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a line management system for an outrigger structure which maintains guiding outrigger cords in convenient, independently displaceable manner.

These and other objects are attained by the outrigger line management system formed in accordance with the present invention. The system comprises of a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The plurality of retention devices are each coupled to one of the outrigger cords. Each of the retention devices defines a retention point for advancing a fishing line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

In certain exemplary embodiments, the system also includes a pivot unit laterally offset from the outrigger structure displaceably retaining each of the outrigger cords. Each of the outrigger cords extends from the pivot unit and through predetermined ones of cord management units in an endless loop.

In another exemplary embodiment, a method for managing the outrigger cords comprises the steps of (1) establishing a plurality of outrigger cords, (2) establishing a plurality of cord management positions, (3) defining each cord management positions, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices. The cord management positions are established longitudinally spaced one from the other along the outrigger structure. Each of the cord management positions are then defined to include a plurality of transversely offset cord passages respectively guiding predetermined ones of the outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The cord management positions are arranged to define a portion of the outrigger structure a progressively decreasing number of cord passages. The retention devices are established to define a retention point for advancing a line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

Those skilled in the art will appreciate the scope of the present invention and realize aspects thereof after reading the following detailed description of the preferred embodiments in association with the accompanying illustrative figures.

### BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying illustrative figures incorporated in and forming a part of this specification depict several aspects of

4

the invention, and together with the description serve to explain the principles of the invention.

FIG. 1 is a diagram illustrating a view of a line management system installed on a surface vessel in accordance with one exemplary embodiment of the present invention;

FIG. 1A is a diagram illustrating an enlarged view of the pivot unit in the embodiment depicted in FIG. 1;

FIG. 2 is a diagram schematically illustrating a portion of the line management system operation on an outrigger structure in accordance with an exemplary embodiment of the present invention;

FIG. 2A is an exploded plan view of a retention device depicted in FIG. 2;

FIG. 3 is a perspective view schematically illustrating a cord management unit formed in accordance with an exemplary embodiment of the present invention;

FIG. 3A is a perspective view schematically illustrating a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. 4 is a perspective view of a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. 5 is a schematic perspective view of a cord management unit formed in accordance with another alternate embodiment of the present invention;

FIG. 6 is an exploded perspective view of a clamp member formed in accordance with another alternate embodiment of the clamp member depicted in FIG. 5; and,

FIG. 7 is a perspective view of an eye hook employed in the prior art for guiding cords on an outrigger structure.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments set forth below represent the necessary information to enable those skilled in the art to practice the invention and illustrate the best mode of practicing the invention. In light of the illustrated figures and the following description, those skilled in the art will understand the concepts of the invention and will recognize applications of these concepts not particularly addressed herein. It should be understood that these concepts and applications fall within the scope of the disclosure and accompanying claims.

Wherever possible in the following description, similar reference numerals will refer to corresponding elements on parts of different Drawings unless otherwise indicated.

Referring to FIGS. 1 and 2, there is a depiction of an exemplary embodiment of the line management system 1 for a surface vessel or boat 5. The line management system 1, installed as shown on a boat, includes a plurality of outrigger cords 20, a plurality of cord management units 30, and a plurality of retention devices 40 all coupled to the outrigger structure 10. As depicted in FIG. 1, the outrigger structure 10 may be mounted on top of a surface vessel, to the gunwale or bow, or any other suitable part of the vessel for supporting a plurality of articles therealong. System 1 may be applied to various applications to aid in the smooth loading and deployment of suitable articles to be supported along the outrigger structure 10. The fishing application shown for illustrative purposes herein is but one of numerous such applications where system 1 may be employed in accordance with various aspects of the present invention.

In the fishing application illustrated, the outrigger structure 10 allows the deployment of more fishing lines 60 cast out from the boat each separated from the other by adequate fishing space than would normally be possible. The spacing prevents fishing lines 60 from entangling during trolling

US 9,717,226 B1

with other fishing lines **60** originating from the same boat **5**. The number of fishing lines **60** being trolled increases the chances of catching fish and permits multiple individuals to fish from the boat **5**. Use of outrigger structure **10** equipped with system **1** in accordance with the present invention mitigates the inherent entanglement risk while preserving ease of use. Each outrigger structure **10** may be suitably formed as one piece, or made up of individual outrigger sections joined together.

In accordance the present invention, a line management system **1** is coupled to each outrigger structure **10** used for support extension purposes—such as to extend support for a fishing line **60** to the side of a boat during trolling. The line management system **1** is used for safely guiding outrigger cords **20** through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. Typically, when the outrigger structure **10** is in use, it is extended transversely to the length of a boat **5** for trolling fishing lines **60** coupled to the retention device **40**. The outrigger structure **10** thus serves to increase the span of the boat to allow more fishing lines **60** to be trolled. By way of example, a 28 foot fishing boat having a 16 foot wide fishing platform can have a pair of outrigger structures **10**, with each outrigger structure **10** being 40 foot long. Once the fishing boat **5** is ready to fish, each of the outrigger structures **10** is extended transversely from the boat in opposite directions to effectively create a 96 foot wide fishing platform from which to suspend multiple fishing lines **60**.

In one preferred embodiment, a plurality of outrigger cords **20** are supported along the longitudinal length of the outrigger structure **10** by at least one cord management unit **30**. Typically, a plurality of cord management units **30** is employed, with each cord management unit **30** firmly coupled to the outrigger structure **10**. The cord management units **30** are longitudinally spaced one from the other along the outrigger structure **10**.

Each outrigger cord **20** is coupled with a retention device **40** for securing a retention point **400** on a fishing line **60**. The retention device **40** facilitates individual management of each fishing line **60** during, for example, sport fishing. When multiple baited fishing lines **60** are being cast out from a boat **5**, the retention device **40** allows for each fishing line **60** fed from a certain point on the boat **5**, by a fishing rod **70** for instance, to be maintained without interfering with the other fishing lines **60** being trolled.

Each outrigger cord **20** is preferably looped through a pivot unit **50** spaced from an outrigger structure **10** and at least one cord management unit **30** provided on such outrigger structure **10** (as described in following paragraphs). Each outrigger cord **20** remains longitudinally displaceable relative to the outrigger structure **10** so that a user may retract or advance the retention point **400**. Each of the retention devices **40** defines a retention point **400** for pivotally supporting a fishing line. This retention point **400** is preferably displaceable longitudinally along the outrigger structure responsive to a displacement of the outrigger cord **20**. Typically, the outrigger cord **20** is displaced to retract the retention point **400** or retention device **40** when seeking to attach or manage a fishing line **60**. Once the fishing line **60** is attached to the retention device **40**, the outrigger cord **20** is then advanced by displacing the outrigger cord **20** to a relative position that gives adequate longitudinal spacing with respect to the other fishing lines **60**.

In certain embodiments, the retention device **40** pivotally retains a fishing line **60** at the retention point **400** until sufficient resistance is encountered on the line **60**. When a

fish bites the line, for instance, the pull on line **60** will cause its release from the retention device **40**.

Once retracted, a user may bait, then releasably attach a fishing line **60** to a retention point **400**. When the retention point **400** is advanced back out along the given outrigger structure **10**, the retention point preferably serves as a point from which the line's baited end extends into the water. One or more fishing lines **60** may be so retained to extend in pivoted manner from a portion of each outrigger cord **20**, so long as suitable spacing is maintained to avoid undue line cluttering and tangling. In the embodiment illustrated, one retention device **40** is shown connected to each individual cord **20**.

As depicted in FIG. **2**, the outrigger cords **20** are individually coupled to a stop cork **80** that acts to limit the displacement of the outrigger cords past a predetermined point. The stop cork **80** limits the displacement by preventing the retention device **40** from unintentionally getting wedged in the cord management unit **30**.

In the preferred embodiment, the line management system **1** also includes a pivot unit **50** preferably anchored to a fixed point on the boat **5**, laterally offset from the outrigger structure **10** for displaceably retaining a portion of each outrigger cord **20**. The pivot unit **50** acts as a pivotal support about which the outrigger cords **20** may be displaced. Each of the outrigger cords **20** extends from the pivot unit **50** and through respective cord management units **30**, preferably in an endless loop.

In an exemplary embodiment, the pivot unit **50** includes a plurality of rotatable members **500** individually receiving a respective outrigger cord **20**. However, the pivot unit **50** is not limited to a rotatable structure and may be any structure of suitable type to provide a pivot support for displacement of the outrigger cords **20**.

Each retention device **40**, as depicted in FIG. **2A**, is coupled to an outrigger cord **20** and used to transport an intermediate portion of a fishing line **60** relative to outrigger structure **10**. Among other things, the retention device **40** comprises of a clip portion **402** and retention point **400**. The clip portion **402** allows for the free release of the line **60** when the line is caused to apply sufficient resistance pressure thereon.

When multiple fishing lines **60** are being trolled in the water, in the illustrated embodiment, the lines **60** are preferably maintained by system **1** in such a way that each fishing line **60** clears every other fishing line **60** on its way back towards its feed point (such as the corresponding fishing pole **70**) upon released from the clip portion **402**. The originating/feed points of the fishing lines **60** are suitably arranged, so that when one fishing line **60** releases from its retention device **40**, the fishing line **60** does not physically contact or otherwise interfere with the other deployed fishing lines **60** on its return to a direct line extension from the originating point. It is not unusual to have the retention devices **40** coupled to respective outrigger cords **20** to be displaced in height 8 feet relative to each other, to ensure a clear path of return as a direct line from the feed point (to the water) is restored by a released fishing line **60**.

In a typical application, one end of a fishing line **60** may be fed to originate from a fishing rod **70** temporarily secured to a support bracket provided on the boat **5**. A distal end **600** is baited and drawn in the water during trolling. The retention point **400** is located between the originating end and distal end **600** of the fishing line. The retention point **400** provides a pivot point from which the distal portion (having the end **600**) of the fishing line **60** may be suspended from the outrigger structure **10** for safe trolling. The clip portion

US 9,717,226 B1

7

402, which may be made of any suitably resilient or rigid material having enough structural strength to hold the fishing line 60 in place, is configured to open when there is tension on the fishing line 60. For example, when a fish takes the bait at the distal end 600 of the fishing line 60 and causes sufficient tension thereon, the clip portion 402 of the retention device 40 will release. Thereafter, the fishing line 60 must be re-loaded onto the retention device 40 if that line is to be deployed again at its trolling position.

To re-couple fishing line 60 (to re-load a retention device 40), the particular outrigger cord 20 for the clip portion 402 that released the fishing line 60 is pulled to draw the retention device 40/clip portion 402 back in towards the boat until it is within a user's reach. The clip portion 402 is re-loaded by coupling a newly-baited fishing line 60. Once the retention device 40 is drawn in for re-coupling, the clip portion 402 may be snapped open or pulled away from the retention device 40 to an open position so that the fishing line 60 may be hooked by the retention point 400. Thereafter, the retention device 40 is advanced outward again by accordingly displacing its outrigger cord 20. In accordance with one aspect of the present invention, the outrigger cords 20 are independently maintained along respective transversely offset cord passages 304 as described in following paragraphs, such that each may be freely displaced, and the longitudinal displacement of any of the outrigger cords 20 will not interfere with the rest of the outrigger cords 20.

As depicted in FIG. 3, the line management system 1 also includes at least one a cord management unit 30 for each cord 20. In broad concept, the cord management unit 30 defines a plurality of transversely offset cord passages 304 which independently guide the outrigger cords 20 longitudinally along the outrigger structure 10. The cord management unit 30 allows for multiple outrigger cords 20 to be independently controlled without undue interference from the other outrigger cords 20.

Each cord management unit 30 preferably includes independently displaceable pulley members 300 to engage respective outrigger cords 20. In the disclosed embodiment, the pulley members 300 are made wheel-like to be freely rotatable. Since each pulley member 300 is freely rotatable and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members 300, depending on the specific requirements of a particular application. For example, the pulley members 300 may be suitably sealed. Preferably, the pulley members 300 are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members 300 define transversely offset cord passages 304 whose concave profiles are directed radially outward to receive and guide respective outrigger cords 20, and maintain their independent longitudinal displacement relative to the outrigger structure 10. The transversely offset cord passages 304 may are formed with annular grooves 310 having, for example U-shaped or V-shaped sectional profiles. The annular grooves 310 are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords 20 therefrom.

In preferred embodiments, a plurality of cord management units 30 are arranged along a length of each outrigger structure 10, so that decreasing numbers of transversely offset cord passages 304 are provided by successive unit 30. For example, a system 1 configured to support three separate outrigger cords 20a, 20b, 20c on an outrigger structure 10, as illustrated in FIG. 2, would employ with the pivot unit 50

8

four cord management units 30a, 30b, 30c, 30d. The cord management units 30a-30d are then arranged to define, along a portion of the outrigger structure 10, a progressively decreasing number of cord passages 304.

In the embodiment illustrated in FIG. 2, for example, the first two cord management units 30a, 30b closest to the boat 5, would preferably each define three cord passages 304 to participate in guiding all three outrigger cords 20a, 20b, 20c. The third cord management unit 30c would preferably define one less cord passage, or two cord passages 304, to participate in guiding just two of the outrigger cords 20b, 20c, since the first outrigger cord 20a pivots at the second cord management unit 30b to return to the pivot unit 50. The next cord management unit 30d may then define even fewer cord passages, or one cord passage 304 in this case, to participate in guiding the one remaining outrigger cords 20c, since the first outrigger cord 20b pivots at the third cord management unit 30c to return to the pivot unit 50.

In certain alternate embodiments, of course, the number of cord management units 30, as well as the arrangement and extent of cord passages defined by respective cord management units 30, may be varied to suit the particular requirements of the intended applications. While not the most efficient, for example, each outrigger cord 20 may be looped about the pivot unit 50 and a set of cord management units 30 whose cord passages pass that outrigger cord 20 only, to the exclusion of the other outrigger cords 20. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord 20) are maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord 20) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units 30 may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules 300 may be disposed in replaceable manner within the housing 306 of a cord management unit 30, such that numbers and even the precise positions of the individual pulley or other members 300 within the unit 30 may be adjustably varied to suit different needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module 30, or its re-positioning, within the housing 306.

In preferred embodiments, the pulley members 300 are coaxially aligned, sharing the same shaft. The outrigger cords 20 are secured in the cord passages 304 by a bridge member 302. Preferably, the bridge member 302 is reconfigurably coupled to a housing 306 structure to contain the plurality of outrigger cords 20 in one position and allow their removal in another. The housing 306 is suitably formed to provide structural support and containment for the pulley members 300 and the outrigger cords 20. In the embodiment of FIG. 3, the bridge member 302 is displaceable relative to the pulley members 300 about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively. The plurality of cord management units 30 are longitudinally spaced along the outrigger structure 10 and their housings 306 releasably fastened by clamp member 308. The clamp member 308 may be sleeved onto the outrigger structure 10, selectively positioned on the outrigger structure 10, and fastened by a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The fasteners serve to secure the clamp member 308 to the outrigger

**APPX99**

US 9,717,226 B1

9

structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

FIG. **3**A is an alternate embodiment of the line management system **1** depicted in FIG. **3**. The line management system **1** also includes at least one a cord management unit **30** for each cord **20**. In broad concept, the cord management unit **30** defines a plurality of transversely offset cord passages **304** which independently guide the outrigger cords **20** longitudinally along the outrigger structure **10**. The cord management unit **30** allows for multiple outrigger cords **20** to be independently controlled without undue interference from the other outrigger cords **20**.

Each cord management unit **30** preferably includes independently displaceable pulley members **300** to engage respective outrigger cords **20**. In the disclosed embodiment, the pulley members **300** are made wheel-like to be freely rotatable. Since each pulley member **300** is freely rotatable and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members **300**, depending on the specific requirements of a particular application. For example, the pulley members **300** may be suitably sealed. Preferably, the pulley members **300** are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members **300** define transversely offset cord passages **304** whose concave profiles are directed radially outward to receive and guide respective outrigger cords **20**, and maintain their independent longitudinal displacement relative to the outrigger structure **10**. The transversely offset cord passages **304** may are formed with annular grooves **310** having, for example U-shaped or V-shaped sectional profiles. The annular grooves **310** are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords **20** therefrom.

In preferred embodiments, a plurality of cord management units **30** are arranged along a length of each outrigger structure **10**, so that decreasing numbers of transversely offset cord passages **304** are provided by successive unit **30**. For example, a system **1** configured to support three separate outrigger cords **20**a, **20**b, **20**c on an outrigger structure **10**, as illustrated in FIG. **2**, would employ with the pivot unit **50** four cord management units **30**a, **30**b, **30**c, **30**d. The cord management units **30**a-**30**d are then arranged to define, along a portion of the outrigger structure **10**, a progressively decreasing number of cord passages **304**.

In the embodiment illustrated in FIG. **2**, for example, the first two cord management units **30**a, **30**b closest to the boat **5**, would preferably each define three cord passages **304** to participate in guiding all three outrigger cords **20**a, **20**b, **20**c. The third cord management unit **30**c would preferably define one less cord passage, or two cord passages **304**, to participate in guiding just two of the outrigger cords **20**b, **20**c, since the first outrigger cord **20**a pivots at the second cord management unit **30**b to return to the pivot unit **50**. The next cord management unit **30**d may then define even fewer cord passages, or one cord passage **304** in this case, to participate in guiding the one remaining outrigger cords **20**c, since the first outrigger cord **20**b pivots at the third cord management unit **30**c to return to the pivot unit **50**.

In certain alternate embodiments, of course, the number of cord management units **30**, as well as the arrangement and extent of cord passages defined by respective cord management units **30**, may be varied to suit the particular requirements of the intended applications. While not the most

10

efficient, for example, each outrigger cord **20** may be looped about the pivot unit **50** and a set of cord management units **30** whose cord passages pass that outrigger cord **20** only, to the exclusion of the other outrigger cords **20**. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord **20**) are maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord **20**) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units **30** may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules **300** may be disposed in replaceable manner within the housing **306** of a cord management unit **30**, such that numbers and even the precise positions of the individual pulley or other members **300** within the unit **30** may be adjustably varied to suit different needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module **30**, or its re-positioning, within the housing **306**.

In preferred embodiments, the pulley members **300** are coaxially aligned, sharing the same shaft. The outrigger cords **20** are secured in the cord passages **304** by a bridge member **302**. Preferably, the bridge member **302** is reconfigurably coupled to a housing **306** structure to contain the plurality of outrigger cords **20** in one position and allow their removal in another. The housing **306** is suitably formed to provide structural support and containment for the pulley members **300** and the outrigger cords **20**. In the embodiment of FIG. **3**, the bridge member **302** is displaceable relative to the pulley members **300** about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively.

In this embodiment, the housing **306** is coupled to the outrigger structure **10** by a coupling member **309** that is secured by a securing member **311**. The coupling member **309** may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member **309** serve to secure the housing **306** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

The plurality of cord management units **30** are longitudinally spaced along the outrigger structure **10** and their housings **306** releasably fastened by coupling member **309** that is secured by a securing member **311**. The coupling member **309** may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member **309** serve to secure the housing **306** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

In certain alternate embodiments, such as depicted in FIG. **4**, the cord management unit **30** may include a spool-like structure that is integrally formed with a plurality of grooves **310** for receiving respective outrigger cords **20**. The cord passages **304** defined within the grooves **310** may be formed of materials with a very low friction coefficient so as to allow individual outrigger cords **20** to smoothly glide along them when displaced. Among other things, the low friction material making up the cord passage **304** in this embodiment would obviate the need for independent pulley members **300** as depicted in FIG. **3**. However, this embodiment has the drawback of generating more friction between the outrigger cords **20** and the respective receiving grooves **310**.

APPX100

US 9,717,226 B1

**11**

FIG. **5** depicts another alternate embodiment of cord management unit **30**. In this embodiment, the independently displaceable pulley members **300** define cord passages **304** that are laterally offset one from the other to respectively guide outrigger cords **20** to maintain independent longitudinal displacement relative to the outrigger structure. The independent pulley members **300** are respectively coupled to individual shafts which allow independent rotation of each pulley member **300**. Each bridge member **302** is provided as shown to guard against unwanted release of a cord **20** from its pulley member **300**, and thereby retain the outrigger cords **20** operably engaged with the pulley members **300**.

With respect to FIG. **6**, there is shown an alternate embodiment of clamp member **308**. In this embodiment, the clamp member **308** is made up of two separate pieces contoured to conform and easily fasten to the given outrigger structure **10**. The clamp member **308** may be releasably fastened by clamping the separate pieces about the outrigger structure **10** and securing the same with a fastener. The fastener may be a bolt, snap, strap, fire tie, or any other suitable means for fastening the collar-like clamp member **308** pieces to the outrigger structure **10**.

The clamping/fastening measures shown in the illustrated embodiments enable each cord management unit **30** to be retrofitted to existing outrigger structures **10**. The clamp member **308** may be sleeved onto the outrigger structure **10** or releasably fastened by a suitable fastener. Alternatively, where requirements permit, one or more cord management units **30** may also be formed as a fixed or integral part of an outrigger structure **10** itself.

The application of the cord management system **1** of the present inventions is not limited necessarily to fishing. Its use is relevant in any application that requires an outrigger structure, on or off water, where effective management of outrigger cords **20** is necessary to realize the benefits of the structure. For example, system **1** may be employed to set and deploy traps, set and service instrument buoys, or otherwise facilitate the outrigger-aided use and deployment of various other such articles.

The illustrated embodiments implement a method for managing the outrigger cords which generally includes the steps of: (1) establishing a plurality of outrigger cords **20**, (2) establishing a plurality of cord management positions, (3) defining at each cord management position a plurality of transversely offset cord passages **304**, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices **40**. The cord management positions are established longitudinally spaced one from the other along the outrigger structure **10**. A plurality of transversely offset cord passages **304** are defined at certain of the cord management positions to respectively guide predetermined ones of the outrigger cords **20** to maintain independent longitudinal displacement relative to the outrigger structure **10**. The cord management positions **304** are arranged to define along at least a portion of the outrigger structure **10** a progressively decreasing number of cord passages **304**. The retention devices **40** are thereby established to each define a retention point **400** for advancing a line longitudinally along the outrigger structure **10** responsive to a displacement of the outrigger cord **20**.

Although this invention has been described in connection with specific forms and embodiments thereof, it will be appreciated that various modifications other than those discussed above may be resorted to without departing from the spirit or scope of the invention as defined in the appended claims. For example, functionally equivalent elements may be substituted for those specifically shown and described,

**12**

certain features may be used independently of other features, and in certain cases, particular locations of the elements as well as particular method steps may be reversed or interposed, all without departing from the spirit or scope of the invention as defined in the appended claims.

What is claimed is:

1. An outrigger cord management system for a surface vessel having an outrigger structure, comprising:

a plurality of outrigger cords;

a plurality of cord management units disposed at respective cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure, each of said cord management units defining at least one cord passage;

at least one of said cord management units within the outrigger structure portion defining a plurality of cord passages transversely offset one from the other, wherein said cord passages respectively guide predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, said at least one cord management unit retaining the cord passages thereof to extend at fixed angular orientations relative to the outrigger structure;

said cord management units disposed along the outrigger structure portion cooperatively defining consecutive cord management positions respectively guiding a progressively decreasing number of outrigger cords; and,

a plurality of retention devices each coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

2. The system as recited in claim **1**, further comprising a pivot point established for each said outrigger cord, said pivot point being laterally offset from the outrigger structure, each said outrigger cord being displaceably retained by said pivot point to extend from said pivot point and through predetermined ones of said cord management units in an endless loop.

3. The system as recited in claim **1**, wherein said cord management units are configured with guide grooves forming said cord passages at said cord management positions, each said groove receiving one of said outrigger cords.

4. The system as recited in claim **1**, wherein said cord management positions include a proximate position nearest the surface vessel, a distal position farthest from the surface vessel, and a plurality of intermediate positions defined along the outrigger structure therebetween, said proximate position and one of the intermediate positions each concurrently passing an equal number of cords, the remaining intermediate position and said distal position respectively passing a progressively decreasing number of outrigger cords.

5. The system as recited in claim **1**, wherein said at least one cord management unit includes a plurality of rotatable pulley members respectively defining said cord passages.

6. The system as recited in claim **5**, wherein said at least one cord management unit includes a housing supporting said rotatable pulley members, said housing being securely mounted to the outrigger structure by a coupling member engaging the outrigger structure.

7. The system as recited in claim **5**, wherein said at least one cord management unit includes a housing supporting said rotatable pulley members and a clamp member securely

US 9,717,226 B1

**13**

mounting said housing to the outrigger structure, said clamp member being releasably locked by a coupling member.

8. The system as recited in claim **5**, wherein said rotatable pulley members of said at least one cord management unit are coaxially disposed.

9. The system as recited in claim **1**, wherein at least one of said cord management units is releasably fastened to the outrigger structure.

10. The system as recited in claim **1**, wherein at least one pivot point is defined by a plurality of rotatable members receiving the outrigger cords respectively thereabout.

11. The system as recited in claim **1**, wherein each said retention device includes a clip portion for releasably retaining a line and stop cork.

12. A system for managing outrigger cords for a surface vessel having an outrigger structure, comprising:

a plurality of outrigger cords;

a plurality of cord management units fixedly mounted at respective cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure, each of said cord management units including at least one rotatable pulley member defining a cord passage;

at least one of said cord management units within the outrigger structure portion including a plurality of said rotatable pulley members respectively defining a plurality of cord passages transversely offset one from the other, wherein said cord passages respectively guide predetermined ones of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure, said at least one cord management unit retaining the cord passages thereof to extend at fixed angular orientations relative to the outrigger structure;

said cord management units being arranged along the outrigger structure portion to cooperatively define consecutive cord management positions to respectively guide a progressively decreasing number of outrigger cords; and,

a plurality of retention devices each coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

13. The system as recited in claim **12**, wherein said at least one cord management unit includes a housing supporting said rotatable pulley members, said housing being fastened to the outrigger structure by a coupling member engaging the outrigger structure.

14. The system as recited in claim **12**, wherein said at least one cord management unit includes a housing supporting said rotatable pulley members and a clamp member fastening said housing to the outrigger structure, said clamp member being releasably locked by a coupling member.

15. The system as recited in claim **12**, wherein each of said cord management units is releasably fastened to the outrigger structure.

**14**

16. The system as recited in claim **12**, further comprising a pivot point for each said outrigger cord, said pivot point being laterally offset from the outrigger structure and displaceably retaining said outrigger cord to extend from said pivot point and through predetermined ones of said cord management units in an endless loop.

17. A system for managing outrigger cords for a surface vessel having an outrigger structure, comprising:

a plurality of outrigger cords;

a plurality of cord management units disposed at respective cord management positions longitudinally spaced one from the other along at least a portion of the outrigger structure;

each of said cord management units within the portion of the outrigger structure including a housing secured by at least one fastener against displacement relative to the outrigger structure and a plurality of rotatable pulley members supported by said housing, said pulley members respectively defining a plurality of cord passages transversely offset one from the other and extending at fixed angular orientations relative to the outrigger structure, wherein said cord passages each form a guide groove receiving and guiding a predetermined one of said outrigger cords to maintain independent longitudinal displacement thereof relative to the outrigger structure;

said cord management units being arranged along the outrigger structure portion to cooperatively define consecutive cord management positions to respectively guide a progressively decreasing number of outrigger cords; and,

a plurality of retention devices each coupled to one of said outrigger cords to define a retention point for advancing a line longitudinally along the outrigger structure responsive to displacement of said one of said outrigger cords.

18. The system as recited in claim **17**, wherein said pulley members of each said cord management unit are coaxially disposed.

19. The system as recited in claim **17**, wherein at least one of said cord management units includes at least one bridge member coupled to said housing for displacement between first and second positions, said at least one bridge member in said first position retaining the engagement of at least one of said outrigger cords with a corresponding one of said pulley members.

20. The system as recited in claim **17**, further comprising a pivot point established for each said outrigger cord, said pivot point being laterally offset from the outrigger structure, each said outrigger cord being displaceably retained by said pivot point to extend from said pivot point and through predetermined ones of said cord management units in an endless loop.

\*   \*   \*   \*   \*

**APPX102**

US011589566B1

(12) **United States Patent**
Mercier

(10) **Patent No.:**     **US 11,589,566 B1**
(45) **Date of Patent:**       *Feb. 28, 2023**

(54) **OUTRIGGER LINE MANAGEMENT SYSTEM**

(71) Applicant: **Craig Mercier**, Pasadena, MD (US)

(72) Inventor: **Craig Mercier**, Pasadena, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 638 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/664,885**

(22) Filed: **Jul. 31, 2017**

**Related U.S. Application Data**

(60) Continuation of application No. 15/212,571, filed on Jul. 18, 2016, now Pat. No. 9,717,226, which is a
(Continued)

(51) **Int. Cl.**
*A01K 91/08*          (2006.01)
*A01K 91/053*        (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *A01K 91/08* (2013.01); *A01K 91/053* (2013.01); *A01K 91/18* (2013.01); *B63B 21/04* (2013.01); *B63B 35/14* (2013.01)

(58) **Field of Classification Search**
CPC ...... A01K 91/053; A01K 91/08; A01K 91/18; A01K 79/00; A01K 99/00; B63B 35/14; B63B 21/04
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 53,797 | A | * | 4/1866 | Epperson et al. ...... | D06F 53/04 |
| | | | | | 211/119.1 |
| 133,530 | A | * | 12/1872 | Hadden ................... | D06F 53/04 |
| | | | | | 211/119.1 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CH | 269724 | A | * | 7/1950 |
| EP | 0225687 | A1 | * | 6/1987 |

(Continued)

OTHER PUBLICATIONS

Outrigger Line Kits sold by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally screen capture of http://web.archive.org/web/20010406175616/http://www.malinco.com/marine/index.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

(Continued)

*Primary Examiner* — Darren W Ark
(74) *Attorney, Agent, or Firm* — Rosenberg, Klein & Lee

(57)          **ABSTRACT**
A line management system for an outrigger structure is provided for guiding outrigger cords through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. The system includes a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure.

**17 Claims, 6 Drawing Sheets**



APPX104

**US 11,589,566 B1**

Page 2

**Related U.S. Application Data**

continuation of application No. 14/188,180, filed on Feb. 24, 2014, now Pat. No. 9,392,778, which is a division of application No. 12/726,695, filed on Mar. 18, 2010, now Pat. No. 8,656,632.

(51) **Int. Cl.**
  **B63B 35/14**      (2006.01)
  **B63B 21/04**      (2006.01)
  **A01K 91/18**      (2006.01)
(58) **Field of Classification Search**
  USPC ..... 43/27.4, 43.12, 43.13, 42.74, 27.2, 21.2; 114/255, 364; 254/405
  See application file for complete search history.

(56)           **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 279,916 | A | * | 6/1883 | Cochran ................ B66D 3/046 |
| | | | | 254/405 |
| 398,490 | A | * | 2/1889 | Bried ..................... D06F 53/04 |
| | | | | 211/119.1 |
| 402,208 | A | * | 4/1889 | Uren ..................... B66D 3/046 |
| | | | | 254/405 |
| 430,028 | A | * | 6/1890 | Jackson, Jr. ........... B66D 3/046 |
| | | | | 254/405 |
| 430,518 | A | * | 6/1890 | Ferrall ................... B66D 3/046 |
| | | | | 254/405 |
| 430,519 | A | * | 6/1890 | Ferrall ................... B66D 3/046 |
| | | | | 254/405 |
| 516,192 | A | * | 3/1894 | Ferrall ................... B66D 3/046 |
| | | | | 254/405 |
| 667,453 | A | * | 2/1901 | Parker ................... D06F 53/02 |
| | | | | 211/119.02 |
| 790,336 | A | * | 5/1905 | Yoerger ............... A01K 91/053 |
| | | | | 43/42.74 |
| 798,652 | A | * | 9/1905 | Baughman, Sr. ...... B66D 3/046 |
| | | | | 254/405 |
| 847,955 | A | * | 3/1907 | Lindsay ................. B66D 3/046 |
| | | | | 254/405 |
| 1,032,395 | A | * | 7/1912 | Foss ........................ D06F 53/04 |
| | | | | 211/119.15 |
| 1,134,850 | A | * | 4/1915 | Gagnon ................. D06F 53/04 |
| | | | | 211/119.1 |
| 1,157,502 | A | * | 10/1915 | Budaji ..................... D06F 53/02 |
| | | | | 211/119.01 |
| 1,163,193 | A | * | 12/1915 | Althoff .................. A01K 91/10 |
| | | | | 43/15 |
| 1,164,919 | A | * | 12/1915 | Carlson et al. ........ B66D 3/046 |
| | | | | 254/405 |
| 1,209,739 | A | * | 12/1916 | Marvin .................. B66D 3/046 |
| | | | | 254/405 |
| 1,336,186 | A | * | 4/1920 | Baron ..................... D06F 53/02 |
| | | | | 211/119.1 |
| 1,360,429 | A | * | 11/1920 | Michaelis ............ A01K 89/017 |
| | | | | 43/16 |
| 1,428,118 | A | * | 9/1922 | Robeson ................ B66D 3/046 |
| | | | | 254/405 |
| 1,753,084 | A | * | 4/1930 | Kappel ................... D06F 57/00 |
| | | | | 254/405 |
| 1,840,762 | A | * | 1/1932 | Akervick ............... A01K 91/18 |
| | | | | 43/44.85 |
| 2,037,232 | A | * | 4/1936 | Hendriks ............... A01K 91/18 |
| | | | | 43/44.96 |
| 2,196,472 | A | * | 4/1940 | Moriarty ............. A01K 91/053 |
| | | | | 43/21.2 |
| 2,206,174 | A | * | 7/1940 | Falk ..................... D06F 53/045 |
| | | | | 211/119.1 |
| 2,292,415 | A | * | 8/1942 | Waldheim ............... D06F 53/02 |
| | | | | 211/119.02 |
| 2,303,753 | A | * | 12/1942 | Merle .................... A01K 95/00 |
| | | | | 43/42.74 |

| | | | | |
|---|---|---|---|---|
| 2,340,608 | A | * | 2/1944 | Merle .................... A01K 95/00 |
| | | | | 43/42.74 |
| 2,352,631 | A | * | 7/1944 | Guarnieri ............... A01K 91/10 |
| | | | | 43/42.74 |
| 2,488,451 | A | * | 11/1949 | Ursich ................... A01K 91/18 |
| | | | | 43/6.5 |
| 2,550,282 | A | * | 4/1951 | McAvoy ................ A01K 97/12 |
| | | | | 43/17 |
| 2,594,158 | A | * | 4/1952 | Hannameyer .......... A47B 37/00 |
| | | | | 108/31 |
| 2,599,081 | A | * | 6/1952 | Waddell ................... D06F 53/02 |
| | | | | 211/119.13 |
| 2,734,694 | A | * | 2/1956 | Davidson ............... A01K 91/18 |
| | | | | 242/396.9 |
| 2,800,300 | A | * | 7/1957 | Johnson ................... B66D 3/06 |
| | | | | 254/402 |
| 2,834,476 | A | * | 5/1958 | Picone, Jr. ............. D06F 53/04 |
| | | | | 211/119.02 |
| 2,838,866 | A | * | 6/1958 | Labin ..................... A01K 87/04 |
| | | | | 43/43.12 |
| 2,912,782 | A | * | 11/1959 | Maximov ............... A01K 91/06 |
| | | | | 43/27.2 |
| 2,951,307 | A | * | 9/1960 | Joy ........................ A01K 91/02 |
| | | | | 43/26.1 |
| 3,060,614 | A | * | 10/1962 | Prince ................... A01K 91/08 |
| | | | | 43/6.5 |
| 3,193,964 | A | * | 7/1965 | Hurst ..................... A01K 91/08 |
| | | | | 43/43.12 |
| 3,275,301 | A | * | 9/1966 | Read ...................... B66D 3/046 |
| | | | | 254/405 |
| 3,355,835 | A | * | 12/1967 | Lyons ................... A01K 89/017 |
| | | | | 43/6.5 |
| 3,358,399 | A | * | 12/1967 | Waldman ............... A01K 91/02 |
| | | | | 43/4 |
| 3,462,870 | A | * | 8/1969 | Terilli .................... A01K 91/02 |
| | | | | 43/4 |
| 3,650,063 | A | * | 3/1972 | Pierce ................... A01K 91/04 |
| | | | | 43/42.74 |
| 3,656,630 | A | * | 4/1972 | Miguel ................... D06F 53/00 |
| | | | | 211/119.11 |
| 3,787,995 | A | * | 1/1974 | Watanabe .............. A01K 91/08 |
| | | | | 43/43.12 |
| 3,835,567 | A | * | 9/1974 | Humbert ................ A01K 91/08 |
| | | | | 43/6.5 |
| RE28,380 | E | * | 4/1975 | Tison ..................... A01K 91/18 |
| | | | | 43/6.5 |
| 3,959,913 | A | * | 6/1976 | Weber ..................... A01K 91/08 |
| | | | | 43/43.12 |
| 3,968,587 | A | * | 7/1976 | Kammeraad .......... A01K 91/08 |
| | | | | 43/27.4 |
| 4,237,642 | A | * | 12/1980 | Petorella ................ A01K 91/18 |
| | | | | 43/26.1 |
| 4,248,002 | A | * | 2/1981 | McNellis ............... A01K 91/08 |
| | | | | 242/397.1 |
| 4,388,774 | A | * | 6/1983 | Thoemke ............... A01K 91/08 |
| | | | | 114/255 |
| 4,524,535 | A | * | 6/1985 | Bates ..................... A01K 91/08 |
| | | | | 43/27.4 |
| 4,610,409 | A | * | 9/1986 | Emory, Jr. ............. A01K 91/08 |
| | | | | 254/326 |
| 4,611,423 | A | * | 9/1986 | Rupp ..................... A01K 91/08 |
| | | | | 43/43.12 |
| 4,625,450 | A | * | 12/1986 | Roemer, Jr. ........... A01K 91/08 |
| | | | | 43/43.12 |
| 4,630,388 | A | * | 12/1986 | Furlong ................. A01K 91/18 |
| | | | | 43/44.84 |
| 4,632,050 | A | * | 12/1986 | Rupp ..................... A01K 91/08 |
| | | | | 114/255 |
| 4,756,115 | A | * | 7/1988 | Reyen ................... A01K 91/053 |
| | | | | 43/42.74 |
| 4,760,993 | A | * | 8/1988 | Du Preez .............. B66D 3/046 |
| | | | | 254/411 |
| 4,807,386 | A | * | 2/1989 | Emory, Jr. ............. A01K 91/08 |
| | | | | 43/15 |
| 4,875,428 | A | * | 10/1989 | Schlesch ................ A01K 91/08 |
| | | | | 114/255 |

**US 11,589,566 B1**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,301,451 | A | * | 4/1994 | VanAssche | A01K 91/08 43/21.2 |
| 5,363,975 | A | * | 11/1994 | Meade | D06F 57/04 211/119.01 |
| 5,375,727 | A | * | 12/1994 | Lavi | D06F 57/12 211/119.01 |
| D366,445 | S | * | 1/1996 | Seggern | D12/303 |
| 5,673,507 | A | * | 10/1997 | Stokes, Jr. | A01K 97/10 114/364 |
| 5,921,196 | A | * | 7/1999 | Slatter | A01K 91/08 114/255 |
| 6,149,020 | A | * | 11/2000 | Gumpel | D06F 57/125 211/119.01 |
| 6,286,245 | B1 | * | 9/2001 | Broberg | A01K 91/08 254/394 |
| 6,386,516 | B1 | * | 5/2002 | Lenders | B66D 3/046 254/393 |
| 6,454,109 | B1 | * | 9/2002 | Doyle | D06F 53/00 211/119.01 |
| 6,505,431 | B1 | * | 1/2003 | Christian | A01K 91/08 43/19.2 |
| 6,769,377 | B2 | | 8/2004 | Rupp, II | |
| 6,834,459 | B2 | * | 12/2004 | van Weenen | A01K 91/08 43/27.4 |
| 7,111,574 | B2 | * | 9/2006 | Slatter | A01K 91/08 114/255 |
| 7,343,709 | B2 | * | 3/2008 | van Weenen | A01K 91/08 43/27.4 |
| 7,533,870 | B2 | * | 5/2009 | Camrass | B66D 3/046 254/402 |
| 7,654,214 | B2 | * | 2/2010 | Rupp, II | B63B 35/20 114/255 |
| 7,878,342 | B1 | * | 2/2011 | Lewis | D06F 53/04 211/119.01 |
| 8,109,034 | B1 | * | 2/2012 | McCauley | A01K 87/02 43/18.1 R |
| 8,656,632 | B1 | * | 2/2014 | Mercier | A01K 91/08 43/27.4 |
| 8,683,735 | B1 | * | 4/2014 | Figari | A01K 91/08 43/18.1 CT |
| 9,392,778 | B1 | * | 7/2016 | Mercier | A01K 91/08 |
| 9,717,226 | B1 | * | 8/2017 | Mercier | A01K 91/08 |
| 10,327,434 | B1 | * | 6/2019 | Jarrell | A01K 91/08 |
| 10,337,547 | B2 | * | 7/2019 | Onorato | A01K 87/02 |
| 10,470,451 | B2 | * | 11/2019 | Onorato | A01K 87/025 |
| 10,575,512 | B2 | * | 3/2020 | Bridgewater | A01K 91/08 |
| 11,116,197 | B2 | * | 9/2021 | Serocki | A01K 91/08 |
| 11,259,513 | B1 | * | 3/2022 | Bravo | A01K 91/08 |
| 2006/0231009 | A1 | * | 10/2006 | Slatter | A01K 91/08 114/255 |
| 2009/0188422 | A1 | | 7/2009 | Rupp, II | |
| 2010/0005702 | A1 | * | 1/2010 | Palacios Cortell | A01K 91/08 43/26.1 |
| 2014/0041282 | A1 | * | 2/2014 | Karpanty | A01K 91/053 43/27.4 |
| 2015/0298945 | A1 | * | 10/2015 | Fayal | B66D 3/046 254/405 |
| 2017/0071178 | A1 | * | 3/2017 | Serocki | A01K 91/08 |

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| FR | 2613905 | A1 | | 10/1988 | |
| FR | 2613905 | A1 | * | 10/1988 | A01K 91/08 |
| JP | 08214747 | A | * | 8/1996 | |
| JP | H08-214747 | A | | 8/1996 | |
| JP | 11056184 | A | * | 3/1999 | |
| JP | H11-56184 | A | | 3/1999 | |
| JP | 2007000143 | A | * | 1/2007 | |
| JP | 2007000143 | A | | 1/2007 | |
| JP | 3155653 | U | * | 11/2009 | |
| KR | 20060034422 | A | * | 4/2006 | |
| KR | 100796809 | B1 | * | 1/2009 | |
| KR | 101370603 | B1 | * | 3/2014 | |
| WO | 03/005813 | A1 | | 1/2003 | |
| WO | WO-03005813 | A1 | * | 1/2003 | A01K 91/02 |
| WO | 2009056135 | A1 | | 5/2009 | |
| WO | WO-2009056135 | A1 | * | 5/2009 | |

OTHER PUBLICATIONS

Outrigger Pulleys sold by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally a screen capture of http://web.archive.org/web/20010410013028/http://www.malinco.com/marine/outrig_pulleys.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Complete Rigging Kits by Malin Marine ("Malin") in 2001. WayBackMachine Internet Archive from Apr. 6, 2001, (originally screen capture of http://web.archive.org/web/20010726142436/http://www.malinco.com/marine/complete_rig_kit.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

Outrigger Line Kits sold by Malin in 2015, as illustrated on their current website as of Sep. 10, 2015. (originally screen capture of http://www.malinco.com/marine.html as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594).

J-Mar Tackle Inc., (now known as Malin Marine) Outrigger System referenced in a Jun. 22, 1989, magazine entitled "The Fisherman" through an article on p. 8 describing the J-Mar Outrigger System. A photocopy of the front of the magazine and the article on p. 8 of the magazine as presented on Oct. 21, 2015 to applicant in related U.S. Appl. No. 90/013,594.

J-Mar Tackle, Inc. New Product release sheet illustrating Outrigger Rigging Kits and Outrigger Pulley, including a Rigging Diagram that illustrates outrigger pulley placement and Quicklip. TM. placement. Undated, but written as J-Mar Tackle which became Malim Marine in 2001 as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

Rupp catalogue and pricing sheet dated Feb. 1, 2000, disclosing outrigger rigging kits (p. 19 of the catalog) as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

Rupp advertisement that references p. 19 of the Rupp catalog as presented to applicant on Oct. 21, 2015 in related U.S. Appl. No. 90/013,594.

Malin Big Boat Rigging Kit Drawing; Available website: https://web.archive.org/web/20021104002444/http://malinco.com/marine/big_boat_rig_drawing.html; Capture of a website at www.malinco.com on Nov. 4, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.

Malin Outrigger Pulleys; Available web site: https://web.archive.org/web/20010728111649/http://www.malinco.com/marine/outrig_pulleys.html; Capture of a website at www.malinco.com on Jul. 28, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.

Malin Quicklip Outrigger Clip; Available web site: https://web.archive.org/web/20010728112009/http://www.malinco.com/marine/outrig_clip.html; Capture of a website at www.malinco.com on Jul. 28, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.

www.ifish.net, Ifish Fishing and Hunting, The Salty Dogs, Need help & ideas rigging new custom outriggers; Available web site: http://www.ifish.net/board/showthread.php?t=131929; created on Nov. 3, 2006; downloaded on Sep. 28, 2015.

Tigress Outriggers & Gear, Rigging Instructions, How to Rig Your Outriggers; Available web site: http://www.tigressoutriggers.com/outriggerset.pdf; created on Aug. 13, 2004; downloaded on Sep. 28, 2015.

Marine & Outdoor Products, HAL-LOCK, HL3 Triple; Available web site: http://www.gotomop.com/product/hl3/; downloaded on Sep. 28, 2015.

Melton International Tackle, Hal Lock Outrigger Shock Cords; Available web site: http://www.meltontackle.com/products/marine-outdoor-products-hal-lock-outrigger-shock-cords.html; downloaded on Sep. 28, 2015.

APPX106

**US 11,589,566 B1**

Page 4

(56)                   **References Cited**

OTHER PUBLICATIONS

Rupp Rigging Instructions; Available web site: http://www.ruppmarine.com/wp-content/uploads/2012/06/RiggingDiagram-lnstructions.pdf; created on Mar. 28, 2008; downloaded on Sep. 28, 2015.

Malin Complete Rigging Kit Drawing; Available web site: https://web.archive.org/web/20021104002338/http://malinco.com/marine/completerig_drawing.html; Capture of a website at www.malinco.com on Nov. 4, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.

Malin Shock Cords, Pulleys, and Snaps; Available web site: https://web.archive.org/web/20010731134510/http://www.malinco.com/marine/shock_cords.html; Capture of a website at www.malinco.com on Jul. 31, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.

Malin Halyard Tensioning Drawing, Available web site: https://web.archive.org/web/20020628204508/http://malinco.com/marine/halyard_drawing.html; Capture of a website at www.malinco.com on Jun. 28, 2002 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.

Malin Big Boat Top Gun Rigging Kit; Available web site: https://web.archive.org/web/20010726142407/http://www.malinco.com/marine/big_boat_rig_kit.html; Capture of a website at www.malinco.com on Jul. 26, 2001 by archive.org (AKA Internet Archive Wayback Machine); downloaded on Sep. 28, 2015.

* cited by examiner

**U.S. Patent**     Feb. 28, 2023     Sheet 1 of 6     US 11,589,566 B1

FIG. 1A

FIG. 1

APPX108



FIG.2A

FIG.2

APPX109



FIG.3

**APPX110**



FIG.3A

FIG.4

**APPX111**



FIG.5



FIG.6

APPX112



FIG.7

US 11,589,566 B1

**1**

## OUTRIGGER LINE MANAGEMENT SYSTEM

### RELATED APPLICATIONS

This application is a Continuation of co-pending application Ser. No. 15/212,571, filed 18 Jul. 2016, which is a Continuation of application Ser. No. 14/188,180, filed 24 Feb. 2014, now U.S. Pat. No. 9,392,778, which is a Divisional of application Ser. No. 12/726,695, filed on 18 Mar. 2010, now U.S. Pat. No. 8,656,632. The entire disclosure of the prior application Ser. No. 15/212,571 is considered a part of the disclosure of the accompanying Continuation application and is hereby incorporated by reference.

### BACKGROUND OF THE INVENTION

The subject outrigger line management system is generally directed to a system for enabling convenient displacement of articles along an outrigger structure. More specifically, the outrigger line management system maintains smooth and efficient displacement of individual lines, cords, or other mechanical link employed to so displace articles along a given outrigger support structure.

Outrigger structures are used on surface vessels to extend the lateral reach of the vessel for various purposes. Cast line fishing applications provide one example where outrigger structures provide useful extension of support points for concurrent use of multiple fishing lines. Typically, a fishing rod feeds a fishing line on which one or more baited hooks are provided. The baited ends of the fishing lines are cast into the water to attract fish about the given boat or other surface vessel. Where more than a few fishing lines are so cast from the same vessel into surrounding waters, intertangling remains a persistent problem, particularly where the vessel continues moving to, for example, troll the lines through the water. Tangling becomes an even greater threat when the vessel undergoes abrupt turns or encounters fast moving currents. To prevent such interference and tangling, fishing lines may be supported through one or more pivot points displaced along the length of an outrigger structure. The baited ends of different fishing lines are thereby spaced to be dragged through the water, each held safely away from the vessel and one another to avoid interference.

In this manner, outrigger support structures extend fishing/trolling lines laterally out beyond the wake of a moving boat. They allow the safe deployment of multiple fishing lines cast out from the boat each pivoted at different points along the outrigger structure to remain separated by sufficient fishing space (until release of the lines from their pivot points is triggered) to prevent entanglement.

Outrigger structures are usually installed on a boat to be moved inline with the hull or folded into a mast when not in service. Typically, a pair of outrigger structures are installed at starboard and port gunwale locations.

Known outrigger structures are often provided with a plurality of fixed eyehooks longitudinally spaced therealong. A plurality of outrigger cords are then passed through the eyehooks and a pulley assembly disposed at a fixed point on the boat. Each outrigger cord forms a displaceable loop about the pulley assembly and one or more supporting eyehooks, and each carries a clip on which a fishing line may be secured for movement along an outrigger structure with the outrigger cord. A user may retract or advance the clip by pulling the corresponding outrigger cord in one direction or the other through its loop. So when a fishing line is to be baited, the user pulls one outrigger cord to draw the clip within reach, 'loads' the clip with an appropriately baited

**2**

fishing line that has been cast, then pulls the outrigger cord in a reverse direction to return the loaded clip to a deployment position on the outrigger structure. This process is repeated for each baited fishing line that has been cast out from a certain point on the boat. When a 'bite' occurs, or when a fishing line encounters sufficient tension, the clip releases, so that the line returns to form a direct line between its feeding point (i.e., fishing rod) for active user control.

This process is not without significant practical obstacles to smooth, proper operation. FIG. **7** depicts a portion of an outrigger structure **10'** having an eye hook **30'** for pivotally retaining its outrigger cords **20'**, as used in the prior art. Normally, multiple outrigger cords **20'** are used to concurrently deploy multiple fishing lines. The multiple outrigger cords **20'** passing through the collar-like eyehook **30'** invariably bunch together during operation, getting tightly intertwined when subjected to tension and manipulation. Much friction results between the tightly packed outrigger cords **20'** themselves, as well as between each cord **20'** and eye hook **30'**. Being that the outrigger cords are normally supported snugly between the eye hook **30'** and other pivot points, a particularly high friction point is created at the sharp bend typically formed at one or more of the eye hooks **30'**. The friction makes it very difficult to displace individual outrigger cords to load and deploy their clips, at least not without mighty physical exertion. Moreover, the considerable friction that must be overcome to effect such cord movement causes premature wearing on the cords themselves.

Various outrigger structures are known in the art. By way of example, U.S. Pat. No. 3,462,870 discloses several embodiments of a fishing system that uses a buoy line maintained in a desired area by an airborne kite. The system can have a plurality of lines operated by a fisherman having a reel with a plurality of spools which may be individually wound without disturbing the others. The lines can also be operated by individual fishermen each having a reel. The individual lines may be secured to the buoy line with a releasable clip that disengages when a fish applies tension to the line, allowing that particular line to be cleared of the remaining fishing lines and to be reeled in.

U.S. Pat. No. 3,060,614 is directed to a multiple pole trolling device for mounting on a boat. The multiple pole trolling devices are spaced apart and rotatably mounted on a pole base that is rotatable and tiltably adjustable. Each of the poles has a fixed trolling line located in the water when set to a rearward position. When the assembly is rotated, the line comes out of the water over the boat so that the fish can be removed.

U.S. Pat. No. 2,196,472 is directed to a fishing apparatus in the form of a tree formed of tubular members that support a plurality of fishing lines. The tree may be thrust into the bottom of a body of water. The mast as shown has a set of screws that may be used to adjust the coaxial tubular members for use in water of different depths.

U.S. Pat. No. 3,358,399 is directed to a kite fishing apparatus having two reels, one for a kite line, and the other for a fishing line. A three-in-one glider-type structure is provided and functions to carry the fishing line over the body of water. The baited end of the fishing line is cast out by the outgoing kite line and by means provided to detachably and adjustably connect the kite line to the fishing line.

U.S. Pat. No. 4,388,774 is directed to a fishing line system for use on a boat that supports six fishing rods each spaced from the other to prevent the fishing lines from tangling during trolling. A pull on either side of the boat is mounted on roller booms that can be extended or retracted as

US 11,589,566 B1

required. A rearwardly extending pair of fishing poles are carried by holders mounted on the stern of the boat to position lines laterally inward of lines. The booms are disposed transversely to the left of the boat and are supported by antifriction assemblies which support the booms.

A significant drawback remains in the prior art for effectively managing the outrigger cords to enable loading and deploying of articles along an outrigger structure. There is, therefore, a need for a system that enables sufficiently free, unrestricted individual displacement of the outrigger cords along the outrigger structure.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a line management system for an outrigger structure which maintains guiding outrigger cords in convenient, independently displaceable manner.

These and other objects are attained by the outrigger line management system formed in accordance with the present invention. The system comprises of a plurality of outrigger cords, cord management units, and retention devices. The plurality of cord management units are coupled to the outrigger structure and are longitudinally spaced one from the other along the outrigger structure. Each of the cord management units defines a plurality of transversely offset cord passages respectively guiding predetermined ones of outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The plurality of retention devices are each coupled to one of the outrigger cords. Each of the retention devices defines a retention point for advancing a fishing line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

In certain exemplary embodiments, the system also includes a pivot unit laterally offset from the outrigger structure displaceably retaining each of the outrigger cords. Each of the outrigger cords extends from the pivot unit and through predetermined ones of cord management units in an endless loop.

In another exemplary embodiment, a method for managing the outrigger cords comprises the steps of (1) establishing a plurality of outrigger cords, (2) establishing a plurality of cord management positions, (3) defining each cord management positions, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices. The cord management positions are established longitudinally spaced one from the other along the outrigger structure. Each of the cord management positions are then defined to include a plurality of transversely offset cord passages respectively guiding predetermined ones of the outrigger cords to maintain an independent longitudinal displacement relative to the outrigger structure. The cord management positions are arranged to define a portion of the outrigger structure a progressively decreasing number of cord passages. The retention devices are established to define a retention point for advancing a line longitudinally along the outrigger structure responsive to a displacement of the outrigger cord.

Those skilled in the art will appreciate the scope of the present invention and realize aspects thereof after reading the following detailed description of the preferred embodiments in association with the accompanying illustrative figures.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying illustrative figures incorporated in and forming a part of this specification depict several aspects of

the invention, and together with the description serve to explain the principles of the invention.

FIG. **1** is a diagram illustrating a view of a line management system installed on a surface vessel in accordance with one exemplary embodiment of the present invention;

FIG. **1A** is a diagram illustrating an enlarged view of the pivot unit in the embodiment depicted in FIG. **1**;

FIG. **2** is a diagram schematically illustrating a portion of the line management system operation on an outrigger structure in accordance with an exemplary embodiment of the present invention;

FIG. **2A** is an exploded plan view of a retention device depicted in FIG. **2**;

FIG. **3** is a perspective view schematically illustrating a cord management unit formed in accordance with an exemplary embodiment of the present invention;

FIG. **3A** is a perspective view schematically illustrating a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. **4** is a perspective view of a cord management unit formed in accordance with an alternate embodiment of the present invention;

FIG. **5** is a schematic perspective view of a cord management unit formed in accordance with another alternate embodiment of the present invention;

FIG. **6** is an exploded perspective view of a clamp member formed in accordance with another alternate embodiment of the clamp member depicted in FIG. **5**; and,

FIG. **7** is a perspective view of an eye hook employed in the prior art for guiding cords on an outrigger structure.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments set forth below represent the necessary information to enable those skilled in the art to practice the invention and illustrate the best mode of practicing the invention. In light of the illustrated figures and the following description, those skilled in the art will understand the concepts of the invention and will recognize applications of these concepts not particularly addressed herein. It should be understood that these concepts and applications fall within the scope of the disclosure and accompanying claims.

Wherever possible in the following description, similar reference numerals will refer to corresponding elements on parts of different Drawings unless otherwise indicated.

Referring to FIGS. **1** and **2**, there is a depiction of an exemplary embodiment of the line management system **1** for a surface vessel or boat **5**. The line management system **1**, installed as shown on a boat, includes a plurality of outrigger cords **20**, a plurality of cord management units **30**, and a plurality of retention devices **40** all coupled to the outrigger structure **10**. As depicted in FIG. **1**, the outrigger structure **10** may be mounted on top of a surface vessel, to the gunwale or bow, or any other suitable part of the vessel for supporting a plurality of articles therealong. System **1** may be applied to various applications to aid in the smooth loading and deployment of suitable articles to be supported along the outrigger structure **10**. The fishing application shown for illustrative purposes herein is but one of numerous such applications where system **1** may be employed in accordance with various aspects of the present invention.

In the fishing application illustrated, the outrigger structure **10** allows the deployment of more fishing lines **60** cast out from the boat each separated from the other by adequate fishing space than would normally be possible. The spacing prevents fishing lines **60** from entangling during trolling

US 11,589,566 B1

with other fishing lines **60** originating from the same boat **5**. The number of fishing lines **60** being trolled increases the chances of catching fish and permits multiple individuals to fish from the boat **5**. Use of outrigger structure **10** equipped with system **1** in accordance with the present invention mitigates the inherent entanglement risk while preserving ease of use. Each outrigger structure **10** may be suitably formed as one piece, or made up of individual outrigger sections joined together.

In accordance with the present invention, a line management system **1** is coupled to each outrigger structure **10** used for support extension purposes—such as to extend support for a fishing line **60** to the side of a boat during trolling. The line management system **1** is used for safely guiding outrigger cords **20** through cord passages to maintain an independent longitudinal displacement in order to prevent entanglement. Typically, when the outrigger structure **10** is in use, it is extended transversely to the length of a boat **5** for trolling fishing lines **60** coupled to the retention device **40**. The outrigger structure **10** thus serves to increase the span of the boat to allow more fishing lines **60** to be trolled. By way of example, a 28 foot fishing boat having a 16 foot wide fishing platform can have a pair of outrigger structures **10**, with each outrigger structure **10** being 40 foot long. Once the fishing boat **5** is ready to fish, each of the outrigger structures **10** is extended transversely from the boat in opposite directions to effectively create a 96 foot wide fishing platform from which to suspend multiple fishing lines **60**.

In one preferred embodiment, a plurality of outrigger cords **20** are supported along the longitudinal length of the outrigger structure **10** by at least one cord management unit **30**. Typically, a plurality of cord management units **30** is employed, with each cord management unit **30** firmly coupled to the outrigger structure **10**. The cord management units **30** are longitudinally spaced one from the other along the outrigger structure **10**.

Each outrigger cord **20** is coupled with a retention device **40** for securing a retention point **400** on a fishing line **60**. The retention device **40** facilitates individual management of each fishing line **60** during, for example, sport fishing. When multiple baited fishing lines **60** are being cast out from a boat **5**, the retention device **40** allows for each fishing line **60** fed from a certain point on the boat **5**, by a fishing rod **70** for instance, to be maintained without interfering with the other fishing lines **60** being trolled.

Each outrigger cord **20** is preferably looped through a pivot unit **50** spaced from an outrigger structure **10** and at least one cord management unit **30** provided on such outrigger structure **10** (as described in following paragraphs). Each outrigger cord **20** remains longitudinally displaceable relative to the outrigger structure **10** so that a user may retract or advance the retention point **400**. Each of the retention devices **40** defines a retention point **400** for pivotally supporting a fishing line. This retention point **400** is preferably displaceable longitudinally along the outrigger structure responsive to a displacement of the outrigger cord **20**. Typically, the outrigger cord **20** is displaced to retract the retention point **400** or retention device **40** when seeking to attach or manage a fishing line **60**. Once the fishing line **60** is attached to the retention device **40**, the outrigger cord **20** is then advanced by displacing the outrigger cord **20** to a relative position that gives adequate longitudinal spacing with respect to the other fishing lines **60**.

In certain embodiments, the retention device **40** pivotally retains a fishing line **60** at the retention point **400** until sufficient resistance is encountered on the line **60**. When a fish bites the line, for instance, the pull on line **60** will cause its release from the retention device **40**.

Once retracted, a user may bait, then releasably attach a fishing line **60** to a retention point **400**. When the retention point **400** is advanced back out along the given outrigger structure **10**, the retention point preferably serves as a point from which the line's baited end extends into the water. One or more fishing lines **60** may be so retained to extend in pivoted manner from a portion of each outrigger cord **20**, so long as suitable spacing is maintained to avoid undue line cluttering and tangling. In the embodiment illustrated, one retention device **40** is shown connected to each individual cord **20**.

As depicted in FIG. **2**, the outrigger cords **20** are individually coupled to a stop cork **80** that acts to limit the displacement of the outrigger cords past a predetermined point. The stop cork **80** limits the displacement by preventing the retention device **40** from unintentionally getting wedged in the cord management unit **30**.

In the preferred embodiment, the line management system **1** also includes a pivot unit **50** preferably anchored to a fixed point on the boat **5**, laterally offset from the outrigger structure **10** for displaceably retaining a portion of each outrigger cord **20**. The pivot unit **50** acts as a pivotal support about which the outrigger cords **20** may be displaced. Each of the outrigger cords **20** extends from the pivot unit **50** and through respective cord management units **30**, preferably in an endless loop.

In an exemplary embodiment, the pivot unit **50** includes a plurality of rotatable members **500** individually receiving a respective outrigger cord **20**. However, the pivot unit **50** is not limited to a rotatable structure and may be any structure of suitable type to provide a pivot support for displacement of the outrigger cords **20**.

Each retention device **40**, as depicted in FIG. **2A**, is coupled to an outrigger cord **20** and used to transport an intermediate portion of a fishing line **60** relative to outrigger structure **10**. Among other things, the retention device **40** comprises of a clip portion **402** and retention point **400**. The clip portion **402** allows for the free release of the line **60** when the line is caused to apply sufficient resistance pressure thereon.

When multiple fishing lines **60** are being trolled in the water, in the illustrated embodiment, the lines **60** are preferably maintained by system **1** in such a way that each fishing line **60** clears every other fishing line **60** on its way back towards its feed point (such as the corresponding fishing pole **70**) upon released from the clip portion **402**. The originating/feed points of the fishing lines **60** are suitably arranged, so that when one fishing line **60** releases from its retention device **40**, the fishing line **60** does not physically contact or otherwise interfere with the other deployed fishing lines **60** on its return to a direct line extension from the originating point. It is not unusual to have the retention devices **40** coupled to respective outrigger cords **20** to be displaced in height 8 feet relative to each other, to ensure a clear path of return as a direct line from the feed point (to the water) is restored by a released fishing line **60**.

In a typical application, one end of a fishing line **60** may be fed to originate from a fishing rod **70** temporarily secured to a support bracket provided on the boat **5**. A distal end **600** is baited and drawn in the water during trolling. The retention point **400** is located between the originating end and distal end **600** of the fishing line. The retention point **400** provides a pivot point from which the distal portion (having the end **600**) of the fishing line **60** may be suspended from the outrigger structure **10** for safe trolling. The clip portion

US 11,589,566 B1

7

402, which may be made of any suitably resilient or rigid material having enough structural strength to hold the fishing line 60 in place, is configured to open when there is tension on the fishing line 60. For example, when a fish takes the bait at the distal end 600 of the fishing line 60 and causes sufficient tension thereon, the clip portion 402 of the retention device 40 will release. Thereafter, the fishing line 60 must be re-loaded onto the retention device 40 if that line is to be deployed again at its trolling position.

To re-couple fishing line 60 (to re-load a retention device 40), the particular outrigger cord 20 for the clip portion 402 that released the fishing line 60 is pulled to draw the retention device 40/clip portion 402 back in towards the boat until it is within a user's reach. The clip portion 402 is re-loaded by coupling a newly-baited fishing line 60. Once the retention device 40 is drawn in for re-coupling, the clip portion 402 may be snapped open or pulled away from the retention device 40 to an open position so that the fishing line 60 may be hooked by the retention point 400. Thereafter, the retention device 40 is advanced outward again by accordingly displacing its outrigger cord 20. In accordance with one aspect of the present invention, the outrigger cords 20 are independently maintained along respective transversely offset cord passages 304 as described in following paragraphs, such that each may be freely displaced, and the longitudinal displacement of any of the outrigger cords 20 will not interfere with the rest of the outrigger cords 20.

As depicted in FIG. 3, the line management system 1 also includes at least one a cord management unit 30 for each cord 20. In broad concept, the cord management unit 30 defines a plurality of transversely offset cord passages 304 which independently guide the outrigger cords 20 longitudinally along the outrigger structure 10. The cord management unit 30 allows for multiple outrigger cords 20 to be independently controlled without undue interference from the other outrigger cords 20.

Each cord management unit 30 preferably includes independently displaceable pulley members 300 to engage respective outrigger cords 20. In the disclosed embodiment, the pulley members 300 are made wheel-like to be freely rotatable. Since each pulley member 300 is freely rotatable and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members 300, depending on the specific requirements of a particular application. For example, the pulley members 300 may be suitably sealed. Preferably, the pulley members 300 are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members 300 define transversely offset cord passages 304 whose concave profiles are directed radially outward to receive and guide respective outrigger cords 20, and maintain their independent longitudinal displacement relative to the outrigger structure 10. The transversely offset cord passages 304 may are formed with annular grooves 310 having, for example U-shaped or V-shaped sectional profiles. The annular grooves 310 are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords 20 therefrom.

In preferred embodiments, a plurality of cord management units 30 are arranged along a length of each outrigger structure 10, so that decreasing numbers of transversely offset cord passages 304 are provided by successive unit 30. For example, a system 1 configured to support three separate outrigger cords 20a, 20b, 20c on an outrigger structure 10, as illustrated in FIG. 2, would employ with the pivot unit 50

8

four cord management units 30a, 30b, 30c, 30d. The cord management units 30a-30d are then arranged to define, along a portion of the outrigger structure 10, a progressively decreasing number of cord passages 304.

In the embodiment illustrated in FIG. 2, for example, the first two cord management units 30a, 30b closest to the boat 5, would preferably each define three cord passages 304 to participate in guiding all three outrigger cords 20a, 20b, 20c. The third cord management unit 30c would preferably define one less cord passage, or two cord passages 304, to participate in guiding just two of the outrigger cords 20b, 20c, since the first outrigger cord 20a pivots at the second cord management unit 30b to return to the pivot unit 50. The next cord management unit 30d may then define even fewer cord passages, or one cord passage 304 in this case, to participate in guiding the one remaining outrigger cords 20c, since the first outrigger cord 20b pivots at the third cord management unit 30c to return to the pivot unit 50.

In certain alternate embodiments, of course, the number of cord management units 30, as well as the arrangement and extent of cord passages defined by respective cord management units 30, may be varied to suit the particular requirements of the intended applications. While not the most efficient, for example, each outrigger cord 20 may be looped about the pivot unit 50 and a set of cord management units 30 whose cord passages pass that outrigger cord 20 only, to the exclusion of the other outrigger cords 20. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord 20) are maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord 20) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units 30 may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules 300 may be disposed in replaceable manner within the housing 306 of a cord management unit 30, such that numbers and even the precise positions of the individual pulley or other members 300 within the unit 30 may be adjustably varied to suit different needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module 30, or its re-positioning, within the housing 306.

In preferred embodiments, the pulley members 300 are coaxially aligned, sharing the same shaft. The outrigger cords 20 are secured in the cord passages 304 by a bridge member 302. Preferably, the bridge member 302 is reconfigurably coupled to a housing 306 structure to contain the plurality of outrigger cords 20 in one position and allow their removal in another. The housing 306 is suitably formed to provide structural support and containment for the pulley members 300 and the outrigger cords 20. In the embodiment of FIG. 3, the bridge member 302 is displaceable relative to the pulley members 300 about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively. The plurality of cord management units 30 are longitudinally spaced along the outrigger structure 10 and their housings 306 releasably fastened by clamp member 308. The clamp member 308 may be sleeved onto the outrigger structure 10, selectively positioned on the outrigger structure 10, and fastened by a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The fasteners serve to secure the clamp member 308 to the outrigger

US 11,589,566 B1

9 10

structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

FIG. **3A** is an alternate embodiment of the line management system **1** depicted in FIG. **3**. The line management system **1** also includes at least one a cord management unit **30** for each cord **20**. In broad concept, the cord management unit **30** defines a plurality of transversely offset cord passages **304** which independently guide the outrigger cords **20** longitudinally along the outrigger structure **10**. The cord management unit **30** allows for multiple outrigger cords **20** to be independently controlled without undue interference from the other outrigger cords **20**.

Each cord management unit **30** preferably includes independently displaceable pulley members **300** to engage respective outrigger cords **20**. In the disclosed embodiment, the pulley members **300** are made wheel-like to be freely rotatable. Since each pulley member **300** is freely rotatable and exposed to the weather elements on the boat, suitable measures may be necessary to weatherize said pulley members **300**, depending on the specific requirements of a particular application. For example, the pulley members **300** may be suitably sealed. Preferably, the pulley members **300** are made of composite, wood, metal, or other such material having enough strength and resilience to withstand the environmental elements, friction, and forces that the members would be typically subjected to during use.

The pulley members **300** define transversely offset cord passages **304** whose concave profiles are directed radially outward to receive and guide respective outrigger cords **20**, and maintain their independent longitudinal displacement relative to the outrigger structure **10**. The transversely offset cord passages **304** may are formed with annular grooves **310** having, for example U-shaped or V-shaped sectional profiles. The annular grooves **310** are configured to provide lateral support and containment sufficient to avoid slippage of the outrigger cords **20** therefrom.

In preferred embodiments, a plurality of cord management units **30** are arranged along a length of each outrigger structure **10**, so that decreasing numbers of transversely offset cord passages **304** are provided by successive unit **30**. For example, a system **1** configured to support three separate outrigger cords **20**a, **20**b, **20**c on an outrigger structure **10**, as illustrated in FIG. **2**, would employ with the pivot unit **50** four cord management units **30**a, **30**b, **30**c, **30**d. The cord management units **30**a-**30**d are then arranged to define, along a portion of the outrigger structure **10**, a progressively decreasing number of cord passages **304**.

In the embodiment illustrated in FIG. **2**, for example, the first two cord management units **30**a, **30**b closest to the boat **5**, would preferably each define three cord passages **304** to participate in guiding all three outrigger cords **20**a, **20**b, **20**c. The third cord management unit **30**c would preferably define one less cord passage, or two cord passages **304**, to participate in guiding just two of the outrigger cords **20**b, **20**c, since the first outrigger cord **20**a pivots at the second cord management unit **30**b to return to the pivot unit **50**. The next cord management unit **30**d may then define even fewer cord passages, or one cord passage **304** in this case, to participate in guiding the one remaining outrigger cords **20**c, since the first outrigger cord **20**b pivots at the third cord management unit **30**c to return to the pivot unit **50**.

In certain alternate embodiments, of course, the number of cord management units **30**, as well as the arrangement and extent of cord passages defined by respective cord management units **30**, may be varied to suit the particular requirements of the intended applications. While not the most efficient, for example, each outrigger cord **20** may be looped about the pivot unit **50** and a set of cord management units **30** whose cord passages pass that outrigger cord **20** only, to the exclusion of the other outrigger cords **20**. Each cord management unit might then need to define but one cord passage, but measures would be required to ensure that the cord passages of one cord management unit set (for a given cord **20**) are maintained in sufficiently transversely offset manner from the cord passages defined by an adjacent set of such units (for another cord **20**) to avoid interfering contact.

In certain other alternate embodiments, one or more of the cord management units **30** may be of modular configuration to facilitate flexible adaptation to different applications. For example, individual pulley member modules **300** may be disposed in replaceable manner within the housing **306** of a cord management unit **30**, such that numbers and even the precise positions of the individual pulley or other members **300** within the unit **30** may be adjustably varied to suit different needs. Suitable measures would then be employed to enable such individual replacement of a pulley member module **30**, or its re-positioning, within the housing **306**.

In preferred embodiments, the pulley members **300** are coaxially aligned, sharing the same shaft. The outrigger cords **20** are secured in the cord passages **304** by a bridge member **302**. Preferably, the bridge member **302** is reconfigurably coupled to a housing **306** structure to contain the plurality of outrigger cords **20** in one position and allow their removal in another. The housing **306** is suitably formed to provide structural support and containment for the pulley members **300** and the outrigger cords **20**. In the embodiment of FIG. **3**, the bridge member **302** is displaceable relative to the pulley members **300** about a hinged coupling between the first and second positions. The first and second positions represent open and closed positions respectively.

In this embodiment, the housing **306** is coupled to the outrigger structure **10** by a coupling member **309** that is secured by a securing member **311**. The coupling member **309** may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member **309** serve to secure the housing **306** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

The plurality of cord management units **30** are longitudinally spaced along the outrigger structure **10** and their housings **306** releasably fastened by coupling member **309** that is secured by a securing member **311**. The coupling member **309** may be a bolt, snap, strap, fire tie, cable, or other such suitable fastening measures known in the art. The coupling member **309** serve to secure the housing **306** to the outrigger structure **10** to prevent the cord management unit **30** from being unintentionally displaced relative to the outrigger structure **10**.

In certain alternate embodiments, such as depicted in FIG. **4**, the cord management unit **30** may include a spool-like structure that is integrally formed with a plurality of grooves **310** for receiving respective outrigger cords **20**. The cord passages **304** defined within the grooves **310** may be formed of materials with a very low friction coefficient so as to allow individual outrigger cords **20** to smoothly glide along them when displaced. Among other things, the low friction material making up the cord passage **304** in this embodiment would obviate the need for independent pulley members **300** as depicted in FIG. **3**. However, this embodiment has the drawback of generating more friction between the outrigger cords **20** and the respective receiving grooves **310**.

US 11,589,566 B1

11

FIG. **5** depicts another alternate embodiment of cord management unit **30**. In this embodiment, the independently displaceable pulley members **300** define cord passages **304** that are laterally offset one from the other to respectively guide outrigger cords **20** to maintain independent longitudinal displacement relative to the outrigger structure. The independent pulley members **300** are respectively coupled to individual shafts which allow independent rotation of each pulley member **300**. Each bridge member **302** is provided as shown to guard against unwanted release of a cord **20** from its pulley member **300**, and thereby retain the outrigger cords **20** operably engaged with the pulley members **300**.

With respect to FIG. **6**, there is shown an alternate embodiment of clamp member **308**. In this embodiment, the clamp member **308** is made up of two separate pieces contoured to conform and easily fasten to the given outrigger structure **10**. The clamp member **308** may be releasably fastened by clamping the separate pieces about the outrigger structure **10** and securing the same with a fastener. The fastener may be a bolt, snap, strap, fire tie, or any other suitable means for fastening the collar-like clamp member **308** pieces to the outrigger structure **10**.

The clamping/fastening measures shown in the illustrated embodiments enable each cord management unit **30** to be retrofitted to existing outrigger structures **10**. The clamp member **308** may be sleeved onto the outrigger structure **10** or releasably fastened by a suitable fastener. Alternatively, where requirements permit, one or more cord management units **30** may also be formed as a fixed or integral part of an outrigger structure **10** itself.

The application of the cord management system **1** of the present inventions is not limited necessarily to fishing. Its use is relevant in any application that requires an outrigger structure, on or off water, where effective management of outrigger cords **20** is necessary to realize the benefits of the structure. For example, system **1** may be employed to set and deploy traps, set and service instrument buoys, or otherwise facilitate the outrigger-aided use and deployment of various other such articles.

The illustrated embodiments implement a method for managing the outrigger cords which generally includes the steps of: (1) establishing a plurality of outrigger cords **20**, (2) establishing a plurality of cord management positions, (3) defining at each cord management position a plurality of transversely offset cord passages **304**, (4) arranging the cord management positions, and (5) establishing a plurality of retention devices **40**. The cord management positions are established longitudinally spaced one from the other along the outrigger structure **10**. A plurality of transversely offset cord passages **304** are defined at certain of the cord management positions to respectively guide predetermined ones of the outrigger cords **20** to maintain independent longitudinal displacement relative to the outrigger structure **10**. The cord management positions **304** are arranged to define along at least a portion of the outrigger structure **10** a progressively decreasing number of cord passages **304**. The retention devices **40** are thereby established to each define a retention point **400** for advancing a line longitudinally along the outrigger structure **10** responsive to a displacement of the outrigger cord **20**.

Although this invention has been described in connection with specific forms and embodiments thereof, it will be appreciated that various modifications other than those discussed above may be resorted to without departing from the spirit or scope of the invention as defined in the appended claims. For example, functionally equivalent elements may be substituted for those specifically shown and described,

12

certain features may be used independently of other features, and in certain cases, particular locations of the elements as well as particular method steps may be reversed or interposed, all without departing from the spirit or scope of the invention as defined in the appended claims.

What is claimed is:

1. An outrigger cord management apparatus for guiding a plurality of outrigger cords along a longitudinally extended outrigger structure of a surface vessel, the outrigger cords each having coupled thereto at least one retention device, each of said at least one retention device defining a retention point for a line advanced along the outrigger structure responsive to displacement of each of the outrigger cords thereof, the outrigger cord management apparatus comprising:

at least one outrigger structure extending beyond a surface vessel,

a plurality of outrigger cords,

a plurality of cord management units coupled to said at least one outrigger structure in a spaced apart relationship with one another,

a pivot unit attached to said surface vessel in a spaced relationship with said at least one outrigger structure, each of said outrigger cords being operatively coupled between said pivot unit and at least one respective cord management unit of said plurality of cord management units and forming a cord endless loop configuration, and

a plurality of lines, wherein each of said plurality of lines is removably attached, at one end thereof, to the retention point of a respective said at least one retention device coupled to a respective outrigger cord of said plurality of outrigger cords, wherein a position of said each of said plurality of lines is controlled by displacing the retention point of the respective said at least one retention device longitudinally along said at least one outrigger structure responsive to a controlled displacement of said respective outrigger cord, and wherein said at least one respective cord management unit includes:

a housing portion;

a releasable fastening portion coupled to said housing portion, said releasable fastening portion being configured to fixedly mount said housing portion intermediately along said at least one outrigger structure extending beyond a surface vessel to thereby extend said housing portion laterally from said at least one outrigger structure; and

a rotatable portion rotatably coupled to said housing portion, said rotatable portion defining a plurality of cord passages transversely offset one from the other and configured for respectively independently guiding said each of said plurality of outrigger cords longitudinally along said at least one outrigger structure when said housing portion is mounted thereto;

wherein said housing and rotatable portions are configured to maintain the cord passages about a common axis fixed in angle relative to said at least one outrigger structure when said housing portion is mounted thereto by said releasable fastening portion, and

wherein said rotatable portion is configured to enable said plurality of outrigger cords to be independently and simultaneously controlled for displacement without undue interference of any one of said plurality of outrigger cords with other of said plurality of outrigger cords.

**APPX119**

US 11,589,566 B1

**13**

**2**. The apparatus as recited in claim **1**, wherein said rotatable portion is configured with guide grooves forming said cord passages, each said guide groove being configured to receive one of said outrigger cords.

**3**. The apparatus as recited in claim **1**, wherein said rotatable portion includes a plurality of rotatable pulley members respectively defining said cord passages.

**4**. The apparatus as recited in claim **3**, wherein said releasable fastening portion includes a coupling member for securely engaging the said at least one outrigger structure.

**5**. The apparatus as recited in claim **3**, wherein said rotatable pulley members are coaxially disposed along said housing portion.

**6**. The apparatus as recited in claim **1**, wherein said releasable fastening portion further comprising a clamp member securely mounting said housing to the at least one outrigger structure, said clamp member being releasably locked by a coupling member.

**7**. The apparatus as recited in claim **1**, further comprising at least one pivot point established by said pivot unit for each of said outrigger cords to be guided, said at least one pivot point being laterally offset from said housing portion, the cord passages of said rotatable portion and said at least one pivot point being arranged to support said cord endless loop configuration for each of said outrigger cords to be guided.

**8**. The apparatus as recited in claim **1**, wherein said at least one retention device further comprising a clip portion configured for releasably retaining a line of said plurality of lines and a stop cork coupled to each of said outrigger cords and positioned relative to said at least one retention device, said retention device being fixed relative to each of said plurality of outrigger cords.

**9**. An outrigger cord management apparatus for guiding a plurality of outrigger cords along a longitudinally extended outrigger structure of a surface vessel, the outrigger cords each having coupled thereto at least one retention device defining a retention point for a line advanced along the outrigger structure responsive to displacement of each of the outrigger cords thereof, the outrigger cord management apparatus comprising:

at least one outrigger structure extending beyond a surface vessel,

a plurality of outrigger cords,

a plurality of cord management units coupled to said at least one outrigger structure in a spaced apart relationship with one another,

a pivot unit attached to said surface vessel in a spaced relationship with said at least one outrigger structure, each of said outrigger cords being operatively coupled between said pivot unit and said at least one respective cord management unit of said plurality of cord management units and forming a cord endless loop configuration, and

a plurality of lines, wherein each of said plurality of lines is removably attached, at one end thereof, to the retention point of a respective said at least one retention device coupled to a respective outrigger cord of said plurality of outrigger cords, wherein a position of said each of said plurality of lines is controlled by displacing the retention point of the respective said at least one retention device longitudinally along said at least one outrigger structure responsive to a controlled displacement of said respective outrigger cord, and wherein said at least one respective cord management unit includes:

a housing portion;

**14**

a releasable fastening portion coupled to said housing portion, said releasable fastening portion being configured to releasably secure said housing portion intermediately along said at least one outrigger structure extending beyond a surface vessel to thereby extend said housing portion laterally from said at least one outrigger structure; and,

a rotatable portion rotatably coupled to said housing portion, said rotatable portion defining a plurality of cord passages transversely offset one from the other and configured for respectively independently guiding each of said plurality of outrigger cords longitudinally along said at least one outrigger structure when said housing portion is mounted thereto;

wherein said housing and rotatable portions are configured to define on the at least one outrigger structure a cord management assembly releasably maintaining the cord passages about a common axis fixed in angle relative to said at least one outrigger structure when said housing portion is mounted thereto by said releasable fastening portion, and

wherein said rotatable portion is configured to enable said plurality of outrigger cords to be independently and simultaneously controlled for displacement without undue interference of any one of said plurality of outrigger cords with other of said plurality of outrigger cords.

**10**. The apparatus as recited in claim **9**, wherein said rotatable portion is configured with guide grooves forming said cord passages, each said guide groove being configured to receive one of said outrigger cords.

**11**. The apparatus as recited in claim **9**, wherein said rotatable portion includes a plurality of rotatable pulley members respectively defining said cord passages.

**12**. The apparatus as recited in claim **11**, wherein said rotatable pulley members are coaxially disposed along said housing portion.

**13**. The apparatus as recited in claim **9**, wherein said releasable fastening portion includes a coupling member for releasably securing said cord management assembly relative to said at least one outrigger structure.

**14**. An outrigger cord management apparatus for guiding a plurality of outrigger cords along a longitudinally extended outrigger structure of a surface vessel, the outrigger cords each having coupled thereto at least one retention device defining a retention point for a line advanced along the outrigger structure responsive to displacement of each of the outrigger cord thereof, the outrigger cord management apparatus comprising:

at least one outrigger structure extending beyond a surface vessel,

a plurality of outrigger cords,

a plurality of cord management units coupled to said at least one outrigger structure in a spaced apart relationship with one another,

a pivot unit attached to said surface vessel in a spaced relationship with said at least one outrigger structure, each of said outrigger cords being operatively coupled between said pivot unit and at least one respective cord management unit of said plurality of cord management units and forming a cord endless loop configuration, and

a plurality of lines, wherein each of said plurality of lines is removably attached, at one end thereof, to the retention point of a respective said at least one retention device coupled to a respective outrigger cord of said plurality of outrigger cords, wherein a position of said

APPX120

US 11,589,566 B1

15

each of said plurality of lines is controlled by displacing the retention point of the respective at least one retention device longitudinally along said at least one outrigger structure responsive to a controlled displacement of said respective outrigger cord, and wherein said at least one respective cord management unit includes:

a housing portion;

a releasable fastening portion coupled to said housing portion, said releasable fastening portion being configured to releasably lock said housing portion intermediately along said at least one outrigger structure extending beyond a surface vessel to thereby extend said housing portion laterally from said at least one outrigger structure; and

at least one rotatable portion including a plurality of rotatable pulley members, each of said rotatable pulley members being independently rotatably coupled to said housing portion to define a plurality of cord passages transversely offset one from the other, said cord passages being configured for respectively guiding said plurality of outrigger cords longitudinally along said at least one outrigger structure when said housing portion is mounted thereto;

16

wherein said housing and rotatable portions are configured to define on said at least one outrigger structure a cord management assembly maintaining the cord passages about a common axis fixed in angle relative to said at least one outrigger structure when said housing portion is mounted thereto by said releasable fastening portion, and

wherein said rotatable portion is configured to enable said plurality of outrigger cords to be independently and simultaneously controlled for displacement without undue interference of any one of said plurality of outrigger cords with other of said plurality of outrigger cords.

15. The apparatus as recited in claim 14, wherein said rotatable pulley members are configured with guide grooves forming said cord passages, each said groove being configured to receive one of said outrigger cords.

16. The apparatus as recited in claim 15, wherein said rotatable pulley members are coaxially disposed along said housing portion.

17. The apparatus as recited in claim 14, wherein said releasable fastening portion includes a coupling member for releasably locking said cord management assembly relative to said at least one outrigger structure.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2026, I electronically filed the foregoing Opening Appeal Brief for Appellant, GEM Products, LLC, with the Court's CM/ECF filing system, which constitutes service, pursuant to Fed. R. App. P. 25(c) and Fed. Cir. R. 25(a).

Date:  July 13, 2026

*/s/* Joseph R. Lanser
Joseph R. Lanser
TAFT STETTINIUS & HOLLISTER, LLP
111 E. Wacker Dr.
Suite 2600
Chicago, IL 60601
Tel. (312) 527-4000
Fax (312) 527-4011
Email: jlanser@taftlaw.com